UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

ADVOCACY CENTER FOR THE ELDERLY          CIVIL ACTION
AND DISABLED, ET AL.


VERSUS                                   NO. 10-1088


LOUISIANA DEPARTMENT OF HEALTH           SECTION R
AND HOSPITALS, ET AL.


**<u>ORDER AND REASONS</u>**

Before the Court is defendants' Motion to Dismiss (R. Doc. 20).  For the following reasons, the motion is DENIED.


**I. Introduction**

Plaintiffs in this matter are W.B., who brings this suit through his mother and next friend, Charrie Butler, and also the Advocacy Center for the Elderly and Disabled.  The Advocacy Center is part of a network of organizations established under federal law to advocate on behalf of people with disabilities. The federal laws under which the Advocacy Center was established include the Protection and Advocacy for Individuals with Mental Illness Act of 1986 ("PAIMI").[1]

---

[1] 42 U.S.C. § 10801, *et seq.*  The PAIMI Act is also occasionally called the Protection and Advocacy for Mentally Ill Individuals Act and abbreviated as "PAMII."  The two abbreviations refer to the same statute; the Court uses "PAIMI" for simplicity.  In addition to the PAIMI Act, the Advocacy

Defendants are the Louisiana Department of Health and Hospitals, as well as three state officials who are sued in their official capacities.  These officials include Alan Levine, the Secretary of the Department of Health and Hospitals; Mark Anders, the Chief Executive Officer of the Eastern Louisiana Mental Health System, which is a component of the Department of Health and Hospitals; and Michelle Duncan, the Director of the Forensic Services Division of the Eastern Louisiana Mental Health System.

Plaintiffs allege that Louisiana law requires criminal defendants in Louisiana courts who are found incompetent to stand trial to be transferred to the Feliciana Forensic Facility ("Feliciana") if they require inpatient restorative treatment. Plaintiffs further contend that Feliciana is the only inpatient facility where these detainees can receive adequate mental-health treatment.  But Feliciana is full.  It can accept no more patients, and under Louisiana law it must reject any new patients once it has reached full capacity.  The consequence of this, plaintiffs claim, is that incompetent detainees awaiting a vacancy at Feliciana simply languish in parish jails for extended

---

Center alleges that it is a creature of the Protection and Advocacy of Individual Rights Program of the Rehabilitation Act of 1973, 29 U.S.C. § 794e, as well as the Developmental Disabilities Assistance and Bill of Rights Act of 2000, 42 U.S.C. § 15041, *et seq.*

periods of time without having been convicted of any crime.[2]
Plaintiffs claim that, as of October of 2009, 104 Incompetent
Detainees had been held for an extended period of time despite
having been found incompetent to stand trial and committed, but
not yet transferred, to Feliciana.  Nearly half had waited over
180 days, they claim, and nearly 20 had been waiting more than a
year.  Some had been waiting for more than two years.  Plaintiffs
additionally claim that, as of January 8, 2010, 28 Detainees were
awaiting transfer from Orleans Parish Prison.  They assert that
the average wait time for these Detainees was 161 days, and that
some had been waiting for more than 250 days, while others more
than 440.

　　　Plaintiffs brought this suit in April of 2010 seeking
declaratory and injunctive relief.  Defendants now move to
dismiss this suit.  The Court rules as follows.


## II. Discussion

　　　Defendants seek dismissal of this action on several grounds.
First, they contend that this suit is barred by the Eleventh
Amendment.  Second, they argue that neither plaintiff may
maintain this suit.  Third, they argue that plaintiffs' complaint

---

[2] The terms "Incompetent Detainees" or "Detainees" in the
capitalized form, unless otherwise indicated, refers to these
inmates who have been found incompetent to stand trial by a
Louisiana court and ordered to be transferred to Feliciana, but
have not yet been transferred.

is insufficient.  Finally, they assert that venue is not proper
in the Eastern District of Louisiana.


*A. Legal Standard*

     Defendants assert that this case must be dismissed under
Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil
Procedure.  Rule 12(b)(1) requires dismissal of an action if the
court lacks jurisdiction over the subject matter of the
plaintiff's claim.  Motions submitted under that rule allow a
party to challenge the court's subject-matter jurisdiction based
upon the allegations on the face of the complaint.[3]  In ruling on
a Rule 12(b)(1) motion to dismiss, the court may rely on (1) the
complaint alone, presuming the allegations to be true, (2) the
complaint supplemented by undisputed facts, or (3) the complaint
supplemented by undisputed facts and by the court's resolution of
disputed facts.[4]  The plaintiff bears the burden of demonstrating
that subject-matter jurisdiction exists.[5]  When examining a
factual challenge to subject-matter jurisdiction that does not

---

     [3] *Barrera-Montenegro v. United States*, 74 F.3d 657, 659 (5th
Cir. 1996); *see also Lopez v. City of Dallas, Tex.*, No. 03-2223,
2006 WL 1450420, at *2 (N.D. Tex. May 24, 2006).

     [4] *Den Norske Stats Oljeselskap As v. HeereMac Vof*, 241 F.3d
420, 424 (5th Cir. 2001); *see also Barrera-Montenegro,* 74 F.3d at
659.

     [5] *See Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir.
1981).

implicate the merits of plaintiff's cause of action, the district court has substantial authority "to weigh the evidence and satisfy itself as to the existence of its power to hear the case."[6] Accordingly, the Court may consider matters outside the pleadings, such as testimony and affidavits.[7] A court's dismissal of a case for lack of subject-matter jurisdiction is not a decision on the merits, and the dismissal does not necessarily prevent the plaintiff from pursuing the claim in another forum.[8]

To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead enough facts "to state a claim to relief that is plausible on its face."[9] A claim is facially plausible when the plaintiff pleads facts that allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged."[10] A court must accept all well-pleaded facts as true and must draw all reasonable inferences in favor of

---

[6] *Garcia v. Copenhaver*, *Bell & Assocs.*, 104 F.3d 1256, 1261 (11th Cir. 1997); *see also Clark v. Tarrant County*, 798 F.2d 736, 741 (5th Cir. 1986).

[7] *See Garcia*, 104 F.3d at 1261.

[8] *See Hitt v. City of Pasadena*, 561 F.2d 606, 608 (5th Cir. 1977).

[9] *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547 (2007)).

[10] *Iqbal,* 129 S.Ct. at 1940.

the plaintiff.[11]  But the Court is not bound to accept as true legal conclusions couched as factual allegations.[12]

A legally sufficient complaint must establish more than a "sheer possibility" that plaintiff's claim is true.[13]  It need not contain detailed factual allegations, but it must go beyond labels, legal conclusions, or formulaic recitations of the elements of a cause of action.[14]  In other words, the face of the complaint must contain enough factual matter to raise a reasonable expectation that discovery will reveal evidence of each element of the plaintiff's claim.[15]  If there are insufficient factual allegations to raise a right to relief above the speculative level, or if it is apparent from the face of the complaint that there is an insuperable bar to relief, the claim must be dismissed.[16]

---

[11] *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 239 (5th Cir. 2009); *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996).

[12] *Iqbal*, 129 S.Ct. at 1949.

[13] *Id.*

[14] *Id.*

[15] *Lormand*, 565 F.3d at 256.

[16] *Twombly*, 550 U.S. at 555; *Jones v. Bock*, 549 U.S. 199, 215 (2007); *Carbe v. Lappin*, 492 F.3d 325, 328 & n.9 (5th Cir. 2007).

*B. Sovereign Immunity*

The Court addresses defendants' subject-matter-jurisdiction challenges first.[17]  Defendants first assert that the doctrine of sovereign immunity bars all claims asserted against the Louisiana Department of Health and Hospitals and all claims asserted against Department employees acting in their official capacities.[18]

Sovereign immunity prevents citizens from bringing suit in federal court against states of the United States that have not consented to the suit.[19]  This rule applies to state agencies such as the Louisiana Department of Health and Hospitals.[20]  In

---

[17] *See Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).

[18] Defendants bring this challenge to the Court's subject-matter jurisdiction under Rule 12(b)(1).  A suit that is barred by sovereign immunity is not precisely the same as one that is barred for want of subject-matter jurisdiction; unlike subject-matter jurisdiction, sovereign immunity is waivable.  *See Wis. Dept. of Corrections v. Schacht*, 524 U.S. 381, 394 (1998) (Kennedy, J., concurring).  Rule 12(b)(1) is still the appropriate rule for such a challenge.  *See, e.g., Warnock v. Pecos County, Tex*., 88 F.3d 341, 343 (5th Cir. 1996) ("Because sovereign immunity deprives the court of jurisdiction, the claims barred by sovereign immunity can be dismissed only under Rule 12(b)(1) and not with prejudice.").

[19] U.S. CONST. amend. XI; *Pennhurst State Sch. & Hosp.*, 465 U.S. 89, 97-103; *Hans v. Louisiana*, 134 U.S. 1, 21 (1890).

[20] The Fifth Circuit has determined that the Department of Health and Hospitals's predecessor was an alter ego of the State of Louisiana, and was thus entitled to sovereign immunity.  *See Darlak v. Bobear*, 814 F.2d 1055, 1060 (5th Cir. 1987).  Courts have made the same holding with respect to the current Department of Health and Hospitals.  *See, e.g., Johnson v. Easley*, No. 01-

7

addition, lawsuits against state officials in their official capacities are typically suits against the state itself and cannot be brought absent a sovereign-immunity exception.[21]

Plaintiffs, in response, voluntarily dismiss the Department of Health and Hospitals as a defendant.[22] They then suggest that this suit does fall into an exception to sovereign immunity, specifically the exception that was articulated by the Supreme Court in *Ex Parte Young*.[23] This exception holds that a suit is not barred by sovereign immunity when it is brought against state officials to enjoin the enforcement of an allegedly unconstitutional law.[24] This exception may be maintained because the enforcement of an unconstitutional law cannot be an official act on behalf of the state, "because the state *cannot* confer authority on its officers to violate the Constitution or federal law."[25] Accordingly, "[o]nly for the purposes of the Eleventh

---

3325, 2003 WL 203103, at *2 (E.D. La. Jan. 29, 2003) ("the Louisiana Department of Health and Hospitals is an alter ego of the state and is entitled to Eleventh Amendment immunity").

[21] *See Kentucky v. Graham*, 473 U.S. 159, 165 (1985).

[22] R. Doc. 31 at 5 n.2.

[23] 209 U.S. 123 (1908).

[24] *See id.* at 155-56; *Meza v. Livingston*, 607 F.3d 392, 411-12 (5th Cir. 2010); *Am. Bank & Trust Co. of Opelousas v. Dent*, 982 F.2d 917, 920 (5th Cir. 1993).

[25] *Dent*, 982 F.2d at 920-21 (emphasis in original); *Ex Parte Young*, 209 U.S. at 159.

Amendment are official-capacity actions for prospective relief not treated as actions against the state."[26]  The exception applies only to suits that seek prospective relief that is rooted in federal authority; it does not apply to actions that seek monetary relief for past harms or that pursue injunctive relief on the basis of state law.[27]  A court need not fully examine the merits of a plaintiff's claim before it determines that the *Ex Parte Young* exception applies.  Instead, "a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective."[28]  Typically, *Ex Parte Young* is adequately invoked when a plaintiff alleges an ongoing violation of federal law.[29]

In their motion to dismiss, defendants assert generally that *Ex Parte Young* does not apply to this case.  They do not

---

[26] *McCarthy v. Hawkins*, 381 F.3d 407, 414 (5th Cir. 2004) (quoting *Graham*, 473 U.S. at 167 n.14) (ellipsis and internal quotation marks omitted).

[27] *See Edelman v. Jordan*, 415 U.S. 651, 668-69, 677 (1974); *Pennhurst*, 465 U.S. at 106.

[28] *See Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (quoting *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 296 (1997) (O'Connor, J., concurring in part and concurring in the judgment)) (internal quotation marks and brackets omitted).

[29] *See Coeur d'Alene Tribe*, 521 U.S. at 281 ("An allegation of an ongoing violation of federal law where the requested relief is prospective is ordinarily sufficient to invoke the *Young* fiction."); *see also McCarthy*, 381 F.3d at 415-16.

specifically articulate why this is correct.[30]  The Court finds
that there is little question that this case falls into the *Ex
Parte Young* exception.  First, plaintiffs allege an ongoing
violation of federal constitutional law — specifically, the
Fourteenth Amendment.  They plead very clearly that they seek to
vindicate the Fourteenth Amendment rights of the Incompetent
Detainees who are awaiting transfer to Feliciana.[31]  Furthermore,
the relief they seek is accurately characterized as prospective:
they seek a declaration that the relevant laws are
unconstitutional both facially and as applied, and they seek
preliminary and permanent injunctive relief requiring defendants
to accept custody of the Incompetent Detainees and provide them
with proper restorative treatment.[32]  This is a sufficient
showing under the Supreme Court's case law to invoke the *Ex Parte
Young* doctrine.  The Seventh Circuit has recently reached a
similar conclusion, finding that the *Ex Parte Young* exception
covered an injunctive suit filed by a PAIMI organization to gain
access to the records of mentally ill patients in state

---

[30] R. Doc. 20 at 6.  Defendants note that a lack of time
prevented them from addressing this issue adequately.  These
motions were placed on an expedited briefing schedule with the
consent of all the parties.  R. Doc. 12.  Defendants' later
filings, however, have not presented any reason why the *Ex Parte
Young* exception would not apply.

[31] R. Doc. 1 at 15-16.

[32] *Id.* at 2, 17.

hospitals.[33]  Defendants' sovereign-immunity challenge therefore
fails.


*C. Justiciability: Advocacy Center*

Defendants next challenge the Advocacy Center's ability to
bring this suit.  Specifically, they contend that the Center
lacks standing.

Standing is "an essential and unchanging part of the case-
or-controversy requirement of Article III."[34]  A plaintiff
bringing a lawsuit bears the burden of demonstrating three
elements of standing.  First, the plaintiff must have an "injury
in fact," which is an invasion of a legally protected interest
that is "concrete and particularized" and "actual or imminent."[35]
A conjectural or hypothetical injury will not suffice.  Second,
the plaintiff must establish a causal connection between the
injury and a defendant's conduct.  "[T]he injury has to be fairly

_____

[33] *Ind. Protection & Advocacy Servs. v. Ind. Family & Social
Servs. Admin.*, 603 F.3d 365, 371-74 (7th Cir. 2010) ("In short,
[plaintiffs'] lawsuit is a classic application of *Ex Parte Young*.
It asks a federal court to order state officials to modify their
conduct to comply with federal law."); *see also Mo. Protection &
Advocacy Servs., Inc. v. Carnahan*, 499 F.3d 803, 807 (8th Cir.
2007) (holding that by similar advocacy organization suit brought
to enjoin enforcement of Missouri voting laws fell into the *Ex
Parte Young* exception).

[34] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992);
*see also Cadle Co. v. Neubauer*, 562 F.3d 369, 371 (5th Cir.
2009).

[35] *Lujan*, 504 U.S. at 560.

traceable to the challenged action of the defendant and not the result of the independent action of some third party not before the court."[36]   Third and finally, the plaintiff must demonstrate a likelihood — not merely a speculation or conjecture — that the injury will be redressed if it prevails in the action.[37]

With this in mind, defendants claim that the Advocacy Center lacks the necessary standing to bring this suit.  They note that the Center has not suffered anything like the injury described in the complaint, and they further suggest that the Center is not empowered to "stand in the shoes" of the Incompetent Detainees who are awaiting transfer to Feliciana.

It is obviously true that the Advocacy Center, as an entity, has not suffered the injury described in the complaint. Plaintiffs, however, forward two arguments as to why the Center has standing to pursue this suit.  They first argue that it has standing under the plain language of the PAIMI Act.  They also suggest that the center has "associational" standing.

In enacting the PAIMI Act, Congress determined that "individuals with mental illness are vulnerable to abuse and serious injury."[38]   To ensure that the rights of these

---

[36] *Id.* (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976)) (internal punctuation omitted).

[37] *Id.* at 561.

[38] 42 U.S.C. § 10801 (a)(1).

12

individuals are safeguarded, Congress endeavored "to assist States to establish and operate a protection and advocacy system for individuals with mental illness."[39]  The Secretary of Health and Human Services makes allotments under the Act to help establish and administer these systems.[40]  The systems also have the authority to "investigate incidents of abuse and neglect of individuals with mental illness if the incidents are reported to the system or if there is probable cause to believe that the incidents occurred," and they are similarly authorized to "pursue administrative, legal, and other appropriate remedies to ensure the protection of individuals with mental illness who are receiving care or treatment in the State."[41]  Based on these provisions, plaintiffs argue that they have standing to pursue legal remedies for the protection of mentally ill individuals.

While the PAIMI Act might be relevant to the standing determination, it cannot be doubted that it is an act of Congress, whereas standing is a constitutional requirement.  The language of the PAIMI Act cannot, without more, supply standing if the Advocacy Center lacks standing under the constitutional

---

[39] *Id.* § 10801(b)(1)-(2).

[40] *Id.* § 10803.

[41] *Id.* § 10805(a)(1).

standards.[42]  Plaintiffs' argument that the language of PAIMI

confers standing on the Advocacy Center therefore fails.[43]

The Court thus turns to plaintiffs' second argument: that

the Advocacy Center has associational standing to bring this

suit.  It is clear that an organization that has itself suffered

no injury may bring suit on behalf of its members who have.[44]

The Supreme Court explained the requirements for associational

standing in *Hunt v. Washington State Apple Advertising*

*Commission*:

> [A]n association has standing to bring suit on behalf
> of its members when: (a) its members would otherwise
> have standing to sue in their own right; (b) the
> interests it seeks to protect are germane to the
> organization's purpose; and (c) neither the claim
> asserted nor the relief requested requires the
> participation of individual members in the lawsuit.[45]

---

[42] *See Or. Advocacy Center v. Mink*, 322 F.3d 1101, 1109 (9th
Cir. 2003) (holding that the PAIMI Act did not itself confer
standing on a PAIMI organization).

[43] *See also Ass'n for Retarded Citizens of Dallas v. Dallas
County Mental Health & Mental Retardation Cent. Bd. of Trustees*,
19 F.3d 241, 244 (5th Cir. 1994) ("The mere fact that an
organization redirects some of its resources to litigation and
legal counseling in response to actions or inactions of another
party is insufficient to impart standing upon the
organization. . . . Furthermore, that [the organization] is a
federally funded program established in part to provide disabled
individuals with legal representation does not enhance its
assertion of organizational standing.").

[44] *Warth v. Seldin*, 422 U.S. 490, 511 (1975) ("Even in the
absence of injury to itself, an association may have standing
solely as the representative of its members.").

[45] 432 U.S. 333, 343 (1977).

Certain of these requirements do not appear to be contested here. Defendants, for example, do not suggest that the interests that plaintiffs seek to protect are not germane to the Advocacy Center's purpose.  In addition, there is no suggestion that the Incompetent Detainees would categorically lack standing if suing in their own right.  Disagreement arises, however, over the issue of whether the Incompetent Detainees are "members" of the Advocacy Center.[46]

As a literal matter, they are not, as plaintiffs have made no showing that the Incompetent Detainees are formally on the membership rolls of the Advocacy Center.  But this level of formality it not required; associational standing may be asserted by organizations that do not have official members, as long as the beneficiaries of the suit have "indicia of membership" in the organization.[47]  In *Hunt*, for example, the Washington State Apple Advertising Commission brought suit on behalf of apple growers and dealers in Washington state.  The Commission, however, had

---

[46] The Supreme Court has determined that the third requirement is of prudential and not constitutional magnitude, and is thus subject to abrogation by Congress.  *See United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 555, 558 (1996).  Several courts have determined that Congress abrogated the requirement for suits like the present one.  *See, e.g., Mink*, 322 F.3d at 1113; *Disability Advocates v. Paterson*, 598 F. Supp. 2d 289, 308 n.22 (E.D.N.Y. 2009).

[47] *Hunt*, 432 U.S. at 344.

"no members at all."[48]  The Court held that it nevertheless could maintain its suit because the apple growers and dealers had all the indicia of membership.  "They alone elect the members of the Commission; they alone may serve on the commission; they alone finance its activities, including the costs of this lawsuit, through assessments levied upon them."[49]  The Court found that the Commission properly represented the views and interests of its "constituents," and it allowed the suit to go forward.

Accordingly, plaintiffs argue that the Incompetent Detainees are constituents of the Advocacy Center such that the Center may claim standing to bring this suit.  They rely on two appellate cases to support their arguments.  The Eleventh Circuit faced this question in the 1999 case of *Doe v. Stincer*.[50]  There, a PAIMI organization sued a state official and doctors at a state hospital, alleging that the failure of these doctors to provide a patient with her medical records violated the Americans with Disabilities Act.  The organization also challenged the enforcement of a Florida statute.  The defendants mounted a standing challenge, and the organization asserted that it had associational standing under *Hunt*.  The court found that the PAIMI organization was properly analogous to the Washington State

---

[48] *Id.* at 342.

[49] *Id.* at 344-45.

[50] 175 F.3d 879 (11th Cir. 1999).

Apple Advertising Commission in *Hunt*.  It explained that PAIMI organizations act on behalf of the particular segment of the community — that is, individuals with mental illnesses — and that they performed the functions of traditional membership organizations.[51]  Furthermore, it held that mentally ill individuals display indicia of membership in such organizations. The governing boards and advisory councils of PAIMI organizations are required to include individuals who are either undergoing or have undergone mental-health treatment, or the families of such individuals.[52]  Accordingly, the Eleventh Circuit held, the PAIMI organization was sufficiently like a traditional membership association and its constituents would qualify as "members" under the first prong of the *Hunt* test.[53]

Similarly, in the 2003 case of *Oregon Advocacy Center v. Mink*, the Ninth Circuit found associational standing in a suit highly similar to the one before the Court: a PAIMI organization brought suit alleging that state-court defendants who had been found incompetent to stand trial were subject to delays in being

---

[51] *Id.* at 886.

[52] *Id.* (quoting 42 U.S.C. § 10805(a)(6)(B)-(C), (c)(1)(B)).

[53] The Eleventh Circuit ultimately held that, although the PAIMI organization's constituents were members for the purposes of the first *Hunt* factor, the organization had not established that one of these constituents had standing to sue in his own right.  *Id.* at 886-88.  Here, defendants do not challenge that the Incompetent Detainees have standing to sue in their own right.

17

transferred to the state mental hospital, which had refused to
accept them timely.  The organization claimed that these delays
violated the Fourteenth Amendment rights of these incompetent
detainees.  As in *Stincer*, the state asserted that the
organization lacked standing, and the plaintiffs asserted
associational standing under *Hunt*.  The Ninth Circuit described
as "overly formalistic" the state's argument that people with
mental illnesses were not members because they did not actually
control the organization's activities and finances.[54]  Instead,
the court found that "[g]iven [the organization's] statutory
mission and focus under [PAIMI], its consitutents — in this case,
the mentally incapacitated defendants — are the functional
equivalent of members for the purposes of associational
standing."[55]  Although the court stated that the PAIMI
organization's constituents did not bear all the indicia of
membership that the *Hunt* beneficiaries had, the "constituents do
possess many indicia of membership — enough to satisfy the
purposes that undergird the concept of associational standing:
that the organization is sufficiently identified with and subject
to the influence of those it seeks to represent as to have a

---

[54] *Mink*, 322 F.3d at 1110.

[55] *Id.*

'personal stake in the outcome of the controversy.'"[56]  Finding
that the interests of the representative and the represented were
properly shared, the court found that the first *Hunt* prong was
satisfied, and additionally that the PAIMI organization had
standing to maintain the suit.[57]

A number of district courts have held this way as well.  For
example, in *Laflamme v. New Horizons, Inc.*, the District of
Connecticut heard a suit brought by a PAIMI organization on
behalf of disabled individuals challenging allegedly
discriminatory practices by a state-supported housing facility.[58]
Upon a challenge to the standing of the organization, the court
followed *Mink*, holding that the organization satisfied the *Hunt*
test and could thus bring the suit on behalf of its
constituents.[59]  Similarly, the Northern District of New York in
*Aiken v. Nixon* held that a PAIMI organization could challenge the
search policies of a mental-health center on behalf of its
constituents under *Hunt*.[60]  Numerous other district courts have
determined that PAIMI organizations may claim associational

---

[56] *Id.* at 1111 (quoting *Vill. of Arlington Heights v. Metro.
Housing Dev. Corp.*, 429 U.S. 252, 261 (1977)).

[57] *Id.* at 1112-13.

[58] 605 F. Supp. 2d 378 (D. Conn. 2009).

[59] *Id.* at 395-97.

[60] 236 F. Supp. 2d 211, 224 (N.D.N.Y. 2002).

19

standing on behalf of their constituents.[61]

Defendants counter plaintiffs' arguments with the Fifth Circuit case of *Association for Retarded Citizens of Dallas v. Dallas County Mental Health & Mental Retardation Center Board of Trustees*.[62]  There, a mentally retarded minor with cerebral palsy resided in a facility for children with developmental disabilities.  The Texas Department of Mental Health and Mental Retardation decided to close the facility and move the minor to a group home.  The Department then cancelled the construction of the group home, and the minor was forced to move into a temporary home.  An advocacy group for the protection of the developmentally disabled, among others, brought a Fair Housing Act challenge to the cancellation of the group home's construction and alleged that the move to the temporary home caused irreparable injury to the minor.  The district court dismissed the advocacy group's claims for lack of standing.

The Fifth Circuit affirmed and rejected the advocacy group's

---

[61] *See, e.g., State of Conn. Office of Protection and Advocacy for Persons with Disabilities v. State of Conn.*, ___ F. Supp. 2d ___, 2010 WL 1416146, at *8-12 (D. Conn. 2010); *Disability Advocates v. Paterson*, 598 F. Supp. 2d 289, 308-10 (E.D.N.Y. 2009); *New Jersey Protection & Advocacy v. Davy*, No. 05-1784, 2005 WL 2416962, at *2-3 (D.N.J. Sept. 30, 2005); *Univ. Legal Servs., Inc. v. St. Elizabeths Hospital*, No. 05-0585, 2005 WL 3275915, at *4 & nn.3-4 (D.D.C. July 22, 2005); *Risinger v. Concannon*, 117 F. Supp. 2d 61, 69-71 (D. Me. 2000); *see also Lakey v. Taylor*, 278 S.W.3d 6, 13-15 (Tex. App.-Austin 2008); *but see Carnahan*, 499 F.3d at 809-10.

[62] 19 F.3d 241 (5th Cir. 1994).

arguments for associational standing.  It held that the standing inquiry failed at the first *Hunt* requirement because the mentally retarded minor was not a "member" of the advocacy group, and that "[t]he organization bears no relationship to traditional membership groups because most of its 'clients' — handicapped and disabled people — are unable to participate in and guide the organization's efforts."[63]

This Court, of course, is bound to follow the decisions of the Fifth Circuit.  It finds, however, that the *Retarded Citizens*

---

[63] *Id.* at 214.  The organization in question was an advocacy organization established under a federal statute dedicated to the protection of the developmentally disabled.  The Fifth Circuit's decision makes clear that it examined the 1993 version of the statute applicable to the organization, 42 U.S.C. § 6042 (now codified in relevant part at 42 U.S.C. §§ 15043-44).  *See Retarded Citizens*, 19 F.3d at 244 n.5.  The 1993 version of the statute contained no requirements that the organization's constituents participate in the organization's functions.  The statute required only that, if the organization had a multimember governing board, it should be composed of "members who broadly represent or are knowledgeable about the needs of the individuals served by the system."  42 U.S.C. § 6042(d)(1) (West Supp. 1993). The *Retarded Citizens* holding was thus under this 1993 version of the statute.  The statute was amended in 1994 to obligate such organizations to include "individuals with developmental disabilities who are eligible for services, or have received or are receiving services, or parents, family members, guardians, advocates, or authorized representatives of such individuals" in their advisory councils or governing boards.  *See* Developmental Disabilities Assistance and Bill of Rights Act Amendments of 1994, Pub. L. No. 103-230, § 303, 108 Stat. 284, 314-319 (1994); *see also* 42 U.S.C. § 6042 (West Supp. 1995).  These requirements, enacted later than the statute in *Retarded Citizens*, are similar to the PAIMI provisions that the Court finds relevant to the Advocacy Center's ability to assert associational standing.  The Court is aware of no Fifth Circuit decision interpreting the effect of the post-1994 version of the statute on an organization's ability to assert associational standing.

decision is distinguishable from the case before the Court.  In
that case, the Fifth Circuit explicitly mentioned that the
constituents of the organization were not able to participate in
its activities.  Here, however, the PAIMI organizations are
required by federal statute to give its constituents a central
role in its management and activities.

For example, as the Eleventh Circuit noted in *Stincer*, these
organizations are required to establish an advisory council
"which shall include attorneys, mental health professionals,
individuals from the public who are knowledgeable about mental
illness, a provider of mental health services, individuals who
have received or are receiving mental health services, and family
members of such individuals."[64]  By statute, "at least 60 percent
of the membership of which shall be comprised of individuals who
have received or are receiving mental health services or are
family members of such individuals."[65]  The advisory council must
be chaired by someone who has received or is receiving mental-
health treatment, or by the family member of such a person.[66]

Furthermore, the PAIMI systems are required to have a
"governing authority."  If the governing authority is either a
private non-profit organization with a multimember governing

---

[64] 42 U.S.C. § 10805(a)(6)(B).

[65] *Id.*

[66] *Id.* § 10805(a)(6)(C).

board or a public system with a multi-member governing board, the composition of the board must include "members . . . who broadly represent or are knowledgeable about the needs of the clients served by the system."[67]  This category "shall be construed to include individuals who have received or are receiving mental health services and family members of such individuals."[68]  For PAIMI systems in which the governing authority is a private non-profit group, the governing authority must consist of "members who broadly represent or are knowledgeable about the needs of the clients served by the system including the chairperson of the advisory council of such system."[69]

In *Retarded Citizens*, the Fifth Circuit found that the non-PAIMI organization lacked the requisite nexus between its constituents and the management of the organization's activities. But here, unlike in *Retarded Citizens*, the Advocacy Center is required by federal law to include its constituents in its activities.[70]  The constituents of the Center do play a significant role in the organization's activities.  The Court therefore holds that the scenario before it is not controlled by

---

[67] *Id.* § 10805(c)(1)(B)(i).

[68] *Id.* § 10805(c)(1)(B).

[69] *Id.* § 10805(c)(1)(B)(ii).

[70] Again, the Fifth Circuit's *Retarded Citizens* decision invoked a version of a statute that did not require constituent participation in the organization's activities.

*Retarded Citizens* because a PAIMI organization, unlike the organization in that case, is statutorily obligated to have its constituents "participate in and guide the organization's efforts."[71]   As the *Mink* and *Stincer* courts found, the constituents of PAIMI organizations bear many of the traditional indicia of membership in those organizations, and they play a critical role in the organizations' control, direction, and activities.   Furthermore, there is very little question that an entity like the Advocacy Center is allied with and representative of its constituents and will advocate on their behalf.   The Court thus determines that the Advocacy Center is sufficiently analogous to the Washington State Apple Advertising Commission that the Supreme Court determined to have associational standing in *Hunt*.   Defendants' standing challenge to the Advocacy Center is rejected.

## D. Justiciability: W.B. and Butler

Defendants also contend that Butler and W.B. cannot bring this suit.   They first suggest that Butler lacks standing because she has not demonstrated that she is, in fact, W.B.'s mother and is capable of acting on his behalf.   This argument is meritless.

---

[71] *See also Laflamme*, 605 F. Supp. 2d at 397 (distinguishing *Retarded Citizens* because the constituents in that case, unlike with PAIMI organizations, did not participate in the organization's efforts).

24

At the motion-to-dismiss stage, the allegations in the
plaintiffs' complaint are taken as true.[72]  Plaintiffs' complaint
clearly pleads that Butler is W.B.'s mother.[73]  Defendants'
standing challenge is measured against the presumptively accurate
allegations in the complaint.  The Supreme Court, in the habeas
context, has found that an individual may pursue an action as a
next friend if that person provides a sufficient explanation why
the real party in interest cannot appear and if that person is
truly dedicated to the best interests of the real party in
interest.[74]  Here, W.B. has been determined incompetent to stand
trial, and defendants have marshaled nothing other than
speculation to suggest that the mother of an incompetent criminal

_____

[72] *Den Norske Stats Oljeselskap As*, 241 F.3d at 424 (on
challenge under Rule 12(b)(1), "we must accept all factual
allegations in the plaintiff's complaint as true").  A court may
look at additional facts in the record upon a Rule 12(b)(1)
challenge, but neither party has presented evidence on this
issue.  *Id.  See also Lujan*, 504 U.S. at 561 (elements of
standing "are not mere pleading requirements but [are] rather an
indispensable part of the plaintiff's case, [and thus] each
element must be supported in the same way as any other matter on
which the plaintiff bears the burden of proof, *i.e.*, with the
manner and degree of evidence required at the successive stages
of the litigation").

[73] R. Doc. 1 at 4.  In addition, Butler testified during the
preliminary-injunction hearing that she is W.B.'s mother.
Prelim. Inj. Hr'g Trans. at 7-8, June 22, 2010.  Defendants did
not challenge this.

[74] *Whitmore v. Arkansas*, 495 U.S. 149, 163-64 (1990); *see
also* FED. R. CIV. P. 17(c)(1) (minor or incompetent person may be
represented by a general guardian, a committee, a conservator, or
a like fiduciary).

defendant might not act in her son's best interest.  This
argument is thus unsuccessful.

Defendants next argue that W.B.'s case has been mooted
because, since the filing of the complaint, he was transferred by
a court order to a state hospital.  He was transferred, according
to defendants, because he is a juvenile, and Feliciana does not
accept juveniles.  The transfer took place on the very day that
defendants filed their motion to dismiss.  They now contend that
W.B. is no longer one of the Detainees who is awaiting transfer
to Feliciana, and that his case has thus become moot.
Accordingly, they argue, neither he nor Butler may bring this
lawsuit.

This argument fails.  "It is well settled that, in a suit
for injunctive relief, the voluntary cessation of the allegedly
illegal conduct does not moot the controversy arising from the
challenged activity."[75]  The reasoning underlying this rule is
manifest: a contrary rule would allow a defendant to refrain
temporarily from the challenged conduct, thus defeating suit, and
then resume its "old ways" once the plaintiff's lawsuit is a

---

[75] *Donovan v. Cunningham*, 716 F.2d 1455, 1461 (5th Cir.
1983); *see also Friends of the Earth, Inc. v. Laidlaw Envtl.
Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000) (quoting *City of
Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982))
(internal quotation marks omitted).

26

thing of the past.[76]  This rule is not absolute; even if a defendant voluntarily ceases the conduct, "[a] case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not be reasonably expected to recur."[77]  Here, the defendants, as the parties asserting mootness, bear the "heavy" and "formidable" burden of making this showing.[78]  A defendant's "bare assurance" that it will not engage in the conduct again is insufficient to meet its burden.[79]

Defendants have not carried this burden.  Their counsel admitted at oral argument that W.B. was transferred upon her motion, and only after she learned that he was actually a juvenile.[80]  This asserted restriction on juvenile admissions to Feliciana appears to be a matter of custom and not a matter of law.[81]  Although special provisions of Louisiana law apply to

---

[76] *Friends of the Earth*, 528 U.S. at 189; *City of Mesquite*, 455 U.S. at 289 n.10; *Donovan*, 716 F.2d at 1461.

[77] *Friends of the Earth*, 528 U.S. at 189-90 (quoting *United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203 (1968)).

[78] *Id.*

[79] *Donovan*, 716 F.2d at 1461.

[80] Prelim. Inj. Hr'g Trans. at 6 (statement of Adrienne Bordelon).

[81] *Id.* at 100-101 (statement of Michelle Duncan, director of Community Forensic Services at the Eastern Louisiana Mental Health System, that there is no legal provision preventing Feliciana from accepting juveniles); *id.* at 184 (statement of Dr. John Thompson, clinical director of Feliciana, suggesting that

juveniles, they may still be committed to Feliciana under the Louisiana Code of Criminal Procedure.[82]  In addition, W.B. will turn eighteen in a matter of months, and at this point he will be transferred out of the hospital unit where he is currently being held.[83]

Furthermore, W.B. is still in the system of the Department of Health and Hospitals, he has not been transferred to Feliciana, and there is little to no assurance that he will not be transferred immediately back to parish prison upon the termination of this lawsuit or when he turns eighteen.  When determining when a claim is moot because the unlawful conduct is unlikely to recur, courts are cognizant that individuals who have a history of institutional placements for mental illness are often likely to be reinstitutionalized.[84]  The evidence indicates

_____

the rule is a matter of custom).

[82] *See* LA. CODE CRIM. PROC. art. 644.1(B) (juvenile defendants transferred to criminal court are subject to LA. CODE CRIM. PROC. art. 648, which provides for transfer to Feliciana); *see also* LA. CHILD. CODE. art. 837 (allowing commitment of child to Department of Health and Hospitals if a court finds the child to lack the mental capacity to proceed to trial).

[83] Defendants' Hr'g Ex. 1 (Central Louisiana State Hospital record noting that W.B. was born in September of 1992); Prelim. Inj. Hr'g Trans. at 96 (statement of Christopher Arnold, admissions tech at Central Louisiana State Hospital, that once minors in W.B.'s unit turn eighteen, they are transferred out of the juvenile unit).

[84] *See Vitek v. Jones*, 445 U.S. 480, 486-87 (1980); *see also Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 594 n.6 (1999); *Lynch v. Baxley*, 744 F.2d 1452, 1456-57 (11th Cir. 1984).

that W.B. is mentally ill and institutionalized, he has not been transferred to Feliciana, and, although defendants have voluntarily ceased their challenged conduct and have transferred W.B. from parish jail, the Court is in no way convinced that his injury will not be repeated.

In a related analysis, courts recognize an exception to the mootness doctrine, which holds that a claim is not moot if the challenged conduct is capable of repetition but evades review.[85] This case satisfies that exception.

First, there is little question that the complained-of activity in this matter has the tendency to evade review. Pretrial detention is by nature transitory.  Even here, where the Incompetent Detainees are not awaiting an actual trial, they are eventually transferred to Feliciana in, according to the complaint, an average of 161 days.[86]  Plaintiffs admit that the injury they seek to redress is transitory.  They at no point allege that Detainees are kept in parish prisons indefinitely. While it is not inconceivable that a lawsuit could commence and conclude within the times listed in the complaint, it is certainly unlikely.  The possibility of securing an appellate decision is exceedingly remote.  And the very notion assumes that

---

[85] *See Libertarian Party v. Dardenne*, 595 F.3d 215, 217 (5th Cir. 2010).

[86] R. Doc. 1 at 8.

the Detainee would have sufficient information to bring the claim at the commencement of his detention, which is even less likely.

Because the injury is capable of repetition, the second half of the exception is met as well.  Assuming — but not, for the purposes of the mootness discussion, deciding that W.B.'s injury has temporarily ceased — the Court finds that he has shown a "reasonable expectation" that he will be subject to the same governmental action again.[87]  As explained above, W.B. was treated as if he were a legal adult and he was ordered to Feliciana by a Louisiana court.  He was transferred to another hospital only when counsel for defendants in this lawsuit noticed that he was still a minor and would be for several months.[88]  And again, defendants have pointed to no authority to establish that Feliciana's ban on the admission of minors is a matter of law and not a matter of custom.

Both the Supreme Court and the Fifth Circuit have noted, in the class-action context, that allegedly unlawful conduct that arises from the circumstances of pretrial detention is capable of repetition: "Pretrial detention is by nature temporary, and it is most unlikely that any given individual could have his constitutional claim decided on appeal before he is either

---

[87] *Libertarian Party*, 595 F.3d at 217 (quoting *Oliver v. Scott*, 276 F.3d 736, 741 (5th Cir. 2002)).

[88] Prelim. Inj. Hr'g Trans. at 6.

released or convicted.  The individual could nonetheless suffer repeated deprivations, and it is certain that other persons similarly situated will be detained under the allegedly unconstitutional procedures.  The claim, in short, is one that is distinctly 'capable of repetition, yet evading review.'"[89]  So too here.[90]

In addition, plaintiffs challenge and seek an injunction against defendants' *policy* of delaying transfers to Feliciana and not just the individual treatment of W.B.  In *Ukranian-American Bar Association v. Baker*,[91] the D.C. Circuit faced a scenario in which lawyers and a bar association challenged, on First Amendment grounds, the government's policy of denying lawyers access to apparent Soviet asylum-seekers in certain circumstances.  The court rejected an argument that the case had become moot because the particular asylum-seeker to which plaintiffs sought access no longer sought asylum.  "That the particular situation that precipitated the constitutional challenge to the Government's policy is no longer 'live' is not determinative . . . .  The Government's failure to contest the

---

[89] *Gerstein v. Pugh*, 420 U.S. 103, 110 n.11 (1975); *see also Jones v. Diamond*, 519 F.2d 1090, 1097-98 (5th Cir. 1975) (describing a mootness issue in similar circumstances to be an "illusory problem" given the Supreme Court's discussion in *Gerstein*).

[90] *See also Olmstead*, 527 U.S. at 594 n.6.

[91] 893 F.2d 1374 (D.C. Cir. 1990) (D. Ginsburg, J.).

existence of the alleged policy precludes it from prevailing in
the argument that the controversy became moot once [the asylum-
seeker] left the country; the complaint challenges the
Government's policy, not merely the Government's handling of the
[particular] incident."[92]  Here, plaintiffs challenge a policy of
holding Incompetent Detainees in parish jails until room becomes
available at Feliciana.  Defendants do not contest the existence
of this policy, and in fact they go to some length to explain it.

Finally, defendants claim that W.B.'s claim was never viable
to begin with because he was never eligible for transfer to
Feliciana.  This argument is unavailing.  As established, W.B.
was treated like an adult Incompetent Detainee and remained in
jail until counsel for defendants in this lawsuit noticed that he
had not yet turned eighteen.  He was subject to the same injury
as any another adult Detainee in a similar circumstance.  And the
Court is aware of no legal provision that would bar his admission
to Feliciana.  As discussed previously, there is no guarantee
that he will not shortly find himself in the same situation he
was in before his transfer.  Defendants' mootness argument is
therefore rejected.

E. *Sufficiency of Plaintiffs' Complaint*

Defendants next contend that plaintiffs' complaint is

---

[92] *Id.* at 1377.

insufficient.  In order to comply with the Federal Rules of Civil Procedure, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief" and "a demand for the relief sought."[93]  And again, to survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead enough facts "to state a claim to relief that is plausible on its face."[94]  A claim is facially plausible when the plaintiff pleads facts that allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged."[95]

Defendants assert two grounds for this argument — both are hypertechnical and both fail.  First, they contend that, although plaintiffs brought a Fourteenth Amendment claim for violation of the Incompetent Detainees' due-process rights, they failed to specify whether their claim sounded in substantive due process or procedural due process.  Defendants cite no authority for the proposition that a complaint is insufficient for failure to specify this.  Plaintiffs' complaint lays out their claim in some detail; it is not insufficient for a mere failure to specify whether their due-process claims are procedural or substantive.[96]

---

[93] FED. R. CIV. P. 8(a).

[94] *Iqbal*, 129 S.Ct. at 1949 (quoting *Twombly*, 550 U.S. at 547).

[95] *Id.* at 1940.

[96] Courts have noted that a plaintiff's complaint fails to make this clear without making any mention that the complaint

Defendants next contend that the complaint is insufficient because it pleads only a violation of the Fourteenth Amendment and does not refer to a specific cause of action — such as 42 U.S.C. § 1983 — through which it brings its suit.  "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."[97]  Here, plaintiffs unambiguously allege a violation of due process under the Fourteenth Amendment.[98]  And defendants do not seriously contest that the complaint explains that defendants were acting under color of state law when they took the alleged actions, even if the complaint does not contain the phrase "under color of state law."  This claim for relief is plausible on its face. Furthermore, defendants were hardly confused about plaintiffs' cause of action; in fact, they promptly identified that

---

might be *per se* insufficient. *See, e.g., White v. City of Oklahoma City*, No. 07-696, 2008 WL 341654, at *3 (W.D. Okla. Feb. 6, 2008) ("Plaintiff does not specify whether he believes that his substantive or his procedural due process claims have been violated.  Accordingly, the Court will consider both types of claims."); *Medina v. District of Columbia*, 517 F. Supp. 2d 272, 279 (D.D.C. 2007) ("plaintiff does not specify whether he is bringing substantive or procedural due process claims so the Court will analyze his claims under both.").

[97] *Cornish v. Corr. Servs. Corp.* 402 F.3d 545, 549 (5th Cir. 2005) (quoting *West v. Atkins*, 487 U.S. 42, 48 (1988)).

[98] R. Doc. 1 at 3, 15-16.

plaintiffs' complaint sought to establish a claim through a "gateway statute" such as § 1983.  The Court cannot find that a failure to cite § 1983 dooms their complaint.[99]  To find that a direct invocation of a statutory cause of action is required for a complaint to survive, especially when defendants know what that cause of action is and do not contest that plaintiffs have pleaded sufficient *facts* to make out their case, would be to apotheosize form at the expense of substance and to apply a much greater pleading standard than the law requires.

Defendants' contention that the Fourteenth Amendment does not itself provide a private right of action is therefore beside the point.  Plaintiffs do not suggest that they have a cause of action directly under the Fourteenth Amendment; they argue that they have adequately pleaded a claim under § 1983 even though they did not specifically cite to that statute in their complaint.  Defendants do not appear to contest this latter point.  The Court rejects defendants' sufficiency arguments.

*F. Venue*

Finally, defendants contend that venue in the Eastern District of Louisiana is improper.  Venue challenges are properly brought under Rule 12(b)(3) of the Federal Rules of Civil

---

[99] *See, e.g., Jenning v. Patton*, No. 08-686, 2010 WL 706497, at *1 (S.D. Miss. Feb. 23, 2010).

Procedure.  Upon such a challenge, the Court views all facts in the light most favorable to the plaintiff.[100]  When, as here, a case arises under the Court's federal-question jurisdiction, a suit may be brought in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought.[101]

Defendants suggest that venue in the Eastern District of Louisiana is improper because all of the defendants reside in and are located in East Feliciana Parish and East Baton Rouge Parish, which are located in the Middle District of Louisiana.[102] Furthermore, they suggest that the acts and omissions complained of, which include the failure to admit W.B. and the other Incompetent Detainees to Feliciana, all occurred in these parishes as well.

Plaintiffs' complaint asserts that W.B. is incarcerated at Orleans Parish Prison.  Although Feliciana is located in the Middle District of Louisiana, the Eastern District is where W.B.

---

[100] *See Ginter ex rel. Ballard v. Belcher, Prendergast & Laporte*, 536 F.3d 439, 448-49 (5th Cir. 2008).

[101] 28 U.S.C. § 1391(b).

[102] 28 U.S.C. § 98(b).

was being held and where his rights were allegedly being
violated.  Furthermore, the Eastern District is where W.B. was
allegedly receiving inadequate mental-health treatment before his
transfer.  In addition, the Advocacy Center proceeds as an
associational plaintiff on behalf of all Incompetent Detainees,
many of whom are in Orleans Parish and the remainder of the
Eastern District of Louisiana.  It is amply clear that a
substantial part of the events or omissions that give rise to
this lawsuit transpired in the Eastern District of Louisiana.
Defendants cannot seriously claim that the Eastern District is a
venue that is remote or unrelated to the challenged acts and
omissions.

       As plaintiffs point out, defendants' venue arguments have
been rejected by a court in this district.  In *McNiece v.
Jindal*,[103] a plaintiff brought suit because he was evicted from a
nursing home in the Eastern District of Louisiana when he lost
Medicaid coverage after the state found him ineligible for
nursing home care.  The state moved to transfer to the Middle
District because plaintiff "questions the policies, procedures,
and decisions of the defendant in his capacity as Secretary of
the DHH, and that these policies, procedures, and decisions were
arrived at and implemented in Baton Rouge, which is located in

-----

       [103] No. 97-2421, 1997 WL 767665 (E.D. La. Dec. 9, 1997).

37

the Middle District of Louisiana."[104]   The court rejected this
argument, holding that the plaintiff's eviction was a substantial
event giving rise to the claim.   Furthermore, the court noted
that the state official was not being haled into a remote court
having no relationship to the dispute: "[the Secretary of the
Louisiana Department of Health and Hospitals] should be apprised
that his decisions and their enforcement have effects throughout
the State of Louisiana, not just in the Middle District where his
office is located."[105]   So too here.   In addition, defendants
cannot argue that venue is improper as a result of W.B.'s
transfer because "venue must be determined based on the facts at
the time of filing," and the parties do not dispute that W.B. was
incarcerated in Orleans Parish Prison when plaintiffs' complaint
was filed.[106]   Venue in the Eastern District of Louisiana is
therefore proper.

---

[104]  *Id.* at *1.

[105]  *Id.* at *2.

[106]  *Flowers Indus., Inc. v. F.T.C.*, 835 F.2d 775, 776 n.1
(11th Cir. 1987); *see also Jones v. Cooper*, No. 09-086, 2009 WL
4823837, at *3 (W.D. La. Dec. 14, 2009) (citing *St. Paul
Reinsurance Co. v. Greenberg*, 134 F.3d 1250, 1253 (5th Cir.
1998)).

**III. Conclusion**

      For the foregoing reasons, defendants' Motion to Dismiss is DENIED.  Plaintiffs have voluntarily dismissed the Louisiana Department of Health and Hospitals as a defendant.

      New Orleans, Louisiana, this     9th     day of August, 2010.

                          *Sarah Vance*
                          SARAH S. VANCE
             UNITED STATES DISTRICT JUDGE

39