UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


ADVOCACY CENTER FOR THE ELDERLY                CIVIL ACTION
AND DISABLED, ET AL.


VERSUS                                         NO. 10-1088


LOUISIANA DEPARTMENT OF HEALTH                 SECTION R
AND HOSPITALS, ET AL.


<u>**ORDER AND REASONS**</u>

Before the Court are plaintiffs' Motion for Preliminary
Injunction (R. Doc. 22), and defendants' Motion to Strike
Declarations of Adam Humann and Barry Gerharz (R. Doc. 43).  For
the following reasons, the motion for a preliminary injunction is
GRANTED IN PART and DENIED IN PART and the motion to strike is
DENIED.  The Court orders injunctive relief as described at the
end of this Order.


**I. Introduction**

Plaintiffs in this matter are W.B., who brings this suit
through his mother and next friend, Charrie Butler, and also the
Advocacy Center for the Elderly and Disabled.  The Advocacy
Center is part of a network of organizations established under

federal law to advocate on behalf of people with disabilities.[1]

Defendants are three Louisiana state officials who are sued in their official capacities.[2]  These officials include Alan Levine, the Secretary of the Department of Health and Hospitals; Mark Anders, the Chief Executive Officer of the Eastern Louisiana Mental Health System, which is a component of the Department of Health and Hospitals; and Michelle Duncan, the Director of the Forensic Services Division of the Eastern Louisiana Mental Health System.

The essence of plaintiffs' challenge is this: Louisiana law dictates that criminal defendants in Louisiana courts who are found incompetent to stand trial are to be transferred to the Feliciana Forensic Facility ("Feliciana") if they require inpatient restorative treatment.  Plaintiffs contend that Feliciana is the only inpatient facility where these detainees can receive adequate mental-health treatment.  But Feliciana is full.  It can accept no more patients, and under Louisiana law it must reject any new patients once it has reached full capacity.

---

[1] The Advocacy Center alleges that it was established under a number of federal laws, including the Protection and Advocacy for Individuals with Mental Illness Act of 1986, 42 U.S.C. § 10801, *et seq.*, the Protection and Advocacy of Individual Rights Program of the Rehabilitation Act of 1973, 29 U.S.C. § 794e, as well as the Developmental Disabilities Assistance and Bill of Rights Act of 2000, 42 U.S.C. § 15041, *et seq.*

[2] Plaintiffs initially included the Louisiana Department of Health and Hospitals as a defendant, but voluntarily dismissed it in response to defendants' Motion to Dismiss.

The consequence of this, plaintiffs claim, is that incompetent pretrial detainees awaiting a vacancy at Feliciana simply languish in parish jails for extended periods of time without having been convicted of any crime.[3]  They allege that, as of October of 2009, more than one hundred Detainees had been held for an extended period of time, despite having been found incompetent to stand trial and having been committed, but not yet transferred, to Feliciana.

The merits of this claim involve the entanglement and effect of several state statutes.  In Louisiana, a defendant may be adjudged mentally incapacitated and unable to stand trial "when, as a result of mental disease or defect, a defendant presently lacks the capacity to understand the proceedings against him or to assist in his defense."[4]  The issue of the defendant's mental incapacity may be raised at any time by the defense, the prosecution, or the court, and the criminal prosecution comes to a halt once the issue is raised.[5]  If the court "has reasonable ground to doubt the defendant's mental capacity to proceed," it is required to order an examination into the defendant's mental

---

[3] The terms "Incompetent Detainees" or "Detainees" in the capitalized form, unless otherwise indicated, refers to these inmates who have been found incompetent to stand trial by a Louisiana court and ordered to be transferred to Feliciana, but have not yet been transferred.

[4] LA. CODE CRIM. PROC. art. 641.

[5] *Id.* art. 642.

health.[6]  To assist in this inquiry, the court appoints a sanity
commission that consists of two or three qualified physicians or,
in lieu of one physician, a qualified clinical or medical
psychologist with experience or training in forensic
evaluations.[7]  This commission examines the defendant and issues
a report.  The court then holds a contradictory hearing in which
the sanity commission's report is admissible into evidence and
the members of the commission may be called as witnesses and
cross-examined by the defense, the prosecution, or the court.[8]

Article 648 of the Louisiana Code of Criminal Procedure
governs what happens next.  If the court determines, by a
preponderance of the evidence, that a defendant lacks the
capacity to proceed, this incapacity determination
suspends all proceedings, and the court may make one of several
dispositions depending on the defendant's characteristics.  One
such disposition concerns defendants who are charged with a
felony or a misdemeanor violation of domestic abuse battery, who
are likely to commit crimes of violence, and who are not likely
to have their mental health restored within ninety days.[9]  If

---

[6] *Id.* arts. 643, 647.

[7] *Id.* art. 644.

[8] *Id.* art. 647.

[9] *Id.* art. 648(A)(2)(a).  "Domestic abuse battery" is "the
intentional use of force or violence committed by one household
member upon the person of another household member."  La. Rev.

inpatient treatment is recommended for such an individual, "the court shall commit the defendant to the Feliciana Forensic Facility."[10]

If a defendant committed to Feliciana is still held in a parish jail 180 days after the court determined that he lacked competency to proceed, the court is required to convene a status conference with the prosecution and the defense.  On motion of either party, the court may order a hearing to determine whether there has been a change in defendants' mental capacity or if the court's earlier order requires modification.[11]  If the defendant is still in parish jail 180 days after this status conference, the court is required to order a hearing to determine whether the defendant should be released or the state should commence civil-

---

STAT. § 14:35.3(A).

[10] LA. CODE CRIM. PROC. art. 648(A)(2)(a).  If the defendant's is likely to be restored within ninety days, the court may order ninety days of jail-based treatment.  This reflects the changes made to Article 648 by House Bill 462, which was signed into law the day before the Court held its preliminary-injunction hearing. 2010 La. Sess. Law Serv. 419 (H.B. 462).  That amendment also amended Article 648 to alter the disposition of defendants who are charged with certain felony drug offenses or misdemeanor offenses against the person, except for domestic abuse battery. If the court finds such a defendant to be incompetent and also determines that defendant's competency will not be restored within ninety days, the court is to release him for outpatient competency restoration or "other appropriate treatment."  These individuals may have, under the earlier law, been committed to Feliciana.

[11] LA. CODE CRIM. PROC. art. 648(A)(2)(d).

commitment hearings.[12]

According to plaintiffs, Incompetent Detainees who are awaiting transfer to Feliciana can languish for up to 360 days — nearly one year — before the state is required to take action. And these circumstances are exacerbated by Title 28, Section 25.1 of the Louisiana Revised Statutes, which governs the establishment of Feliciana and certain aspects of its operations. Specifically, the statute provides that "[t]he administrator of the Feliciana Forensic Facility *shall* refuse admission to any person if . . . [a]dmission of the person would cause overcrowding of the facility . . . [or if the] facility is unable to provide appropriate care or treatment for the person."[13]

Thus, the essence of plaintiffs' challenge is that Louisiana law requires that certain defendants, after being adjudged incompetent to stand trial in Louisiana state courts, be transferred to Feliciana.  But if they are not transferred, the state is not required to act for nearly a year.  And Louisiana law also requires Feliciana to turn away transferees if their admission would cause overcrowding or if appropriate care would be unavailable there.  As of now, Feliciana is full and can admit no new patients until additional space in the facility becomes available.

---

[12] *Id.* art. 648(A)(2)(e).

[13] La. Rev. Stat. § 25.1(C)(2)(a)(i)-(ii).

In addition, plaintiffs allege the Detainees are receiving inadequate mental-health treatment in the parish jails where they are awaiting transfer.  Therefore, they claim, Incompetent Detainees are receiving substandard mental-health care that is not related to regaining capacity, and they are subjected to unconstitutional delays and extended imprisonment when they have been convicted of no crime and are not awaiting trial.[14]

Plaintiffs brought this suit in April of 2010 seeking declaratory and injunctive relief.  They now move for a preliminary injunction ordering all of the Incompetent Detainees at issue to be transferred to Feliciana.  Defendants move to strike two declarations that were submitted as evidence in support of plaintiffs' motion.  The Court held a preliminary-injunction hearing on June 22, 2010, and it now rules as follows.

## II. Discussion

### A. Defendants' Motion to Strike

The Court first addresses defendants' motion to strike two of plaintiffs' declarations.  These two declarations, one submitted by Adam Humann and another submitted by Barry Gerharz,

---

[14] Defendants maintain a list of the individuals who have been committed to Feliciana but have not been transferred. Patients are transferred to Feliciana ideally based on when the court ordered them committed, but the order in which they are transferred typically depends on how mentally ill the patient is. See Prelim. Inj. Hr'g Trans. at 165 (statement of Dr. John Thompson).

both describe interviews with W.B. in the parish jail where he was incarcerated before his transfer.  These declarations contain statements that W.B. purportedly made during the course of these interviews that concern his background and the conditions under which he was being kept.  Both Humann and Gerharz are among the counsel of record for plaintiffs in this matter.[15]

Defendants move to strike these declarations on two grounds. First, they contend that they are submitted in violation of Louisiana Rule of Professional Conduct 3.7, which provides that "[a] lawyer shall not act as an advocate at a trial in which the lawyer is likely to be a necessary witness."[16]  Second, they contend that the statements made by W.B. constitute inadmissible hearsay.

The Court holds that Rule 3.7 does not require exclusion of the testimony.  The animating purpose of the rule is to avoid juror confusion, and this purpose is little served by striking these declarations.  The Fifth Circuit has noted that

> the only justification for the attorney testimony rule
> that might be viewed as affecting the rights of the
> opposing party is that derived from the fear that the
> jury will either accord such testimony undue weight, or
> will be unable to distinguish between the attorney's
> testimony, offered under oath, and his legal argument,

---

[15] Gerharz recently withdrew as counsel for plaintiffs.  R. Docs. 55, 56.  Humann's status has not changed.

[16] The Court assumes without deciding that Rule 3.7 may serve as a basis for striking a declaration.

offered in rhetorical support of his client's case.[17]
The justification collapses when no jury is involved.[18]  These
declarations were submitted to the Court.  No jury will make any
determinations with respect to this motion.  And the Court is not
confused about where Humann's and Gerharz's testimony ends and
their advocacy begins.  The declarations need not be struck on
account of the Louisiana Rules of Professional Conduct.

In addition, the hearsay rule does not mandate that these
declarations be excluded from consideration.  "[A]t the
preliminary injunction stage, the procedures in the district
court are less formal, and the district court may rely on
otherwise inadmissible evidence, including hearsay evidence," as
long as the record supports the court's conclusion.[19]  It is
therefore not inappropriate for a court to rely partially on
hearsay evidence at this stage.[20]

---

[17] *Crowe*, 151 F.3d at 233-34; *see also* MODEL RULES OF PROF'L
CONDUCT R. 3.7 ann.

[18] *Crowe*, 151 F.3d at 234 ("this justification is
inapplicable where, as here, the testimony is made to a judge,
not a jury").

[19] *Sierra Club, Lone Star Chapter v. Fed'l Deposit Ins.
Corp.*, 992 F.2d 545, 551 (5th Cir. 1993).

[20] *See Fed'l Savings & Loan Ins. Corp. v. Dixon*, 835 F.2d
554, 558 (5th Cir. 1987); *see also University of Tex. v.
Camenisch*, 451 U.S. 390, 395 (1981) ("a preliminary injunction is
customarily granted on the basis of procedures that are less
formal and evidence that is less complete than in a trial on the
merits"); 11A CHARLES ALAN WRIGHT, ET AL., FEDERAL PRACTICE & PROCEDURE
§ 2949 (2d ed. 1994 & Supp. 2010).

The Court will not, however, admit the entirety of the declarations or accept them for the truth of their assertions. It will admit the portions of the declarations that relate to W.B.'s statements for the purpose of establishing that the statements were made, because this use is relevant to establish W.B.'s state of mind.

*B. Plaintiffs' Motion for Preliminary Injunction*

<u>1. Legal Standard</u>

A plaintiff seeking a preliminary injunction must make a four-part showing before such an injunction will issue.  It must demonstrate: (1) a substantial likelihood of prevailing on the merits; (2) a substantial threat of irreparable injury if the injunction is not granted; (3) that the threatened injury outweighs any harm that will result to the nonmovant if the court grants the injunction; and (4) that the injunction will not disserve the public interest.[21]  "A preliminary injunction is an extraordinary remedy and should only be granted if the plaintiffs have clearly carried the burden of persuasion on all four requirements."[22]

_____

[21] *La Union Del Pueblo Entero v. Fed. Emergency Mgmt. Agency*, 608 F.3d 217, 219-20 (5th Cir. 2010); *DSC Commc'ns Corp. v. DGI Tech., Inc.*, 81 F.3d 597, 600 (5th Cir. 1996).

[22] *Planned Parenthood of Houston & Se. Tex. v. Sanchez*, 403 F.3d 324, 329 (5th Cir. 2005) (quoting *Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 335 F.3d

10

## 2. Substantial Likelihood of Success on the Merits

### i. Legal Framework

The allegations presented in this case implicate several strains of the Supreme Court's Fourteenth Amendment jurisprudence.  First, the Supreme Court has held that once a state determines that a criminal defendant lacks the competency to stand trial, due process requires that the defendant's continued confinement be related to the restoration of his competency.  In *Indiana v. Jackson*, a deaf-mute criminal defendant with limited communication skills was found incompetent to stand trial, and he was committed to a state mental-health facility until he could become competent to be tried.[23]  The lower court ordered him to be committed despite physician testimony that he was unlikely to improve to the point where he could stand trial.  The Supreme Court found the scenario incompatible with due process.[24]

> [A] person charged by a State with a criminal offense who is committed solely on account of his incapacity to proceed to trial cannot be held more than the reasonable time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future.  If it is determined that this is not the case, then the State must either institute the customary civil commitment proceeding that would be required to commit

---

357, 363 (5th Cir. 2003)) (internal punctuation omitted).

[23] 406 U.S. 715, 719 (1972).

[24] *Id.* at 717-20.

indefinitely any other citizen, or release the
defendant.  Furthermore, even if it is determined that
the defendant probably soon will be able to stand
trial, his continued commitment must be justified by
progress toward that goal.[25]

Put differently, "due process requires that the nature and
duration of commitment bear some reasonable relationship to the
purpose for which the individual is committed."[26]

Second, in a related inquiry, the Due Process Clause
prevents a detainee who has not yet been convicted from being
subjected to conditions designed to punish him.  In *Bell v.
Wolfish*, the Supreme Court held that the determination of whether
pretrial detention violates a detainee's due-process rights
depends on whether the conditions of detention amount to
"punishment."[27]  Specifically, "if a restriction or condition
[of pretrial detention] is not reasonably related to a legitimate
goal — if it is arbitrary or purposeless — a court permissibly
may infer that the purpose of the governmental action is
punishment that may not constitutionally be inflicted upon
detainees *qua* detainees."  Thus, similar to the inquiry in
*Jackson*, a court must assess the rational relationship between
the condition of confinement and a legitimate governmental
objective.

---

[25] *Id.* at 736.

[26] *Id.* at 738.

[27] 441 U.S. 520, 539 (1979).

Finally, the Supreme Court has held in similar circumstances that a court must determine whether a detainee's substantive-due-process rights have been violated by "balancing his liberty interests against the relevant state interests."[28]  In *Youngberg v. Romeo*, the Court held that this balancing can be accomplished by making certain that the condition of the inmate's confinement resulted from the exercise of professional judgment.  "It is not appropriate for the courts to specify which of several professionally acceptable choices should have been made."[29]  A decision made by a professional is presumptively valid, and "liability may be imposed only when such a substantial departure from accepted professional judgment, practice, or standards . . . demonstrate[s] that the person responsible did not base the decision on such a judgment."[30]  The Court noted that

---

[28] *Youngberg v. Romeo*, 457 U.S. 307, 321 (1982).  The detainee in *Youngberg* was an individual who had been involuntarily committed to a state hospital by his mother.  The Supreme Court noted that the case differed from *Jackson* because the detainee there was committed by his mother who could not contain his violence, and "[t]hus, the purpose of [his] commitment was to provide reasonable care and safety, conditions not available to him outside of an institution."  *Id.* at 320 n.27.  This distinction is not applicable here, as the purpose of the Incompetent Detainees' commitment is either to restore their competency or determine that their competency cannot be restored.  The Supreme Court in *Youngberg* also clarified that the *Jackson* test is one of procedural due process.  457 U.S. at 320 n.7.

[29] *Id.* at 322 (citing the opinion below, 644 F.2d 147, 178 (3d Cir. 1980) (Seitz, C.J., concurring)).

[30] *Id.* at 323; *see also McCarthy ex rel. Travis v. Hawkins*, 381 F.3d 407, 425-26 (5th Cir. 2004) (Garza, J., concurring in

> [b]y "professional" decisionmakers, we mean a person
> competent, whether by education, training, or
> experience, to make the particular decision at issue.
> Long-term treatment decisions normally should be made
> by persons with degrees in medicine or nursing, or with
> appropriate training in areas such as psychology,
> physical therapy, or the care and training of the
> retarded.  Of course, day-to-day decisions regarding
> care — including decisions that must be made without
> delay — necessarily will be made in many instances by
> employees without formal training but who are subject
> to the supervision of qualified persons.[31]

Courts facing scenarios highly similar to the one before the

Court have relied on these strains of due-process jurisprudence

to assess the legality of detentions.[32]


        *ii. Overview*

    In the discussion that follows, the Court applies these

standards to the evidence presented and finds that plaintiffs

have demonstrated a substantial likelihood of success on the

merits of their Fourteenth Amendment challenge.  The Court will

first examine plaintiffs's largely unrebutted evidence as to the

────────────────────

part and dissenting in part).

    [31] *Id.* at 323 n.30.  The Supreme Court also stated that
budgetary concerns, which are present here, may insulate a
professional from liability in a suit for damages against him in
his individual capacity.  *Id.* at 323.  This concern is not
present here, when none of the individual defendants are sued in
their individual capacities.

    [32] *See Oregon Advocacy Center v. Mink*, 322 F.3d 1101, 1121-
22 (9th Cir. 2003) (applying *Youngberg* and *Jackson*); *Terry ex
rel. Terry v. Hill*, 232 F. Supp. 2d 934, 941-44 (E.D. Ark. 2002)
(applying *Bell*).

                        14

professionally accepted standard of care and the availability of
mental-health treatment in parish jails.  It will then examine
the evidence in support of defendants' contention that they
provide the Incompetent Detainees with additional mental-health
care beyond what is available in local jails, and it will address
defendants' additional arguments and their efforts to address the
problem.  Finally, the Court will examine the decisions of courts
that have confronted highly similar factual scenarios.

        In sum, the evidence demonstrates that defendants' policy of
subjecting Incompetent Detainees to extended delays in jail
before their transfer to Feliciana bears no rational relationship
to the restoration of their competency or a determination that
they will never become competent.  Put differently, the Detainees
are in jail *not* because their imprisonment is related to the
restoration of their competency; they are incarcerated because
there is no room for them elsewhere.  The mental-health treatment
that the Incompetent Detainees are receiving in local jails is
minimal, and defendants provide them with virtually the same
level of mental-health treatment that is available to the average
inmate who has not been deemed incompetent to stand trial.  In
addition, defendants do not appear to contest that the failure to
transfer the Detainees is not the result of any kind of
professional or psychiatric decision-making, but rather a result
of scarce state resources.  Feliciana has only so many beds, and

once those beds are full, patients who are under court order to receive inpatient treatment instead remain in jail.  This circumstance persists not because the Detainees' mental health is better served in parish jails or because any medical professional has recommended this treatment, but because there are no more beds at Feliciana, and the state has not created additional space, despite an obvious surfeit of Incompetent Detainees.

### iii. The Standard of Care for Incompetent Detainees

Plaintiffs do not contend that the Incompetent Detainees have a constitutional right to commitment to one particular mental-health facility, nor could they.  Rather, they have presented evidence as to the professional standard of care for defendants found to be incompetent to stand trial, and they contend that this standard is met in Feliciana and is absent in parish jails.

Dr. Joel Dvoskin, a clinical psychologist with experience in prison mental-health treatment and an expert in clinical, forensic, and correctional psychology and administration of mental-health facilities, testified that there are two common reasons that a defendant is found incompetent to stand trial.[33] Incompetent defendants typically have either severe or acute psychosis or they have cognitive difficulties or intellectual

___

[33] Prelim. Inj. Hr'g Trans. at 69.

16

disabilities.[34]

There is a recognized standard of care for treating Detainees who are incompetent to stand trial on account of psychosis: "In almost every state . . . they are sent to a state forensic hospital like Feliciana, and there they receive comprehensive psychiatric services." In such a facility, Dvoskin stated, the Detainees "would have an interdisciplinary treatment team, they would have an individualized treatment plan with goals and objectives, both short and long term, and interventions that were aimed at each goal and each objective."[35] Part of this treatment is explicitly directed toward the restoration of competency. In addition, psychosis may be corrected through medication, typically in a therapeutic environment in a hospital that includes treatment staff, pro-social activities, and both group and individual therapies.[36] In order to improve, it is important for psychotic patients to feel safe in their environment. A sense of safety is also important for the patients to take their medicine voluntarily instead of having it forced upon them. Dvoskin describes the relationship between the inmate and the treatment team as a "therapeutic alliance," which means "the patient believes that the doctor and the nurses care

---

[34] *Id.* at 69-70.

[35] *Id.* at 80.

[36] *Id.* at 72.

about their well-being." He observed that "[w]e are much more likely to take advice and to sort of change our attitude based on the advice of somebody that we trust and that we think wants to help us than somebody we think of . . . with anger or fear."[37]

For individuals with cognitive or intellectual disabilities, or with these disabilities combined with psychosis, the standard of care will focus more on education.[38] "The standard in a habilitative center or a developmental center would be a wide array of developmental services aimed at teaching the person that they had the capacity to learn to live a better life, but again the main focus would be restoring them to competence through these competency groups that are largely educational."[39] This includes group meetings and classes three to five days a week.[40]

Furthermore, Dr. Dvoskin stressed the importance of prosocial activities for recovery, and he recounted different types of therapy — group, individual, recreational, occupational — that require trained staff. Inmates in jails, on the other hand, have large stretches of unoccupied and unproductive time that makes it difficult to cultivate a therapeutic environment.[41]

---

[37] *Id.* at 73.

[38] *Id.* at 81.

[39] *Id.* at 84.

[40] *Id.* at 83-84.

[41] *Id.* at 75.

Dr. Dvoskin also noted that psychotic inmates are much more likely to be subject to discipline, which often results in their segregation from the rest of the inmates.[42]

Dr. Dvoskin also testified that, in general, although jails try to treat the mentally ill, it is difficult for them to maintain the necessary therapeutic environment in a jail setting. For example, it is difficult for inmates to feel safe while they are incarcerated.  Dvoskin specifically noted that "they don't want to take medication in jail because they are worried about not being able to be vigilant enough if they are tranquilized or if they are under the influence of medication."[43]  Nursing staffs in jails, according to Dvoskin, are often overworked and do not have time to induce inmates to take their medication or take full account of the patients' experience of side effects.[44]

Defendants did not present any evidence, through expert testimony or otherwise, to rebut plaintiffs' evidence as to the professionally accepted standard of care for incompetent detainees.  And the parties do not appear to disagree that this standard of care is met at Feliciana, or that much of the care at Feliciana is directly related to restoring a pretrial detainee to

---

[42] *Id.* at 76.

[43] *Id.* at 74.

[44] *Id.* at 79-80.

19

competency.[45]  The testimony presented establishes that Feliciana
provides treatment through highly qualified interdisciplinary
teams, which include psychiatrists, psychiatric nurses, social
workers, psychiatric aides, guards that are trained as
psychiatric aides, psychologists, a recreational therapist, a
dietitian, medical practitioners, and clergy.[46]  Feliciana
has approximately 410 forensic patients, and its staff includes
twelve to fourteen full- or part-time psychiatrists.[47]  The
doctor-patient ratio is between thirty and thirty-five to one.[48]
These individuals routinely meet with patients at the facility
and develop treatment programs that are based on each detainee's
needs and interests.[49]  Treatment at Feliciana includes treatment
and stabilization of psychiatric disorders and substance-abuse
disorders, behavior management, development of interpersonal
skills, psychotherapy, and behavioral therapy.[50]  The facility

---

[45] *See id.* at 33-35 (statements of Dr. Demaree Inglese that
the staff at an inpatient center such as Feliciana is better at
dealing with incompetent inmates than the staff at a local jail).

[46] *Id.* at 197-98.

[47] *Id.* at 183, 214.

[48] *Id.*

[49] *Id.* at 198.

[50] *Id.* at 197-200.  Dr. John Thompson indicated that
psychotherapy is available at Feliciana, although it is
"[p]robably more supportive but not specific psychotherapy, like
cognitive behavioral therapy or those kinds of therapies."  *Id.*
at 199.

also includes a maximum-security unit for patients with
behavioral issues that allows twenty-four-hour supervision and
nursing care.[51]

### iv. Mental-Health Treatment in Parish Jails

The level of mental-health treatment in parish jails falls
far short of the care available at Feliciana.  As is evident from
the discussion that follows, the treatment available in these
jails is far below the articulated standard of care.  As a
result, the Court cannot discern any rational relationship
between the Incompetent Detainees' continued confinement in
parish jails and the restoration of their competency.  It bears
mentioning at the outset that when Incompetent Detainees are held
in local jails awaiting their transfer to Feliciana, the
conditions of their confinement are effectively the same as any
other competent inmate.  Put another way, they are simply in
jail.  And the mental-health treatment available in jail is
minimal.

Dr. Demaree Inglese, the medical director of the St. Tammany
Parish Sheriff's Office and the former medical director of the
Orleans Parish Criminal Sheriff's Office, conveyed a picture of
the mental-health care available in parish jails.  At the St.
Tammany Parish Prison, the Incompetent Detainees receive the same

---

[51] *Id.* at 200-202.

level of mental-health care as any of the other inmates.[52]  The
prison has between 1,050 and 1,100 inmates, and that the entire
medical staff includes one part-time psychiatrist as well as a
psychiatry resident who sees patients when necessary.[53]  When a
psychiatrist is not available, inmates' psychiatric problems —
including the treatment of potentially suicidal patients — are
handled by non-psychiatric physicians.[54]  The prison has no
registered nurses or psychiatrically trained nurses, and half of
the licensed practical nurses who work at the prison have little
if any experience.[55]

The St. Tammany Parish Prison is "not equipped or built to
be a psychiatric facility housing severely ill psychiatric
patients, whether they are chronically ill or acutely ill."[56]
Problem patients at St. Tammany — particularly those on suicide
watch or who otherwise pose a danger to themselves by, for
example, repeatedly banging their heads against walls[57] — are
placed into isolation cells of approximately four feet by four or
five feet in dimension, with mesh walls and nothing inside the

---

[52] *Id.* at 25.

[53] *Id.* at 20.

[54] *Id.* at 45.

[55] *Id.* at 34.

[56] *Id.* at 27.

[57] *Id.* at 28.

cell.[58]  Here they can be observed by jail staff twenty-four
hours a day.  The cells are not large enough to lie down in and
most patients sleep sitting up.[59]  Inglese noted that "I've been
aware of people in St. Tammany who have been in our little
suicide cell for weeks because there is no other safe place in
our facility to house that person."[60]

The guards at St. Tammany have minimal training in dealing
with mentally ill inmates, and they may not know which inmates
are Incompetent Detainees.  These guards are "trained to
deescalate situations," and in general they are "19 to 25-year
old . . . young men, sometimes young women, who have little
psychiatric training, mental health training, who are working in
a jail."[61]

Dr. Inglese specifically noted that jail-based treatment was
"a very poor substitute for intensive inpatient
rehabilitation."[62]  The Incompetent Detainees, according to
Inglese, might be in the prison for "quite a few months" before
they are found incapable of standing trial, and then after that
it could take "six months, a year, more than a year to actually

---

[58] *Id.* at 27-28, 30-31.

[59] *Id.* at 31.

[60] *Id.* at 29.

[61] *Id.* at 32.

[62] *Id.* at 25.

23

find them a bed in an inpatient psychiatric facility."[63]  It is
not unusual to have Incompetent Detainees in St. Tammany "well
over a year."[64]  Inglese summarized the position of the St.
Tammany Parish Prison as follows:

> The St. Tammany Parish Jail is not funded, designed, or
> equipped to provide the type of comprehensive inpatient
> restorative mental health treatment that Patient
> Detainees require to restore their competency so they
> can proceed to trial.  The Jail cannot, for example,
> provide rehabilitation or counseling services.  St.
> Tammany Parish, like all Louisiana parishes, relies on
> the State of Louisiana to provide inpatient restorative
> mental health treatment.[65]

Other prisons within Louisiana have even less capability to
provide mental-health treatment.  According to Dr. Inglese,
medical staff at St. Bernard Parish Prison includes neither a
physician nor a psychiatrist physician.[66]  At other facilities in
Louisiana — including "Allen Parish, the Overland Jail, St.
Mary's Parish Sheriff's Office, Caldwell County Correctional, St.
James Parish" — and similar jails with small inmate populations,
physicians typically come in once a week or inmates are taken to
see local physicians, and they lack psychiatric services.[67]

––––––––––––––––

[63] *Id.* at 24.

[64] *Id.* at 38.

[65] R. Doc. 22-8 at 2.

[66] *Id.* at 23.

[67] *Id.* at 23.  In addition, Dr. John Thompson, clinical
director of Feliciana, stated that Jefferson Parish had a regular
psychiatrist on staff who may or may not be full time.  East

The Orleans Parish Prison ("OPP") has roughly 3,400 inmates, which includes between twenty-eight and thirty Incompetent Detainees.[68]  Dr. Inglese noted that OPP "is probably equipped to provide the best psychiatric care of any jail in this state," and that the facility has an inpatient ward and more personnel than other facilities.[69]  When he worked there, the prison had two full-time psychiatrists and an active residency training program.[70]  Even still, when a patient in OPP proves to be a suicide risk or is otherwise a source of problems, that patient is tied to a bed in four- or five-point restraints.  Dr. Inglese stated that he was aware of patients at OPP who had been tied to beds for weeks.[71]

Marlin Gusman, the Sheriff of Orleans Parish, indicated that OPP's mental-health unit currently has one full-time psychiatrist

_____

Baton Rouge Parish has a consulting psychiatrist.  Other than that, he knows of no parishes that have full-time psychiatrists other than Orleans Parish, and he "would be surprised if any do." *Id.* at 213.  Susan Johannsen testified that the jails in Livingston Parish, St. Helena Parish, and Tangipahoa Parish have virtually no psychiatric staff.  Washington Parish, she indicated, has a consulting doctor who is board-certified in psychiatry.  *Id.* at 144-47.

[68] *Id.* at 58.  This figure, given by Sheriff Gusman, reflects the number of Incompetent Detainees in OPP at the time of the preliminary-injunction hearing.

[69] *Id.* at 26.

[70] *Id.* at 19.

[71] *Id.* at 28.

and two social workers.[72]  This unit, however, focuses on "basically just maintaining [inmates'] medications" and not restoring the competency of the Incompetent Detainees.[73]  Restoration is not the mental-health unit's primary focus, Gusman said, because OPP is a jail.  "Our primary focus is to keep people in jail before they go to trial."[74]  Gusman stated that he simply did not have the resources to make restoration to competency the main focus of how the jail deals with the Incompetent Detainees.[75]  He further testified that he would like to see the Detainees transferred to Feliciana as soon as possible.

Furthermore, a September 2009 report from the Department of Justice expressed great concern about the state of mental-health treatment in OPP.  Specifically, it found that the suicide-prevention practices at OPP were "grossly inadequate" and contrary to accepted professional standards.[76]  The first response to patients with suicidal ideation, the report indicates, is to place the prisoner in five-point restraints.  In

---

[72] *Id.* at 59-60.

[73] *Id.* at 60.

[74] *Id.*

[75] *Id.*

[76] R. Doc. 22-4 at 36 (report from Loretta King, Acting Attorney General of the Civil Rights Division, to Marlin Gusman, the Sheriff of Orleans Parish).

addition, the report explains that OPP fails to treat individuals with mental illnesses, which is "inconsistent with generally accepted professional standards and ha[s] resulted in mental health deterioration and unnecessary suffering."[77]

Finally, a number of statements W.B. made while he was still incarcerated at Orleans Parish Prison strongly suggest that the his mental health was not improving during his imprisonment.[78] He stated that "little men" would visit him at night while he was imprisoned in OPP, and that they would hit him, tell him that they would be back, and then run away.[79]   W.B. also asserted that he was placed in solitary confinement for "months," and that during this time he talked to himself.   He stated that "[i]t's good to talk to yourself [because] you have fun."[80]   According to Dr. Dvoskin, W.B.'s statement that he was seeing "little men" in the night was likely either a visual hallucination or a delusion or both, and both of these phenomena are examples of psychotic thinking.[81]   While none of W.B.'s statements is taken for the truth of the assertions, the statements do not paint a picture of

---

[77] *Id.* at 40.

[78] Again, the Court considers W.B.'s statements only insofar as they were made and not for the truth of the matters asserted.

[79] R. Doc. 22-3 at 2.

[80] *Id.*

[81] Prelim. Inj. Hr'g Trans. at 72.

someone whose mental health is improving while he is incarcerated.

This evidence demonstrates that the mental-health treatment available in parish jails is virtually nonexistent in many parishes and in others appears to consist of little more than maintenance of medication and prevention of suicide.  There are very few, if any, staff members who are trained to treat mentally ill patients, and the Incompetent Detainees are in large part treated like any other inmate in the facility.  In response, defendants do not contest this portrayal of the state of mental-health treatment in parish jails, other than to point out that not all of the inmates who receive this treatment are Incompetent Detainees.

### v. The CFS Jail-Based Restoration Program

Defendants contend that they provide additional mental-health treatment to the Incompetent Detainees beyond what the jail provides while the Detainees await a vacancy at Feliciana. These services are administered through Community Forensic Services ("CFS"), which is a division of the Eastern Louisiana Mental Health System and the Louisiana Department of Health and Hospitals.  CFS maintains a jail-based outreach program that provides additional services to the Incompetent Detainees.[82]

---

[82] *Id.* at 101.

CFS's involvement with the Incompetent Detainees appears to be the result of administrative action and not a requirement of Louisiana law.

The CFS program is no substitute for inpatient treatment at a mental-health facility.  Dr. John Thompson, the clinical director of Feliciana, indicated that this program is not a substitute for hospitalization.  Rather, it is directed toward those Incompetent Detainees who can be restored with "standard psychiatric medications" and "a minimal amount of education" while they await an opening at Feliciana.[83]

A total of nine "district forensic coordinators," who are masters-level social workers, are the extent of the program for the entire state.  These coordinators are not psychologists or psychiatrists, although they receive some training from a psychologist or a psychiatrist.[84]  Each coordinator is assigned to a particular region, and their duties include making visits to jails.  A coordinator meets with detainees in jail at least twice a month, and their duties involve discussing medication with the detainee and filling out paperwork.[85]  They will also talk to prison staff and attempt to ensure that the detainee is receiving adequate medication.  These nine coordinators do not spend all of

---

[83] *Id.* at 173-74.

[84] *Id.* at 102-04.

[85] *Id.* at 103, 173, 216.

29

their time attending to the Incompetent Detainees.  Indeed, Susan Johannsen, one of the coordinators, testified that she spends 30 percent of her time working with the Incompetent Detainees.[86]

The coordinators are trained to perform various competency tests and to assess the competency of the Detainees.[87]  If the coordinator believes that a pretrial detainee has been restored to competency before transfer to Feliciana, the coordinator will notify CFS, which will send a consultant to evaluate the detainee's competency.  If the detainee is found competent, CFS will begin the process of having him reevaluated by the court.[88]

Defendants cannot seriously contend that the CFS program solves the Detainee problem at the heart of this litigation. Based on the evidence and testimony submitted by defendants, which sought to place the program in the most positive light, the program does not work for about 70 percent of the Incompetent Detainees.[89]  The establishment of a makeshift supplement such as

---

[86] *Id.* at 152.

[87] *Id.* at 102, 162, 169.

[88] *Id.* at 106, 120; *see also* LA. CODE CRIM. PROC. art. 649(a)-(b).

[89] Michelle Duncan, the director of Community Forensic Services, testified that "30-something percent" of Incompetent Detainees who are committed to Feliciana are restored during jail-based treatment.  Prelim. Inj. Hr'g Trans. at 121.  Dr. Thompson testified that "about a third" of the people on the waiting list to come to Feliciana come off the list either because of restoration to competency *or* other forms of diversion. *Id.* at 175.  These other forms of diversion appear to include

the CFS program does not establish that the continued
incarceration of the Incompetent Detainees is rationally related
to the restoration of their competency.

Defendants also produced testimony that Incompetent
Detainees could be admitted to Feliciana on an emergency basis,
such as if they were about to kill themselves or injure someone
else.  The testimony presented was conflicting as to how quickly
such an admission could be accomplished.  Although defendants'
witnesses testified that emergency transfers could be made in no
more than a few days,[90] Dr. Inglese gave a completely different
account.  He stated that a coordinator can get an emergency
patient transferred "within several weeks."[91]  He recalled a few

---

having the charges against the detainee dropped or any other
manner of getting off the Feliciana waiting list without actually
being transferred to Feliciana.  *Id.* at 121.  It appears that not
all forms of diversion discussed by defendants' witnesses — such
as finding the patient housing in the community — apply to the
Incompetent Detainees.  *Id.* at 178.

[90] *See id.* at 104-05 (statement of Michelle Duncan).  Susan
Johannsen also testified that an emergency admission can be
completed within a day or two.  *Id.* at 135.  Dr. Thompson
testified that an Incompetent Detainee could be admitted on an
emergency basis between twenty-four and seventy-two hours if he
were involved.  *Id.* at 166.  Dr. Thompson also testified that
occasionally the state mental-health clinic or the local
inpatient unit would take Detainees when a Detainee needs to be
moved to an inpatient hospital.  *Id.* at 206-07.  Dr. Inglese
testified to the contrary — that to his knowledge no hospital in
the state other than Feliciana would take inmates.  *Id.* at 27.
In any event, the Court has received no evidence on this option
other than one sentence from Dr. Thompson.

[91] *Id.* at 39.

31

instances in which the transfer took "a week or two," but never within a few days.[92]  He stated that he does not attempt the transfer when a patient is merely acting out or is in severe psychosis, because "[t]hat encompasses a significant fraction of our pretrial detainees."[93]  Rather, he seeks an immediate transfer when he perceives "an actual immediate threat to [the Detainee's] health and safety."[94]  He can make these transfers two or three times a year.[95]

Regardless of how quickly or how often emergency transfers are accomplished, this transfer procedure describes psychiatric triage that is a band-aid on a much larger problem.  Unless a detainee presents a dire enough problem to his jailers to warrant an emergency transfer, he remains in the regular jail, not in the mental-health facility to which the Louisiana court ordered that he be sent.

The CFS program appears to have been started to address the very problem that plaintiffs identify.  This, however, does not change the fact that the program essentially consists of nine

---

[92] *Id.* at 55-56.

[93] *Id.* at 53.

[94] *Id.*  In addition, he stated that he once had a "bad head-banger" who needed to get out quickly, and Orleans Parish accepted the prisoner because their restraint beds can prevent an inmate from banging his head.  *Id.* at 55-56.

[95] *Id.* at 39.

social workers who do not have advanced degrees or significant clinical training in psychology or psychiatry tending to every Incompetent Detainee in the state.  They are required only to meet with each Detainee twice every month, and if the other coordinators have the same duties and work obligations as Johannsen, they spend only about 30 percent of their time on the Incompetent Detainees.  This amounts to less interaction with the coordinators than what the Detainees would receive with three coordinators servicing all the Incompetent Detainees in the entire state full-time.  And again, the parish jails lack comprehensive mental-health services and are often unequipped to provide adequate mental-health treatment during the twenty-eight days per month that the Detainee is not meeting with the coordinator.

Dr. Dvoskin characterized the CFS program as "a way of throwing a little bit of a service that a person needs a lot of, I assume because its cheaper, but it doesn't compare at all. It's light years short of inpatient psychiatric care."[96]  He noted that at an inpatient hospital like Feliciana, a patient could receive comprehensive psychiatric services through an interdisciplinary treatment with individualized goals.[97]  Even Dr. Thompson specifically stated that the treatment provided by

---

[96] *Id.* at 85, 87-88.

[97] *Id.* at 80.

33

the CFS jail-based program is not equivalent to the level of care
that patients receive at Feliciana, and that if there were
additional room at Feliciana, he would admit the Incompetent
Detainees much more quickly, although he would still allow a
period in which the best place for a Detainee to be treated could
be determined.[98]

### vi. The Composition of the Waiting List

Defendants also argue that the waiting list supplied to the
Court does not consist exclusively of Incompetent Detainees who
have been adjudged incompetent to stand trial and committed to
Feliciana.  They contend that this list also includes ten
individuals who will receive outpatient restoration due to an
intervening change in the law,[99] three who have been restored and
are awaiting a second sanity hearing, five who are living in the
community pending transfer to Feliciana, and twelve who have been
found not guilty by reason of insanity in state court.
Plaintiffs do not dispute that the Feliciana waiting list
supplied to the Court includes individuals who are not Detainees
who have been found incompetent to stand trial and committed to
Feliciana.

In addition, the defendants suggest that there are other

_____

[98] *Id.* at 205.

[99] *See* 2010 La. Sess. Law Serv. 419 (H.B. 462).

34

categories of individuals on the list.  Dr. Thompson testified
that some of the individuals on the list were committed to
Feliciana for malingering evaluations.[100]  The Court has been
presented with no court order or other record reflecting a
commitment for such a purpose.  Dr. Thompson did not explain why
commitment to a mental hospital would be necessary to assess
malingering.  Further, the Court asked Dr. Thompson how many of
the individuals on the list were committed to Feliciana for
malingering evaluations, and he did not answer the question.
Instead, he said that about five to seven percent of the
individuals on the list "would meet a trigger to have [a
malingering] evaluation done."[101]  This figure, of course, is
different from how many Detainees may have been ordered to
Feliciana for the express purpose of a malingering assessment.
In any event, the Court finds the testimony surrounding the
malingering evaluations hard to believe.  As noted, the Court has
seen no court order committing an inmate to Feliciana for a
malingering evaluation.  In addition, this case was brought
because of the acknowledged scarcity of space at Feliciana.
Absent corroborating evidence, the Court finds it implausible
that the state would make space available to potential
malingerers while Incompetent Detainees who have been court-

---

[100] Prelim. Inj. Hr'g Trans. at 170-73.

[101] *Id.* at 173.

ordered to Feliciana await transfer for many months on end.

In addition, Dr. Thompson mentioned that some individuals who have been ordered by the court to ninety days of jail-based treatment and not committed to Feliciana appear on the Feliciana waiting list.[102]  Neither the waiting list itself, nor any court order or other record suggests that the list includes inmates who have *not* been judicially committed to Feliciana.  In fact, Dr. Thompson, who was the only witness who mentioned that prisoners might get on the waiting list for malingering evaluations or when they are ordered to ninety days of jail-based treatment, specifically testified that he was not responsible for maintaining the list.[103]  Furthermore, defendants could not identify which inmates supposedly fell into either of these two categories.  The Court has not been shown sufficient evidence to establish that inmates appear on the list for these specific reasons.

In any event, defendants freely acknowledge that forty-seven Incompetent Detainees are ready for transfer to Feliciana and face no obstacle to transfer, and they also admit that thirty-nine inmates are waiting for their paperwork to be completed before they are eligible for transfer.  The outcome of this case in no way depends on whether every individual on the list is an

---

[102] *Id.* at 178-81.

[103] *Id.* at 189.

Incompetent Detainee, as defined.  And defendants do not contest that there are numerous Incompetent Detainees who have been awaiting transfer for many months, at least two of whom have been awaiting transfer for over one year.[104]

### vii. Paperwork Required by Statute

Defendants additionally argue that certain Incompetent Detainees cannot be transferred because Feliciana cannot admit a Detainee until the court furnishes particular information.  This information is detailed by statute, which provides as follows:

> No superintendent of an institution shall admit a defendant found by the court to lack the mental capacity to proceed pursuant to Article 648 unless he is furnished by the court the following information:
>
> (1) The name and address of the defendant's attorney.
> (2) The crime or crimes with which the defendant is charged and the date of such charge or charges.
> (3) A copy of the report of the sanity commission.
> (4) Any other pertinent information concerning the defendant's health which has come to the attention of the court such as injuries sustained following incarceration.
> (5) A copy of the defendant's criminal history record.
> (6) A copy of the police report concerning the charged offense.
> (7) A copy of the judgment and order specifying the nature and purpose of the commitment or recommitment to the state institution.[105]

Michelle Duncan testified that although this information is

---

[104] *See* R. Doc. 53-1 at 2, 5.

[105] La. Code Crim. Proc. art. 648.1.

37

supposed to be "furnished by the court," her staff frequently has to get the documents.[106]  She indicated getting the documents is "not something we like to do" because "that's not really our job."[107]  Accordingly, defendants contend that these individuals may not be transferred immediately because their paperwork is not complete, and their transfer would thus be in violation of Louisiana law.

This argument that thirty-nine Detainees do not have their paperwork completed and thus cannot be transferred uses the term "completed" loosely.  All the paperwork exists; it just has not been collected all in one place.  Defendants cannot seriously suggest that the Incompetent Detainees' continued and lengthy imprisonment without trial is justified by a failure to locate and assemble seven documents.  Some of these Detainees whose paperwork has not been completed have been on the waiting list for months.  At least ten of the individuals with incomplete paperwork were placed on the list in 2009.[108]  A few of these individuals have been awaiting the submission of these seven documents for more than nine months.  The Court cannot fathom why these materials cannot be transported or transmitted immediately, and defendants have not even attempted to explain why their

---

[106] Prelim. Inj. Hr'g Trans. at 99-100.

[107] *Id.* at 117-18.

[108] R. Doc. 53-2.

failure to make efforts to collect a small packet of paper would possibly justify the continued imprisonment without trial of thirty-nine individuals.  Paperwork is simply not that great of a burden.  And even though Louisiana law commands that the Detainees cannot be admitted to Feliciana without the completion of the paperwork and that the responsibility for the paperwork does not lie with defendants, defendants clearly share this responsibility in practice.  This provision cannot be used to justify the deprivation of defendants' constitutional rights.

### viii. Defendants' Attempts to Remedy the Problem

The particular problem that plaintiffs identify is one that is chronic and structural.  Defendants do not suggest that the lengthy detention of the Incompetent Detainees is a recent or temporary phenomenon.  In fact, they acknowledge that the condition has persisted for some time.  And the Court has been presented with nothing to indicate that defendants have been able to remedy the existing state of affairs.

Dr. Thompson testified that since the CFS program was established in 1993, there has always been a waiting list for individuals who have been court-ordered to Feliciana but have not been transferred on account of lack of space.[109]  He stated that approximately two hundred individuals are committed to Feliciana

---

[109] Prelim. Inj. Hr'g Trans. at 206.

every year, and that twenty-one of the individuals who were on the list in October of 2009 were still awaiting transfer as of June 22, 2010.[110]  Of the fifty-three people on the list who were eligible for immediate transfer at the time of the preliminary-injunction hearing, Dr. Thompson expected that it would take between six and nine months for those individuals to be transferred.[111]  In that time, between one hundred and one hundred fifty new Incompetent Detainees would be added to the list, and a percentage would be removed from the list.[112]

Dr. Thompson also testified at some point before Hurricane Katrina in August of 2005, Feliciana opened up fifty new beds for specialized competency restoration, and after Katrina the hospital opened another twenty-five beds for a fast-track competency unit.[113]  This unit "is for individuals we think that are on the list but can be restored fairly quickly, or responded to antipsychotic meds in the past rather quickly, so we can admit them to that particular unit."[114]  Even with these expansions, the waiting list has not been alleviated.  Although the length of the list fluctuates, Dr. Thompson testified that it has gotten as

---

[110] *Id.* at 194, 215.

[111] *Id.* at 215.

[112] *Id.*

[113] *Id.* at 185.

[114] *Id.*

short as thirty or forty transfer-eligible individuals, and on
the other end, has reached the point where the number of these
individuals was in the nineties.[115]  And these numbers reflect
only Detainees with complete paperwork.

In addition, Dr. Inglese testified that the number of
mentally ill individuals in Louisiana jails had increased after
Hurricane Katrina because those individuals have "lost their
providers; they went off their medication [and] drugs and alcohol
use have skyrocketed."[116]  His view is that "many, many, many more
patients with serious mental illness [are being] arrested; many,
many, many more people with serious drug and alcohol problems
[are being] arrested."[117]  He also testified that he understood
that "there have been massive cuts in the number of inpatient
beds at treatment facilities."[118]  There is thus no reason to
think that the number of Detainees who are imprisoned while
awaiting transfer or that the length of their delays are
decreasing.  In fact, the evidence suggests that both figures are
on the rise.

---

[115] *Id.* at 186.

[116] *Id.* at 42.

[117] *Id.* at 43.

[118] *Id.* at 43.  This statement was allowed over the objection
of defendants' counsel, as Dr. Inglese heard this from Susan
Johannsen, who is a representative of defendants.  *See* FED. R.
EVID. 801(d)(2).

41

ix. *Additional Case Law and Conclusions*

Again, "due process requires that the nature and duration of commitment bear some reasonable relationship to the purpose for which the individual is committed."[119]  And the continued imprisonment of the Incompetent Detainees in parish jails — even with the scant additional services provided by CFS's jail-based treatment program — does not bear a reasonable relationship to either restoring the Detainees to competency or determining that they will never become competent.  The Incompetent Detainees remain in jail because Feliciana is full, not because there is any suggestion that remaining in jail might restore their competency.  Nothing in the evidence or testimony presented suggests otherwise.  Thus, under the Supreme Court's decision in *Jackson*, the Fourteenth Amendment rights of the Incompetent Detainees are being infringed upon.

The Court's holding in this matter is similar to the holdings of other courts that have confronted similar facts.  In *Oregon Advocacy Center v. Mink*, the Ninth Circuit found that the Fourteenth Amendment rights of pretrial detainees were violated when they were incarcerated in county jails while awaiting transfer to the state mental hospital, which had refused to admit

---

[119] *Jackson*, 406 U.S. at 738.

them in a timely manner.[120]  The pretrial detainees in that case waited, on average, one month in county jails before being transferred, and the court noted that "[i]n many cases, defendants had to wait two, three, or even five months."[121]  In holding that the regime violated the detainees' constitutional rights, the court looked to *Jackson* and found that, while awaiting transfer, the continued confinement of the detainees bore no legitimate relationship to the purposes for which they remained confined — that is, to restore them to competency or to determine that they would never be fit to stand trial.  Only a state facility and not a county jail furthered the goal of evaluating, treating, and restoring the mental health of the detainees.

> Only [the state mental hospital] has the highly trained staff and other resources needed to identify and treat an incapacitated criminal defendant's mental illness. County jails are simply unable to provide restorative treatment, and the jails' disciplinary systems may exacerbate the defendants' mental illnesses.  Holding incapacitated criminal defendants in jail for weeks or months violates their due process rights because the nature and duration of their incarceration bear no reasonable relation to the evaluative and restorative purposes for which courts commit those individuals.[122]

The scenario presented in *Mink* is starkly similar to the one before the Court, except, of course, that Incompetent Detainees

---

[120] 322 F.3d 1101 (9th Cir. 2003).

[121] *Id.* at 1105.

[122] *Id.* at 1122.

in Louisiana wait longer than those in Oregon.

The U.S. District Court for the Eastern District of Arkansas reached a similar conclusion. In the 2002 case of *Terry ex rel. Terry v. Hill*, the court examined a similar statutory scenario to the one involved here. Criminal defendants found to lack capacity were to be transferred to a state mental hospital, which was full. As a result, the detainees remained in jail. "The average wait [before transfer] is over eight months for inpatient evaluations [of competency] and over six months for inmates awaiting treatment."[123] The court found that the conditions of the state jails were highly inadequate to meet the mental-health needs of the inmates. "The lack of inpatient mental health treatment, combined with the prolonged wait in confinement, transgresses the constitution. The lengthy and indefinite periods of incarceration, without any legal adjudication of the crime charged, caused by the lack of space at [the state mental hospital], is not related to any legitimate goal, is purposeless and cannot be constitutionally inflicted upon the [incompetent detainees]."[124]

In addition, in *Mink* and *Terry*, the decision to keep the detainees in jail was not the result of any kind of professional decision-making. Here, too, there is no evidence that the

---

[123] *Terry*, 232 F. Supp. 2d at 938.

[124] *Id.* at 943-44.

44

decision to keep the Incompetent Detainees in parish jails for lengthy durations of time was made by any mental-health professional.[125]   In fact, the opinion of virtually all the mental-health professionals appears to be that it is in the Detainees' best interest to get them to Feliciana quickly.[126]   A state court and a sanity commission of mental-health professionals have recommended inpatient treatment and have specifically rejected jail-based treatment.   Dr. Dvoskin testified that a transfer of the Detainees to an inpatient facility, even taking logistical concerns into account, should be accomplished within a few days.[127]   Dr. Inglese noted that jails are a "poor substitute" for inpatient rehabilitation, and he recounted numerous ways in which the Incompetent Detainees would benefit from treatment at a facility like Feliciana.[128]   Michelle

---

[125] *See Youngberg*, 457 U.S. at 323 (infringement of an inmate's substantive-due-process rights depends upon whether his conditions reflect "a substantial departure from accepted professional judgment, practice, or standards . . . [which] demonstrate[s] that the person responsible did not base the decision on [a professional] judgment").

[126] Only Susan Johannsen expressed the view that not all the Incompetent Detainees should be transferred to Feliciana.   *See* Prelim. Inj. Hr'g Trans. at 150-51.   But this view directly conflicts with the order of the state court as well as the recommendation of the sanity commission.   The Court cannot find that the view of Johannsen, a social worker, can override the explicit order of a state court and the finding of a commission of psychologists and psychiatrists.

[127] *Id.* at 82.

[128] *Id.* at 25, 27-28, 33-35.

45

Duncan stated that no psychiatrist or psychologist affiliated with Feliciana has made an independent determination that the Incompetent Detainees do not require inpatient treatment at Feliciana.[129]  Dr. Thompson testified that establishing the CFS jail-based treatment program was "a better way to do business" than not having such a program, and that the program would improve the relationship between Feliciana and the courts and "help the flow of patients go through the system more quickly."[130] But he did not testify that a mental-health professional had determined that the Detainees should remain in parish jails despite a court order, and he stated that the patients would move to Feliciana more quickly if there were more beds available.[131]

In sum, the evidence presented indicates that the decision to keep the Detainees in parish jail is an economic one and not one made out of concern for their mental-health treatment.  The Court therefore cannot find that the state's interest outweighs the Detainees' liberty interests under the *Youngberg* inquiry.

Defendants present little evidence to contest these determinations.  The thrust of their entire defense appears to be that the situation is not quite as bad as it appears.  Although defendants attempt to chip away at plaintiffs' arguments by

---

[129] *Id.* at 116.

[130] *Id.* at 203.

[131] *Id.* at 205.

46

suggesting that there are fewer Incompetent Detainees awaiting
transfer than the waiting list might suggest, or that not many of
the Detainees remain in jails for many months on end, they do not
dispute many of plaintiffs' essential contentions.

It is critical to keep in mind that, for all the Incompetent
Detainees in question, a Louisiana court has determined that they
require inpatient restorative treatment and not the kind of
outpatient treatment that is provided to them while they remain
in jail.  By statute, the state court makes this determination
because the defendant's capacity is not likely to be restored
within ninety days, and a sanity commission has recommended
inpatient treatment at Feliciana.  Thus, the refusal to accept
the Incompetent Detainees, which results in their continued
incarceration, is not even in compliance with the order of the
Louisiana court and the sanity commission.  A state court and a
panel of mental-health professionals have recommended inpatient
treatment because a detainee is not likely to improve through
jail-based treatment, but jail-based treatment is what the
Detainees receive.

Furthermore, "[p]ersons who have been involuntarily
committed are entitled to more considerate treatment and
conditions of confinement than criminals whose conditions of

confinement are designed to punish."[132]  Here, by virtue of their detention in parish jails, the Incompetent Detainees who have been convicted of no crime are being held in conditions substantially similar to those designed to punish.  Defendants suggest that they have established a proactive and non-punitive system for dealing with the Detainees.  Nevertheless, the Supreme Court has observed that "confinement in prison is punitive and hence more onerous than confinement in a mental hospital."[133]  That the Incompetent Detainees might have the hope that they will at some unidentifiable point in the future be transferred from jail to a mental-health facility in compliance with court order does not mean that their continued, lengthy imprisonment is non-punitive.  And the evidence presented to the Court establishes that during the twenty-eight days out of every month that the Incompetent Detainees are not being visited by a Coordinator, the level of mental-health treatment is indistinguishable from that available to any other inmate.

This determination is not, as defendants suggest, made upon

---

[132] *Youngberg*, 457 U.S. at 321-22.  Of course, the Detainees are in parish jails because they are alleged to have committed crimes.  But they have not been convicted of those crimes, and thus cannot be subject to conditions designed to punish.  *See Bell*, 441 U.S. at 535 ("under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law").

[133] *Heller v. Doe ex rel. Doe*, 509 U.S. 312, 315 (1993).

"a court's idea of how best to operate a detention facility."[134] It is made in compliance with the law.  Defendants have pointed to no legal authority that would suggest that their position is the correct one.

The Court recognizes the limitations that are placed upon defendants, and it acknowledges that defendants have made some attempt to provide a modicum of mental-health treatment for the Incompetent Detainees while they await one of the limited vacancies at Feliciana.  Defendants' limited resources are a concern, but lack of funding cannot justify the continued detention of defendants who have not been convicted of any crime, who are not awaiting trial, and who are receiving next to no mental-health services.  While these Detainees are in parish jails, their continued confinement bears no rational relationship to the restoration of their competency.  Their confinement is also not the result of any decision by a mental-health professional.  And it is undisputed that they remain in parish jails for extended periods of time.  Plaintiffs have therefore demonstrated a likelihood of success on the merits of their as-applied challenge to the continued detention of the Incompetent Detainees.

---

[134] R. Doc. 53 at 11.

49

### x. Plaintiffs' Facial Challenge

Again, plaintiffs have satisfied the first prong of the preliminary-injunction test for their as-applied challenge.  They have not, however, demonstrated a likelihood of success on the merits on their claim that the Louisiana statutes are facially unconstitutional.

Plaintiffs assert that in concert, Article 648 of the Louisiana Code of Criminal Procedure and Section 28:25 of the Louisiana Revised Statutes foster a regime under which Incompetent Detainees who are committed by court order to Feliciana for inpatient mental-health treatment must, by law, be turned away to await transfer in parish prisons.  They therefore ask that both laws be declared unconstitutional.

A plaintiff who seeks to bring a facial challenge to a statute must demonstrate that "no set of circumstances exist under which the Act would be valid, *i.e.*, that the law is unconstitutional in all its applications."[135]  It is insufficient for a plaintiff to establish that the statute would be unconstitutional under some conceivable set of circumstances.[136]  Here, plaintiffs have established that the challenged laws permit

---

[135] *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987); *see also Hersh v. United States ex rel. Mukasey*, 553 F.3d 743, 762 n.23 (5th Cir. 2008).

[136] *See Salerno*, 481 U.S. at 745; *see also United States v. Robinson*, 367 F.3d 278, 290 (5th Cir. 2004).

mentally ill Detainees to fall into a kind of purgatory of
lengthy and unjustified detention.  But this finding depends upon
the condition that Feliciana can accept no additional patients,
and new patients are thus placed on a waiting list.  Plaintiffs
have identified no constitutional problem that would arise if
Feliciana has room for the Incompetent Detainees, and they are
transferred shortly after they are determined to be incompetent.
Although Louisiana Code of Criminal Procedure Article 648
contemplates that a Detainee might be held in parish jail for up
to 360 days while awaiting transfer to Feliciana — which would
certainly be a violation of the Detainee's due-process rights —
the Article does not *require* that the detainee be held for such a
period.  The laws do not mandate that Incompetent Detainees
remain in parish jails for extended periods of time; the
circumstances do.  And plaintiffs have not made any argument that
the statutes are vague or otherwise subject to facial challenge.

Because plaintiffs have not shown that Article 648 of the
Louisiana Code of Criminal Procedure and Section 28:25 of the
Louisiana Revised Statutes are unconstitutional in every
circumstance, they have not demonstrated a likelihood of success
on the merits for their facial challenge.  They have established
a substantial likelihood of success on the merits of their as-
applied claim, and they have thus satisfied the first prong of
the preliminary-injunction standard for this claim.

51

### 3. Substantial Threat of Irreparable Injury

Plaintiffs have demonstrated a substantial threat of irreparable injury if the Court does not issue the injunction. The Incompetent Detainees, including W.B., are inmates in parish prisons.[137]  They have not been convicted of a crime and are not awaiting trial.  There is little question that the state has the authority to detain incompetent defendants for the purposes of determining whether they are or will become competent to proceed.[138]  But, as explained, the Supreme Court has placed limits on such actions.[139]

State-imposed pretrial imprisonment without conviction is a "massive curtailment of individual liberty."[140]  While such curtailment might be justified under certain circumstances, here plaintiffs have made a showing of substantial likelihood that it is not.  "[U]nnecessary deprivation of liberty clearly constitutes irreparable harm."[141]  The threat of irreparable harm

---

[137] Again, W.B. was transferred out of OPP during the briefing of these motions.  But, as explained above, the Court is not convinced that his injury is not capable of repetition.

[138] *See Jackson*, 406 U.S. at 738.

[139] *Id.*

[140] *See Boston v. Lafayette County, Miss.*, 743 F. Supp. 462 (N.D. Miss. 1990) (quoting *Humphrey v. Cady*, 405 U.S. 504, 509 (1972)).

[141] *United States v. Bogle*, 855 F.2d 707, 710-11 (11th Cir. 1998); *see also Burdine v. Johnson*, 87 F. Supp. 2d 711, 717 (S.D. Tex. 2000) (habeas petitioner "suffers irreparable harm each day

typically exists when a possible violation of fundamental rights is at stake.[142]

In addition, plaintiffs have presented evidence that continued incarceration could exacerbate the Incompetent Detainees' mental conditions.  Dr. Dvoskin testified that the mental condition of psychotic inmates can be exacerbated by confinement in jail.[143]  Defendants do not contest this, and this finding is consistent with the evidence presented in other cases with similar fact patterns.[144]

Plaintiffs have therefore demonstrated that they will suffer irreparable harm if the preliminary injunction does not issue, and they have satisfied the second prong of the inquiry.

### 4. Whether the Threatened Injury to Plaintiffs Outweighs the Damage an Injunction Might Cause Defendants

Defendants contend that the burden that an injunction would place on defendants outweighs the threatened injury to plaintiffs

---

that he is imprisoned in violation of the United States Constitution").

[142] *See, e.g., Covino v. Patrissi*, 967 F.2d 73, 77 (2d Cir. 1992); *Newdow v. Bush*, 355 F. Supp. 2d 265, 292 (D.D.C. 2005); *Lincoln Cercpac v. Health & Hosp. Corp.*, 920 F. Supp. 488, 495-96 (S.D.N.Y. 1996); *United States v. State of Mich.*, 534 F. Supp. 668, 669 (W.D. Mich. 1982).

[143] *See* Prelim. Inj. Hr'g Trans. at 78.

[144] *See Terry*, 232 F. Supp. 2d at 940-41; *see also Lynch v. Baxley*, 744 F.2d 1452, 1458 (11th Cir. 1984).

because the state will have to reallocate money from elsewhere. The Court does not doubt defendants' assertion that "[i]t is simply a fact that funding for health care in Louisiana has reached the point of being a zero-sum game; if DHH is ordered to spend more in one area, it must cut another area to obtain the necessary funding to comply with the order."[145]  But such a concern is insufficient to prevent the issuance of a preliminary injunction.  The Fifth Circuit has held that "[i]t is well established that inadequate funding will not excuse the perpetuation of unconstitutional conditions of confinement."[146]  A state's constitutional duties toward those involuntarily confined in its facilities does not wax and wane based on the state budget.  Plaintiffs have therefore met the third prong of the preliminary-injunction standard.

### 5. Public Interest

Finally, plaintiffs have adequately demonstrated that an injunction will not disserve the public interest.  It cannot be denied that there is a strong public interest in protecting the Fourteenth Amendment rights of those in state custody who have

---

[145] R. Doc. 29 at 17.

[146] *Smith v. Sullivan*, 611 F.2d 1039, 1043-44 (5th Cir. 1980).

not been convicted of a crime.[147]  There is a similar public interest in having those charged with criminal offenses proceed speedily to trial.  Again, defendants' argument that it will have to reallocate resources from elsewhere in order to satisfy an injunctive order is not a legitimate consideration and will not prevent the issuance of the injunction.

Defendants have not presented the Court with any alternative other than transfer to Feliciana that would meet the needs of the Incompetent Detainees.  Their position is that the Detainees should remain in parish jails, seeing a CFS coordinator twice a month, until there is space at Feliciana for them within months or even years.  This alternative to transfer is hardly an advancement of the public interest.  Plaintiffs have therefore satisfied the fourth and final prong of the preliminary-injunction standard, and they are entitled to injunctive relief.

### 6. Requirement of Security for Injunctive Relief

Rule 65(c) of the Federal Rules of Civil Procedure states that "[t]he court may issue a preliminary injunction or temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages

---

[147] *See Nobby Lobby, Inc. v. City of Dallas*, 970 F.2d 82, 93 (5th Cir. 1992) ("the public interest is always served when public officials act within the bounds of the law and respect the rights of the citizens they serve") (quoting case below, 767 F. Supp. 801, 821 (N.D. Tex. 1991)).

sustained by any party found to have been wrongfully enjoined or restrained." The Fifth Circuit, however, has recognized an exception to this requirement for litigants who bring suit in the public interest.[148] In addition, "[w]aiving the bond requirement is particularly appropriate where a plaintiff alleges the infringement of a fundamental constitutional right."[149] It is highly unlikely, furthermore, that W.B., an incarcerated minor who has been determined unfit to stand trial, would be able to afford the costs and damages suffered by defendants if they are later demonstrated to have been wrongfully enjoined. The requirement of security is therefore waived.

## III. Conclusion

For the foregoing reasons, defendants' motion to strike is DENIED. Plaintiffs' Motion for a Preliminary Injunction is DENIED IN PART to the extent that they have failed to show a likelihood of success on the merits of their facial challenge to the statutes at issue. It is GRANTED in all other respects.

Defendants are hereby ENJOINED AND ORDERED to transfer to Feliciana **within twenty-one days of the issuance of this Order** all Incompetent Detainees who (1) have been committed to

_____

[148] *City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*, 636 F.2d 1084, 1094 (5th Cir. Unit B Feb 1981).

[149] *Complete Angler, LLC v. City of Clearwater, Fla.*, 607 F. Supp. 2d 1326, 1335 (M.D. Fla. 2009).

Feliciana by court order, (2) are currently eligible for transfer to Feliciana, and (3) have not yet been transferred.  This time period acknowledges that defendants will need time to prepare for the arrival of the Incompetent Detainees at Feliciana.

For those Detainees who have been committed to Feliciana by court order but are not currently eligible for transfer to Feliciana on account of incomplete paperwork, defendants are ENJOINED AND ORDERED to take all necessary steps to contact the appropriate courts in an effort to expedite the transmission of the Detainees' paperwork.  These contacts shall be made within **ten days from the issuance of this Order**.

This Order shall remain in effect until a trial is conducted on the merits, or until it is otherwise modified by the Court. It shall also apply to all Incompetent Detainees who are committed to Feliciana by Louisiana state courts after this Order becomes effective.  If a defendant in Louisiana court is committed to Feliciana under Article 648 while the Order is in effect, defendants are ORDERED to transfer the defendant to Feliciana no later than **twenty-one days from the court order**.

Defendants are additionally ORDERED to submit a status report under seal to the Court **thirty days after the issuance of this order**.  This report shall detail which of the individuals who have been committed to Feliciana by court order have been transferred, and the date upon which they were transferred.  If

57

any of the Detainees have not yet been transferred on account of incomplete paperwork, this report shall include specific, detailed information about each Detainee that explains why the paperwork is still incomplete, what steps defendants have taken to obtain the paperwork, and when defendants expect the paperwork to be completed.  This report shall also include information about those Detainees who are committed to Feliciana after the issuance of this Order, including the date of the order and the date of the transfer or expected transfer.


SO ORDERED.



New Orleans, Louisiana, this _____9th_____ day of August, 2010.


_____

**SARAH S. VANCE**
**UNITED STATES DISTRICT JUDGE**

58