1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF LOUISIANA

3

4

5    ADVOCACY CENTER, et al         *        Docket 10-CV-1088-R
                                     *
6    versus                         *        New Orleans, Louisiana
                                     *
7    LOUISIANA DEPARTMENT OF         *        June 22, 2010
     HEALTH AND HOSPITALS, et al     *
8    * * * * * * * * * * * * * * * * *

9

10

11                     PROCEEDINGS BEFORE THE
                      HONORABLE SARAH S. VANCE
                    UNITED STATES DISTRICT JUDGE
12

13

     <u>Appearances</u>:
14

15   For the Plaintiffs:        Kirkland & Ellis, LLP
                                BY:  MARJORIE P. LINDBLOM, ESQ.
16                                   ADAM T. HUMANN, ESQ.
                                     MAURA M. KLUGMAN, ESQ.
17                              601 Lexington Avenue
                                New York, New York 10022
18

19   For the Plaintiffs:        American Civil Liberties
                                Foundation of Louisiana
20                              BY:  KATIE SCHWARTZMANN, ESQ.
                                     BARRY J. GERHARZ, ESQ.
21                              1340 Poydras Street, Suite 2160
                                Post Office Box 56157
22                              New Orleans, Louisiana 70156

23

     For the Plaintiffs:        Advocacy Center of Louisiana
24                              BY:  NELL HAHN, ESQ.
                                600 Jefferson Street, Suite 812
25                              Lafayette, Louisiana 70501

1    <u>Appearances</u>:

2

3    For the Defendants:          Louisiana Department of
                                  Health and Hospitals
                                  Bureau of Legal Services

4                                 BY:  NEAL R. ELLIOTT JR., ESQ.
                                       ADRIENNE T. BORDELON, ESQ.

5                                 628 N. 4th Street
                                  Post Office Box 3836

6                                 Baton Rouge, Louisiana 70821

7

8    Official Court Reporter:     Toni Doyle Tusa, CCR, FCRR
                                  500 Poydras Street, B-406

9                                 New Orleans, Louisiana 70130
                                  (504) 589-7778

10

11

12

13

14   Proceedings recorded by mechanical stenography; transcript
     produced by computer.

15

16

17

18

19

20

21

22

23

24

25

1                              <u>I N D E X</u>

2                                              <u>PAGE</u>

3    Charrie Butler
          Direct Examination                      8
4         Cross-Examination                       14

5    R. Demaree Inglese
          Direct Examination                      16
6         Cross-Examination                       45
          Redirect Examination                    55
7
     Marlin N. Gusman
8         Direct Examination                      57
          Cross-Examination                       62
9
     Joel Dvoskin
10        Voir Dire                               65
          Direct Examination                      70
11        Cross-Examination                       85

12   Christopher Arnold
          Direct Examination                      92
13        Cross-Examination                       97

14   Michelle Duncan
          Direct Examination                      98
15        Cross-Examination                       112
          Redirect Examination                    118
16
     Susan Johannsen
17        Direct Examination                      122
          Cross-Examination                       141
18        Redirect Examination                    152

19   John W. Thompson, Jr.
          Direct Examination                      160
20        Cross-Examination                       187
          Redirect Examination                    216

21

22

23

24

25

1          <u>**MORNING SESSION**</u>

2          **(June 22, 2010)**

3          **THE DEPUTY CLERK:**  All rise.

4               Be seated, please.

5          **THE COURT:**  Call the case.

6          **THE DEPUTY CLERK:**  Civil Action 10-1088, Advocacy

7     Center versus Department of Health and Hospitals, et al.

8          **THE COURT:**  Counsel, would you make your appearances

9     for the records, please.

10         **MS. LINDBLOM:**  My name is Marjorie Lindblom with the

11    firm of Kirkland & Ellis, LLP, representing the plaintiffs,

12    Advocacy Center and Charrie Butler, as mother and next friend

13    of WB.  With me are Maura Klugman and Adam Humann, also with

14    Kirkland & Ellis.

15         **MS. HAHN:**  Nell Hahn with the Advocacy Center for

16    plaintiffs.

17         **MS. SCHWARTZMANN:**  Katie Schwartzmann with the ACLU

18    of Louisiana for the plaintiffs.

19         **MR. GERHARZ:**  Barry Gerharz for the plaintiffs.

20         **MS. BORDELON:**  Adrienne Bordelon on behalf of the

21    Department of Health and Hospitals.

22         **MR. ELLIOTT:**  Neal Elliott, staff attorney with the

23    Department of Health and Hospitals.

24         **MS. HENIG:**  Joanne Henig.

25         **THE COURT:**  We had a motion to dismiss, which I think

1   is fully briefed, so I don't think we need to hear too much

2   about that.  If there's any additional arguments that are not

3   in the brief or cases that are not in the brief on standing,

4   you can tell me right now; otherwise, I think it's all pretty

5   much good.

6           MR. ELLIOTT:  Your Honor, if you would allow me, I

7   would like to just make a distinction between some of these

8   cases.  I think we have them all briefed, but --

9           THE COURT:  I can distinguish cases.  That's just

10  legal work.  I can do that.  I have one question for you, if

11  you don't mind answering it.  Can you tell me how WB's transfer

12  came about?

13          MS. BORDELON:  I can answer that, Your Honor.

14  Your Honor, WB was 17 at the time of his crime, and by policy

15  the Department of Health and Hospitals does not put minors or

16  people under 17 years of age at Feliciana Forensic.  So through

17  the Juvenile Justice Clearinghouse, when the Juvenile Justice

18  Clearinghouse for the department was notified that we had a

19  juvenile who had been found incompetent to stand trial, we

20  automatically took steps at that point to transfer him to our

21  juvenile facility.  That is why WB was transferred to our

22  juvenile facility at the time that he was.

23          THE COURT:  What is the juvenile facility?

24          MS. BORDELON:  He is at Central State Hospital in

25  Pineville.

1              THE COURT:  He was transferred in March?

2              MS. BORDELON:  He was transferred in May, Your Honor.

3              THE COURT:  How did that come about?  Who initiated

4      that?

5              MS. BORDELON:  Once I took over the matter of this

6      case -- I was not the original attorney assigned to it.  I do

7      the Juvenile Justice Clearinghouse work.  When I realized that

8      he was actually a juvenile, I took steps to have him moved to

9      our juvenile facility because Feliciana Forensic Facility does

10     not admit juveniles.  We have juvenile facilities for which we

11     house juveniles for competency restoration.

12             THE COURT:  So what did you do, file a motion or

13     something?

14             MS. BORDELON:  Yes, Your Honor.  We filed a motion

15     with the Orleans Parish court requesting that he be remanded

16     into the custody of the department to be placed at one of our

17     two juvenile facilities.  We have two juvenile facilities,

18     Your Honor:  One is Central Louisiana State Hospital; the other

19     one is Southeast Louisiana State Hospital.  The opening that we

20     had at the time was at Central Louisiana State Hospital, so he

21     was placed and he is undergoing competency restoration services

22     today.

23             THE COURT:  Is he still a juvenile?

24             MS. BORDELON:  Yes, ma'am.  Yes, Your Honor.

25             THE COURT:  Okay.  Let's proceed.  I understand we

1    have a witness we can start with.

2            **MS. LINDBLOM:**  Yes, Your Honor.  If I might just say

3    one thing on standing.  I feel a little at a disadvantage on

4    the standing issues because some of the arguments were really

5    not raised until their reply brief.  If Your Honor thinks that

6    we have got among the briefs a good understanding of the

7    standing issues, I don't want to take up the Court's time on

8    it.  One thing I would like to point out is that under the *Hunt*

9    case, as I think is clear, the apple growers were not members

10   as such.

11           **THE COURT:**  I got that.

12           **MS. LINDBLOM:**  Okay.  That's it, then.  Thank you,

13   Your Honor.

14           **THE COURT:**  Let's hear from the first witness.

15           **MS. KLUGMAN:**  The plaintiffs call Charrie Butler to

16   the stand.

17           **THE COURT:**  I am entering a sequestration order under

18   which witnesses are not to discuss their testimony with other

19   witnesses before or after they testify.  Expert witnesses can

20   stay in the courtroom.

21           (WHEREUPON **Charrie Butler**, having been duly sworn,

22   testified as follows.)

23           **THE DEPUTY CLERK:**  Please state your full name and

24   correct spelling for the record.

25           **THE WITNESS:**  Charrie Butler.  My son is WB.

1                      **DIRECT EXAMINATION**

2  **BY MS. KLUGMAN:**

3  **Q.**    Would you please spell your name for the Court, ma'am.

4  **A.**    Charrie, C-H-A-R-R-I-E.

5          **THE COURT:**  And your last name.

6          **THE WITNESS:**  Butler, B-U-T-L-E-R.

7          **MS. KLUGMAN:**  Good morning, Your Honor.  My name is

8  Maura Klugman and I represent the plaintiffs.

9  **BY MS. KLUGMAN:**

10  **Q.**    Ms. Butler, thanks so much for coming this morning.  As I

11  mentioned to you a moment ago, because your son is a juvenile,

12  we will refer to him as *your son* or *WB* while we are here today.

13  **A.**    That's okay.

14  **Q.**    Is that all right?

15  **A.**    Yes.

16  **Q.**    Ms. Butler, would you please state where you live for the

17  record.

18  **A.**    4714 Shalimar Drive in New Orleans East, 70126.

19  **Q.**    Are you the mother of plaintiff WB?

20  **A.**    Yes, I am.  My son is WB.

21  **Q.**    When was he born, Ms. Butler?

22  **A.**    Ninth month, 30th, of 1992.

23  **Q.**    You're aware that WB was arrested last summer.  Where was

24  he living before he was arrested?

25  **A.**    1864 North Miro, ZIP code 70119.

1   **Q.**   Was that with you, ma'am?

2   **A.**   Yes, he was.

3   **Q.**   Has he always lived with you?

4   **A.**   Yes.

5   **Q.**   Do you know if your son was diagnosed with a mental

6   illness before he was arrested?

7   **A.**   Yes.

8   **Q.**   What was that?

9   **A.**   DHD, bipolar.

10          **MS. BORDELON:**  Objection, Your Honor.  She's no

11   medical expert on the issue --

12          **THE COURT:**  Overruled.

13          **MS. BORDELON:**  -- of bipolar.

14          **THE COURT:**  She's testifying as a fact witness that

15   her son was diagnosed with bipolar.  She didn't diagnose him.

16              Go ahead.  Proceed.

17          **MS. KLUGMAN:**  Thank you.

18   **BY MS. KLUGMAN:**

19   **Q.**   Ms. Butler, do you know if your son had ever been in

20   trouble with the law before his arrest last fall?

21   **A.**   No.

22   **Q.**   He hadn't been, to your knowledge?

23   **A.**   No, not to my knowledge.  Like what you mean?

24   **Q.**   Had he ever been arrested before, gotten in trouble for

25   anything?

1  **A.**   Yes, when he was back in the -- like in the smaller days,

2  like when he was about 15 at the time.  I think he was 15 or

3  16.  I'm not sure.

4  **Q.**   What did he get in trouble for?

5  **A.**   Like minor stuff.

6  **Q.**   Do you remember what any of it was?

7  **A.**   One was for, I think -- let me see.  It was for some

8  truck -- a car, I think, a carjacking.

9  **Q.**   Okay.  Ms. Butler, do you remember when your son was

10  arrested this last time?

11  **A.**   August 3.

12  **Q.**   August 3 of what year?  Do you remember?

13  **A.**   2009.

14  **Q.**   2009.  Did you ever go see him in jail after he was

15  arrested?

16  **A.**   I'd go see him every Sunday.

17  **Q.**   Every Sunday?

18  **A.**   Yes.

19  **Q.**   Did you see him every Sunday since he was arrested?

20  **A.**   Yes, I did.

21  **Q.**   How long were you able to see your son when you would

22  visit every Sunday?

23  **A.**   15 minutes.

24  **Q.**   15 minutes.  What did you talk about when you went to go

25  visit him in jail?

1    **A.**    How things at home going, what did his day go like and,

2    you know, what he did back there and, you know, how they

3    treated him.

4    **Q.**    What did he tell you about how he was being treated?

5    **A.**    He said that they told him --

6              **MS. BORDELON:**  Objection, Your Honor.

7              **THE COURT:**  What is your hearsay exception?

8              **MS. KLUGMAN:**  It's a catchall exception, Your Honor.

9    He is unavailable and unable to come in today.  His mother was

10   in there talking to him.  It's really the best way to get this

11   evidence put forward today.

12             **MS. BORDELON:**  Your Honor, had plaintiffs subpoenaed

13   WB, the department would have provided him here at the hearing

14   this morning.

15             **MS. KLUGMAN:**  It's not being offered for the truth of

16   the matter asserted.  It's just what he told his mother.

17             **THE COURT:**  I think I'm going to accept it not for

18   the truth but for the fact that the statements were made.  Go

19   ahead.

20   **BY MS. KLUGMAN:**

21   **Q.**    Go ahead and repeat what you were saying.  What did he

22   tell you when you would talk to him about how he was being

23   treated?

24   **A.**    He say every time I would give him money, he said they

25   fought him, they beat him up, and they jumped him over his --

 1          **THE COURT:**  Wait, wait, wait.  You have to slow down,
 2  ma'am.  I'm having trouble understanding you.  He said what?
 3  Every time --
 4          **THE WITNESS:**  He say every time, you know, he was
 5  back there -- I say, "Well, what you did today?"
 6                  He said, "I had a fight."
 7                  I say, "Like what?"
 8                  He say, "I had a fight because when I came to
 9  use the phone to talk to you, they was fighting me over my, you
10  know, stuff."
11  **BY MS. KLUGMAN:**
12  **Q.**   Did he tell you anything else, ma'am?
13  **A.**   He told me that, you know, he didn't like the way he was
14  treated in there and that was, you know --
15          **MS. BORDELON:**  Objection, Your Honor:  Relevancy.
16          **THE COURT:**  Overruled.
17  **BY MS. KLUGMAN:**
18  **Q.**   Go ahead and tell me what he was telling you about how he
19  didn't like being in there.
20  **A.**   It was hot.  He said they was frustrated.  There was too
21  much noise.  He was telling me that, you know, he wish he
22  could, you know, get out and, you know, he is tired of, you
23  know, going through fights every day.
24  **Q.**   Then, ma'am, did you ever go into court with your son?
25  **A.**   Yes, I did.

1    **Q.**    Did you go with him every time he went to court?

2    **A.**    Yes, I did.

3    **Q.**    Do you remember that a judge said that your son should be

4    in the hospital?

5    **A.**    Yes, uh-huh.

6    **Q.**    Is your son in the hospital now?

7    **A.**    Yes, he is.

8    **Q.**    Do you remember when your son was sent to the hospital?

9    **A.**    May.  I'm not too sure what part of May.

10   **Q.**    Did May sound right to you, ma'am?

11   **A.**    Yes.

12   **Q.**    Now that he is in the hospital, do you ever get to speak

13   to him on the phone?

14   **A.**    I speak with him every day, all day.

15   **Q.**    What does he tell you now?

16   **A.**    He is doing better.

17   **Q.**    What does he tell you about that?

18   **A.**    I asked him, I said, "Well, how things is over there?" and

19   he say much better.

20   **Q.**    Does he tell you why?

21   **A.**    I ain't never discussed, no --

22          **THE COURT:**  I'm sorry.  I can't hear you.

23          **THE WITNESS:**  He is, like, everything going, you

24   know, okay.

25

1   BY MS. KLUGMAN:

2   **Q.**   Ms. Butler, are you happy that your son is now in the

3   hospital instead of in Orleans Parish Prison?

4   **A.**   Yes, I am.  Very.

5                **MS. KLUGMAN:**  Thank you very much, ma'am.

6                **THE COURT:**  Cross-examination.

7                **MS. BORDELON:**  Ms. Butler and Your Honor, my name is

8   Adrienne Bordelon on behalf of the Department of Health and

9   Hospitals.

10                               **CROSS-EXAMINATION**

11   BY MS. BORDELON:

12   **Q.**   Ms. Butler, since your son has been at Central Louisiana

13   State Hospital, you have not been up there to visit him, have

14   you?

15   **A.**   No, I never did.  I want to go see him, but everybody say

16   they don't have a ride.  I want to go see him, but I just never

17   have no chance.  You know, somebody just told me they didn't

18   have no way to get over there.  But I would like to go see him

19   if I thought it was okay I could go and see him.  But I

20   wouldn't miss a day.  He knew it.  If I had a way that I could

21   get to him, I would get to him.

22   **Q.**   Ms. Butler, are you aware that if he is restored to

23   competency, he would be returned to the Orleans Parish Prison?

24   **A.**   Yes.  What you mean?

25                **THE COURT:**  Do you not understand the question?

1    **THE WITNESS:**  No.

2    **BY MS. BORDELON:**

3    **Q.**   Do you understand that if the doctors at Central Louisiana

4    State Hospital determine that he has been restored to

5    competency, such that he is competent to stand trial, that he

6    will be returned to the Orleans Parish Prison?

7    **A.**   Yes.

8    **Q.**   Do you realize that just because he has been found right

9    now to be incompetent to stand trial does not mean he will not

10   stand trial for the crimes for which he has been accused?

11   **A.**   Yes, I understand.

12   **Q.**   Do you realize that he will not spend his life at a mental

13   institution if he is found competent to stand trial?

14   **A.**   Yes.

15           **MS. BORDELON:**  No further questions, Your Honor.

16           **THE COURT:**  Redirect.

17           **MS. KLUGMAN:**  No redirect, Your Honor.

18           **THE COURT:**  Let me ask you a question, ma'am.  When

19   your son was in Orleans Parish Prison, was he receiving

20   medication?

21           **THE WITNESS:**  Well, I told them Seroquel, but I don't

22   know if they gave it to him.

23           **THE COURT:**  You told the prison people that he was

24   taking --

25           **THE WITNESS:**  Yes.  Yes, I did.  I did tell them

1   that.

2          **THE COURT:**  But you don't know whether he was

3   receiving that or not?

4          **THE WITNESS:**  No.

5          **THE COURT:**  You may step down, ma'am.  Thank you.

6          **MS. LINDBLOM:**  Your Honor, the plaintiffs call as

7   their next witness Dr. Demaree Inglese.

8          (WHEREUPON **R. Demaree Inglese**, having been duly

9   sworn, testified as follows.)

10         **THE DEPUTY CLERK:**  Please state your full name and

11  correct spelling for the record.

12         **THE WITNESS:**  My name is Dr. Richard Demaree Inglese.

13  Richard, and Demaree is spelled D-E-M-A-R-E-E.  Inglese is

14  I-N-G-L-E-S-E.

15                     **DIRECT EXAMINATION**

16  **BY MS. LINDBLOM:**

17  **Q.**   Good morning, Dr. Inglese.  As you know, my name is

18  Marjorie Lindblom.  I represent the plaintiffs here.

19         Can you tell us where you work, please.

20  **A.**   I'm the medical director of the St. Tammany Parish

21  Sheriff's Office.

22  **Q.**   Were you subpoenaed to appear here today?

23  **A.**   I was.

24  **Q.**   Tell us your education, please.

25  **A.**   Yes.  I went to Case Western Reserve University as an

1    undergrad.  It's a small engineering school in Ohio.

2           Following that, I attended the University of

3    Pennsylvania School of Medicine in Philadelphia.  After that, I

4    did my residency in internal medicine at Keesler United States

5    Air Force Medical Center in Biloxi, Mississippi.

6    **Q.**   Are you a certified psychiatrist?

7    **A.**   I am not.

8    **Q.**   You're an internist?

9    **A.**   Yes, I am.

10   **Q.**   Can you briefly give us a recap of your job history.

11   **A.**   Following my residency, I was deployed to Korea, where I

12   served as chief of medical services flight, so I ran an

13   internal medicine clinic, a primary care clinic.  I was medical

14   director for an emergency department.  I also taught students

15   at the Dongguk University (phonetic) medical school in Seoul,

16   Korea.

17          Following that, I returned to the states and was

18   stationed at Andrews Air Force Base, the base hospital, where I

19   served primarily as a hospitalist, an internist that takes care

20   of inpatients.  I also served as attending for NICU, attending

21   to their CCU, consultant to the emergency department, and I

22   taught for the Uniform Services medical school in Bethesda.

23          After that, I got out of the Air Force and came to

24   New Orleans.  I practiced for roughly nine months as an

25   inpatient hospitalist at West Jeff and then was hired by

1    Sheriff Foti to become medical director of the Orleans Parish
2    Criminal Sheriff's Office, a post I held until July 2006.
3              **THE COURT:**   How long were you there?
4              **THE WITNESS:**   From 2000.  I started as medical
5    director in November of 2000, and I concluded my tenure as
6    medical director in July of 2006.
7    **BY MS. LINDBLOM:**
8    **Q.**    And after OPP?
9    **A.**    Well, coincident with that job for a while, from April of
10   2004 to the present, I also served as medical director of the
11   St. Tammany Parish Sheriff's Office.  Then post-Katrina, it was
12   very difficult to have both jobs because neither cities were
13   running optimally, so I resigned from my post at OPP and
14   continued on in St. Tammany.
15   **Q.**    Just so that we are clear, it's about 10 years, now, that
16   you have worked as a correctional health doctor?
17   **A.**    Yes.  Slightly over 10 years.
18   **Q.**    What were your job responsibilities at OPP?
19   **A.**    OPP, there was, of course, some direct patient care, but
20   that wasn't a large, large portion of my job.  I reserved
21   basically the more complex internal medicine cases and the
22   infectious disease cases for myself.
23              Most of my job was administrative, overseeing the
24   medical staff that was there, the physician care.  I designed a
25   quality improvement department and infection control

1   department, a medical records system, and educational training

2   department, so making sure that these daily operations ran.

3   Contract negotiations.  Interfacing with the community.  All

4   budgetary things.  Overseeing sort of all aspects of both

5   patient care and provider performance was, I guess, the easiest

6   way to talk -- and interfacing, of course, with security.

7   **Q.**   What was the size of the medical staff while you were at

8   OPP?

9   **A.**   OPP had a resident inmate population of about 6,200 to

10  6,500 at the time.  We had 13 full-time physician equivalents.

11  The reason I say "equivalents" is because at night we were

12  manned by an ER group of, I think, roughly 50 physicians who

13  would alternate, but it was the equivalent of 13 full-time

14  physician slots.

15          We had roughly 75 nurses, and then medical

16  assistants, seniors, clerical support staff totaled -- I

17  believe the entire medical department was somewhere in the

18  realm of about 130 to 150 people.

19  **Q.**   At OPP, were there any full-time psychiatrists?

20  **A.**   Yes.  We had two full-time psychiatrists:  Dr. Michael

21  Higgins and Dr. Kenneth Sumner.

22          Dr. Higgins was also faculty at LSU, and so there was

23  an active residency training program that went on at OPP

24  training.  Resident psychiatrists who were completing their

25  education could do additional training in forensic psychiatry,

1  which is Dr. Higgins' specialty.

2  **Q.**   Now, let's talk about St. Tammany.  What are your job

3  responsibilities at St. Tammany?

4  **A.**   My administrative responsibilities are the same just on a

5  smaller scale.  I oversee the medical staff.  I do a lot more

6  direct patient care and interfacing with security.  So it's

7  sort of the same, just on a smaller scale.

8  **Q.**   What is the size of the medical staff at St. Tammany?

9  **A.**   We have roughly 16 nurses, 4 medical assistants --

10  **Q.**   Is that 60 or 16?

11  **A.**   Oh, I'm sorry.  16.

12  **Q.**   Okay.

13  **A.**   16 nurses, four medical assistants, some ancillary

14  support, clerical support staff, and three full-time

15  physicians, one part-time psychiatrist.  Then we have

16  another -- he is actually a resident at LSU in psychiatry who

17  was also a cardiologist before he went back for his

18  residency -- who sees patients on an as-needed basis.

19  **Q.**   Do you have any full-time psychiatrists?

20  **A.**   We do not.

21  **Q.**   About how many inmates are there at the St. Tammany Parish

22  Jail?

23  **A.**   Between 1,050 and 1,100.

24  **Q.**   Are you also familiar with how the medical staffs in the

25  places that you have worked compare with the medical staffs

1   that are available in parish jails in other parishes in the
2   state?
3   A.    I am.  I do a lot of medical-legal consulting, helping to
4   set up jail medical systems, and also I serve as an expert
5   witness a lot in cases that involve sheriffs' offices across
6   the state.
7             So I'm familiar with, you know, large ones like OPP,
8   Orleans Parish Criminal Sheriff's Office, of course, having run
9   it, but also the medium-size ones like St. Tammany.  Jefferson
10  Parish had asked me to run it several years ago, so I went out
11  there and examined their program.
12  Q.    Excuse me.  If I could just stop you for a second.  When
13  you talk about what you know about in some of these other
14  parishes, can you give us a sense about what they have in the
15  way of medical staff at those other places.  Let's start with
16  Jefferson since you mentioned that.
17  A.    When I last looked at Jefferson, which was shortly after
18  Katrina, their size was -- they had one physician.  They were
19  still looking for how they were going to supply psychiatric
20  services, but it would be a part-time psychiatrist on some
21  intermittent basis, a nurse practitioner, and then several
22  licensed practical nurses.
23            THE COURT:  I thought Jefferson Parish licensed out
24  their medical?
25            THE WITNESS:  They did.  It was the group that they

1  licensed it out to that asked me to come in and serve as their
2  medical director --
3          **THE COURT:**  Okay.  Okay.
4          **THE WITNESS:**  -- and I declined.
5          **THE COURT:**  So what did they have as far as
6  psychiatric --
7          **THE WITNESS:**  I don't know now.  That was three years
8  ago and --
9          **THE COURT:**  Well, what did they have three years ago?
10         **THE WITNESS:**  Three years ago, they had no one.  They
11 were looking for psychiatric services at that time.
12         **THE COURT:**  Did they have any part-time psychiatric
13 services?
14         **THE WITNESS:**  Not at that time.
15         **THE COURT:**  Go ahead.
16 **BY MS. LINDBLOM:**
17 **Q.**   Three years ago, when you were talking to the Jefferson
18 Parish people about this, what were they looking to provide in
19 the way of psychiatric services?
20 **A.**   A part-time psychiatrist who would come in on an
21 intermittent basis to see inmates as needed.  Even their
22 physician staff was part-time, to come in one or two days a
23 week and see the more difficult patients.
24 **Q.**   What about other parishes where you are familiar with
25 their medical facilities?

1    A.   I sat down with St. Bernard Parish at one time.  They had

2    been interested in me maybe taking over that facility.  They

3    actually had EMTs and one nurse that were working at the

4    facility, and they would take to the community whenever there

5    was a medical problem.  So there was neither a physician or a

6    psychiatrist physician on staff there.

7              I also consulted with East Baton Rouge and with

8    Lafayette, just to help them set up programs there, but I'm not

9    familiar with what their psychiatric services were, just more

10   their medical, nonmental health type services.  Then through my

11   consulting practice, I have worked with a lot of smaller jails

12   around the state:  Allen Parish, the Overland jail, St. Mary's

13   Parish Sheriff's Office, Caldwell County Correctional,

14   St. James Parish.

15   Q.   What can you tell us about the medical staffs of the

16   psychiatric services that are provided in those parishes?

17   A.   At any of the jails that are smaller than about 1,700,

18   there's very small medical staffs.  There's either a nursing

19   staff on site -- usually not 24 hours a day, usually several

20   days a week or Monday through Friday -- or on call by phone.

21             Then most of the physician care is a physician comes

22   in once a week, once every two weeks and sees some sick call;

23   or they take the inmates to a local area physician or to

24   Charity Hospital and see a physician there whenever there's a

25   medical problem.  None of them, to the best of my knowledge,

1    have any psychiatric services on site.

2    **Q.**    In this case, we have in our papers talked about a group

3    of people that we call patient detainees, that are pretrial

4    detainees who have been adjudged incompetent by the court and

5    ordered to receive treatment at Feliciana, so I will use the

6    term *patient detainees* to talk about them.

7    **A.**    Yes, ma'am.

8    **Q.**    Does St. Tammany house any patient detainees?

9    **A.**    We do.

10   **Q.**    Now, why does St. Tammany house them if these people have

11   been ordered to be transferred to Feliciana?

12   **A.**    Well, I think they come to us -- first of all, they come

13   to us, in general, before they are patient detainees.  They are

14   arrested, and it's determined that they possibly may not be

15   competent, and so there's a competency process that is done to

16   determine whether they are or are not competent, and that can

17   take many months to accomplish that process.  So they are with

18   us for quite a few months prior to that determination being

19   made.

20           Then once the determination is made that someone is

21   incompetent to stand trial, then they are slotted for a bed,

22   but it can take six months, a year, more than a year to

23   actually find them a bed in an inpatient psychiatric facility.

24   **Q.**    What kind of care does your medical staff provide to these

25   patient detainees while they are at St. Tammany Parish?

1    A.    In general, it would be the same types of care that we

2    provide to any of our offenders, any of our inmates.  We

3    provide general medical care to address the acute medical

4    problems that they have or chronic medical conditions they came

5    in with.  We also address somewhat their substance abuse

6    disorders, and we'll deal with acute psychiatric problems.

7               Our psychiatrist works to treat chronically the

8    mental health conditions that they suffer from, whether it's

9    schizophrenia, mania, bipolar disorder, schizoaffective

10   disorder.  Whatever it is that's making them incompetent, our

11   psychiatrist works to treat those illnesses.

12   Q.    Is jail a good place for these patient detainees to

13   receive psychiatric treatment?

14   A.    No.  For the patient detainees, I think that it's a very

15   poor substitute for intensive inpatient rehabilitation.  It's

16   hard to say generically "jail" because the level of care they

17   would receive at Orleans Parish or that they would receive at

18   St. Tammany Parish is vastly different than you're going to

19   receive at, you know, a very much smaller jail with more

20   limited resources:  St. Mary's Parish.  Even Jefferson Parish.

21              So I can speak predominantly about, you know, OPP and

22   St. Tammany Parish compared to inpatient centers.

23   Q.    That's what I was thinking of --

24   A.    Okay.

25   Q.    -- is jail as opposed to inpatient treatment.

1  **A.**    You know, I think that we do a very good job as far as

2  jails go.  We have the greatest ratio of physicians to --

3         **THE COURT:**  By "we," are you talking about

4  St. Tammany?

5         **THE WITNESS:**  Yes, ma'am.  We have probably the

6  greatest ratio of physicians to inmates and nurses to inmates

7  of any jail probably in the state.

8         **THE COURT:**  That's general doctors or is that --

9         **THE WITNESS:**  That's general doctors.  Orleans Parish

10  probably is equipped to provide the best psychiatric care of

11  any jail in this state simply because they have an

12  inpatient-type psychiatric ward set up.  They have more

13  psychiatrists' time.  They have got some of their nurses they

14  have sort of slotted to be dedicated psych nurses, and their

15  facility is designed in a way that it is more easy to care for

16  the mentally ill in that one place.

17  **BY MS. LINDBLOM:**

18  **Q.**    Can you explain to us how much of a burden patient

19  detainees place on the staff at St. Tammany Parish Jail.

20  **A.**    Yeah.  It's a tremendous burden.  You know, I didn't

21  really answer your last question, but I think those two answers

22  are wrapped together.

23  **Q.**    Okay.

24  **A.**    There's a lot of things we can't do that an inpatient

25  psychiatric center can do.  We try to do those things to the

1   best of our ability, which uses up all our resources.  So I

2   think the best way to approach that is to look at specific

3   examples.

4          The first thing that we don't have -- and Orleans, as

5   good as they are, don't have -- is we are not equipped or built

6   to be a psychiatric facility housing severely ill psychiatric

7   patients, whether they are chronically ill or acutely ill.

8   Unfortunately, we are forced to do so because if someone is

9   acutely psychotic or acutely ill and in the outside world would

10  be hospitalized as an inpatient, to my knowledge there is still

11  no inpatient hospital who will take an incarcerated individual

12  in this state.

13  **Q.**   Other than Feliciana?

14  **A.**   Other than Feliciana.  So I can't take them to

15  Charity Hospital and put them on an inpatient psych ward; they

16  won't take an inmate there.  So if you are acutely ill with

17  mania or schizophrenia and in jail and should be hospitalized,

18  we have to keep you and care for you there.

19         So if you are chronically ill and not competent, we

20  don't have a hospital to send you except for Feliciana.  So we

21  are -- I don't want to say stuck, but we are forced to care for

22  the person there as best possible.

23         However, the facility limitations -- you know, they

24  are going to have padded cells.  They are going to have a

25  higher concentration of guards to inmates on those cells.  We

1   are not equipped to deal with it.  At St. Tammany, we are going

2   to put someone in an isolation cell and try to watch them

3   one-on-one so that they can't hurt themselves, they can't hurt

4   others.

5          But our cells, I've put people in there before who,

6   you know, were a danger to themselves -- and that's the only

7   place I have to house them -- but they repeatedly bang their

8   heads into the walls or the metal, and what do you do?  Do you

9   tie them up?  Do you handcuff them?  It's going to take you

10  months to restore some semblance of ordered behavior.  Do you

11  keep someone tied up for months?

12         Now, we have these little isolation cells we put

13  people in.  OPP doesn't.  They will put someone in humane

14  restraints, you know, but --

15         **THE COURT:**  What do you mean by *humane restraints*?

16         **THE WITNESS:**  Well, that's the term that the

17  psychiatric community uses for humane physical or chemical

18  restraints, but basically they are tied to a bed in four or

19  five-point restraints.

20         **THE COURT:**  That's what OPP does?

21         **THE WITNESS:**  Uh-huh, and then they are watched

22  one-on-one.  Now, you know, if somebody is a little depressed

23  and they say they might kill themselves and they are just

24  having some thoughts, they may remain there for a day or two,

25  but what do you do with the patient who is so severely --

1   suffering from such severely disordered thinking who is going

2   to require -- is a danger to himself for a month or two?  They

3   are going to remain tied up to a bed for a month or two.

4                    Now, at a psychiatric facility --

5                THE COURT:  Are you aware of that happening at OPP?

6                THE WITNESS:  I'm aware of people being there for

7   weeks.

8                THE COURT:  In restraints?

9                THE WITNESS:  In restraints.  I've been aware of

10  people in St. Tammany who have been in our little suicide cell

11  for weeks because there is no other safe place in our facility

12  to house that person.

13               THE COURT:  How big is that suicide cell?

14               THE WITNESS:  Probably as big as the area that I'm

15  sitting in now.

16               THE COURT:  You mean that box?

17               THE WITNESS:  Yes, ma'am.

18  BY MS. LINDBLOM:

19  Q.   Just to be clear, when you talk about the suicide cell

20  that you just described to Judge Vance, are you referring to

21  those intake cages?

22  A.   Yes, ma'am.

23  Q.   Can you please describe for the Judge what this intake

24  cage is like other than the size.  What is this, maybe 4 feet

25  by 4 feet or so, 3 feet by 3 feet?

1    **THE COURT:**  It looks more rectangular to me, but my
2    vision is not --
3    **BY MS. LINDBLOM:**
4    **Q.**   Well, why don't you tell us what the size of the intake
5    cage is that you're referring to, as best you know.
6    **A.**   I think they are about 4-by-4, 4-by-5, and they are made
7    of mesh sides.  There's deputies in that area 24 hours a day,
8    so if you started banging your head, they would notice
9    instantly.  If you tried to take off your clothes and make a
10   noose, they would notice instantly.  So it's really the only
11   place in our jail where we can make absolutely certain a person
12   can't harm themselves.
13   **Q.**   In this intake cage, is there any furniture or a bed or
14   anything?
15   **A.**   No.  We remove anything.  That's the idea of putting them
16   in there.  We want nothing in there that they could use to harm
17   themselves.  In fact, we even take most of their prison
18   clothing and put them in shorts and a short-sleeve scrub top
19   similar to the one that I'm wearing now, so there's not even a
20   lot of material that they could -- I mean, some of these people
21   that are truly suicidal --
22   I remember an instance just about two weeks ago.  One
23   of the deputies was patting down someone and took off his
24   rubber glove and it was just a little too close, and the guy
25   managed to reach his arm out of the hole -- I never would have

1   thought that he'd get an arm through -- grabbed the glove and

2   tried to swallow it.  So we don't want furniture or other

3   things in there because people can kill themselves with very

4   unusual objects.

5          Now, in a psych facility, you're going to have a

6   padded cell that is more comfortable, that is certainly warmer,

7   with solid walls in the winter and, you know, you can really

8   stretch out.  So, you know, Orleans and St. Tammany have come

9   up with their own solutions, with the endpoint being we have to

10  keep the person alive; but, you know, we can't build padded

11  cells.  And if we can't, with our larger budgets, how does

12  St. James or a 30-bed jail?  I mean, is every jail expected to

13  be able to build a padded cell in case they have a mentally ill

14  person?

15         So I guess my first point -- and I think I have

16  rambled quite a bit -- was that the jails are not equipped to

17  be inpatient psychiatric centers because of facility

18  limitations.

19  Q.   Let me just ask another question or two on the facilities.

20  In these cages that you have described, are they small enough

21  that a pretrial detainee/patient detainee, most of them can't

22  even lie down stretched out?

23  A.   No.  Usually, I mean, they are going to sleep sitting

24  down.  Now, at OPP, of course, they are on a bed, but the

25  problem is they can't get up at all.

1   Q.   When you refer to them being on the bed at OPP, you mean
2   they are strapped down to a bed?
3   A.   Yes, ma'am.  Yes, ma'am.
4   Q.   All right.  Now, you have talked about facilities.  Is
5   there anything else you want to say about the facilities?
6   A.   No, ma'am.
7   Q.   Let's talk about guards and the effect on guards of having
8   to deal with these patient detainees.
9   A.   I think Orleans is running around 3,000, 3,500 inmates
10  now.  St. Tammany is running around 1,100 inmates.  There's
11  multiple shifts of deputies, so the deputies do not know every
12  inmate, and they rotate through the various buildings.  So the
13  deputies, number one, may not recognize who is a pretrial --
14  what are you calling them, pre-something detainees?
15  Q.   Patient detainees.
16  A.   Patient detainees.  All the deputies may not know who the
17  patient detainees are.
18        The deputies are trained to deescalate situations.
19  They are given some information about dealing with the mentally
20  ill, but in general you are talking 19 to 25-year-old, you
21  know, young men, sometimes young women, who have little
22  psychiatric training, mental health training, who are working
23  in a jail.  So when someone starts acting up and getting crazy
24  and running at them, you know, they don't know if this is a
25  murderer, if this is an intoxicated individual, or if this is

1    somebody who is not competent.

2           You know, they may be dealing with someone that, you

3    know, when you say, "Settle down.  Step back or I'm going to

4    pepper-spray you," that person may not be able to process cause

5    and effect:  If I don't do this, bad things will happen.

6           So the deputies do their best, and we train them as

7    best as possible, to use minimum force on all inmates, but they

8    don't have special training to deal with the mentally ill, the

9    mentally unstable, to deescalate that situation.

10          Whereas if you are in an inpatient center, your ratio

11   of guards to psychiatric patients, for the real ill ones, are

12   higher.  Those people are specifically trained to deal with the

13   mentally ill patients.  They know every patient there is a

14   mentally ill patient as opposed to a hardened felon who just

15   got life or 15 years hard labor.  So they are much better

16   equipped at dealing with the detainees than we are at a jail.

17   **Q.**   Let me interrupt for just a second here.  I normally think

18   of jails as being places that house people that have not yet

19   been convicted, but you talked about how this could be a

20   convicted felon.  Can you explain to the Court, please, why it

21   is that there are convicted felons in the jail as well as

22   people who are being held pending trial.

23   **A.**   Yes.  When you're --

24           **MS. BORDELON:**  Objection:  Relevance.

25           **THE COURT:**  Yes.  What is the relevance?

1          **MS. LINDBLOM:**  I was just trying to show that it's a

2     varied population that the guards are having to deal with and

3     so they don't know, as he said, whether this is somebody who

4     has just been given 15 years for murdering someone or whether

5     it's somebody who is being held pending a cocaine charge.

6          **THE COURT:**  I understand that there are convicted

7     felons in the prison.  I think we can move on.

8          **MS. LINDBLOM:**  Okay.

9     BY MS. LINDBLOM:

10    Q.   Now, let's talk about the nurses and what the effect on

11    your nursing staff is of having to deal with the patient

12    detainees.

13    A.   I do not have any psychiatrically trained nurses.  In

14    fact, because of, you know, nursing -- post-Katrina, nursing

15    paychecks went through the roof, and we are still on the same

16    limited budget we were before Katrina, maybe even more limited

17    because the cost of pharmaceuticals have skyrocketed.

18         So all of my nurses are not mental health nurses;

19    but, in addition, I would say about half of them are directly

20    out of nursing school, with no clinical experience prior to

21    coming to the jail.  So the nurses that are taking care of

22    these severely mentally ill patients have whatever training

23    they got in nursing school and then whatever training we give

24    them as they proceed in the course of their work at our

25    facility.  In an inpatient psychiatric center, you would be

1    dealing with psychiatric nurses, who are specialized in
2    psychiatric nursing care.
3           In addition, we have no registered nurses.  All of
4    our nurses are licensed practical nurses, who have roughly 12
5    months, maybe 18 months of schooling under their belt, as
6    opposed to two to four years of nursing for a registered nurse.
7           So I think that there's a big difference in the
8    nursing staff and in their training and in their capabilities
9    at a psychiatric treatment facility versus a nurse who is going
10   to staff a jail.
11   Q.   Go ahead.
12   A.   So I think that that is the primary difference between the
13   nursing staffs.  So we have, you know, got very different
14   facilities, very different -- you know, differences in the
15   guards, differences in nursing capabilities at the jail.  And
16   then, of course, there's tremendous differences in the
17   physician capabilities at the jail versus the psychiatric
18   treatment facility.
19   Q.   Can you talk about whether it's any kind of financial
20   burden to have patient detainees kept in the parish jail.
21   A.   The detainees are a manpower burden and a financial
22   burden.  Zyprexa, one of the antipsychotic agents we use -- I
23   believe Zyprexa is about $13 a day.  Abilify is on that same
24   order.  A lot of these medications that are used -- many of
25   these inmates require two and three different agents at the

1    same time.  You know, there's costs of $30, $40 a day just for

2    their medications alone and the labs to monitor those

3    medications.

4            You know, the parishes get a very, very small

5    per diem for the inmates that they have, and so a lot of our

6    medical resources for pharmaceuticals that could be used for

7    other inmates are diverted to pay for these very expensive

8    mental health drugs.

9            On a side note, we have the same problem with HIV.

10   Those medications are very, very expensive, and we have no way

11   to recoup or get additional monies to pay for those

12   medications.

13           So the financial dollar is there but, you know,

14   there's other problems that end up costing us a lot of money.

15   I cannot count how many times in a given month one of our

16   severely psychiatric patients jumps up or finds a way to rip

17   the sprinkler head off and then floods a building.  I mean, I

18   lost an entire year of medical records because an inmate was

19   put in a cell near my medical records storage area and broke

20   the sprinkler heads and flooded the area.  Then you have got

21   the money for cleanup.

22           Then a lot of these inmates end up finding a way to

23   hurt themselves.  Like I said, you can only keep them on

24   suicide watch so long.  If they hurt themselves, then you take

25   them to, of course, the nearest hospital.  So I don't use the

1    Charity system; I use St. Tammany Parish Hospital.

2           If they have an ER visit for overdose or slicing

3    their wrists or for banging their head into the wall to a point

4    where, you know, a skull fracture has to be excluded, you have

5    an ER visit, a CAT scan, and you are looking at a bill of

6    thousands of dollars, and this is not a rare occurrence.

7           Then God forbid they need surgery, they do actually

8    cut their wrists deep and they need vascular repair, then you

9    are looking at tens of thousands of dollars.  I don't just

10   throw this out there as a possibility.  In the years I have

11   been at St. Tammany, I've seen these things happen multiple,

12   multiple times.  So the cost in terms of hospital costs that

13   the jail has to bear --

14          Deputy manpower.  Every time they go to the hospital,

15   two deputies -- if there's 16 deputies working the jail on a

16   shift and I have to send an inmate emergently to the hospital,

17   two out of 16 deputies have to go with them, which means that's

18   leaving 14 deputies running the jail.

19          If another inmate chooses to act up at that same time

20   and two or three deputies are involved in controlling him,

21   holding him down so the nurses can give him a medication, then

22   you could be looking at four or five of 16 deputies involved

23   with two patients leaving, you know, 11 people to run the

24   entire rest of the jail.  So it actually compromises the care

25   of the other inmates at the facilities.

1  **Q.**   Are you aware that there is a wait list for patient

2  detainees to be sent to Feliciana?

3  **A.**   I am.

4  **Q.**   What do you know about the average time on the wait list

5  for patient detainees from St. Tammany?

6  **A.**   You know, I'm really not qualified to speak to that in a

7  specific way because I don't get generated any sort of report

8  that tells me what exactly those statistics are.  I just know

9  that -- and I also don't know at what point someone is

10  arrested.  They're obviously mentally ill.  I don't know what

11  date they were found not competent and then how much longer it

12  takes from that date to get to Feliciana.  So it's unclear to

13  me exactly what the time frame is.

14          I do know that it's not unusual for us to have these

15  detainees in our custody well over a year.  In fact, I spoke

16  with Dr. Higgins last week about this issue.  We were just

17  talking about it and my testimony today, and he --

18          **MS. BORDELON:**  Objection:  Hearsay.

19          **THE COURT:**  Sustained.

20          **THE WITNESS:**  He does report to me in an official

21  manner, though.

22          **MS. BORDELON:**  Objection.  It's still --

23          **THE COURT:**  Is he testifying as an expert?

24          **MS. LINDBLOM:**  No, Your Honor.

25          **THE COURT:**  Then he can't testify as to hearsay.

1          THE WITNESS:  Yes, ma'am.

2     BY MS. LINDBLOM:

3     Q.    Do you know a social worker named Susan Johannsen?

4     A.    I do.

5     Q.    Do you work with Ms. Johannsen to try to move people off

6     this wait list and into Feliciana?

7     A.    Ms. Johannsen doesn't actually work for the jail or for

8     me.  I see her around a lot while she is doing the course of

9     her job, and I usually am not involved in that process of

10    actively moving someone.

11          If we have someone who is really -- if we had someone

12    who was so suicidal and just kept trying it, but we -- we just

13    have nothing to do, then I will get involved and call

14    Ms. Johannsen and say, "Susan, you really have to help me with

15    this one.  Can you please do your best to push this one ahead

16    of the list."  Usually, within several weeks, she can do

17    something.

18          Now, that's something that I can do two or three

19    times a year, maybe, for those really special cases where, you

20    know, we are in trouble.  And she may move them out, and then

21    they may stay there for a month or two, and then they come back

22    to me.  But the only time I get involved in the process is in

23    the special instances where I really need help moving someone

24    faster than normal.

25    Q.    You have said that you're aware that you're keeping

1  patient detainees sometimes for a year or more.  Was that true
2  even before Katrina?
3  **A.**   Yes, yes.
4       **MS. BORDELON:**  Objection.  She is misstating the
5  facts, Your Honor.
6       **THE COURT:**  He said that he was aware that detainees
7  were in the prison for over a year.  He said that.
8       **MS. BORDELON:**  But he also testified that he didn't
9  know from when they were determined to be incompetent to
10 proceed --
11      **THE COURT:**  That's not what the question goes to.
12 She said he was aware of detainees in the prison for over a
13 year.  I'm assuming that's just detainees.
14           I understand the limits on the question.  That's
15 not people who were adjudicated for Feliciana.  It's just
16 detainees who have been there for a year.  Okay.  Or are we
17 talking about people who were supposed to go to Feliciana?
18      **MS. LINDBLOM:**  I would like to ask about people who
19 are supposed to go to Feliciana.  What I want to understand is
20 given that he knows that some people are supposed to go to
21 Feliciana, I'm trying to get an understanding of if that
22 changed since Katrina; is this a new problem or is it a problem
23 that's been around for 10 years.
24      **MS. BORDELON:**  Well, I believe, Your Honor, that he
25 testified that he doesn't know when someone that is a pretrial

1  detainee in his jail has been adjudicated incompetent and then

2  ordered, so I don't believe that he is the appropriate

3  witness --

4          THE COURT:  He knows that there are people who have

5  come in with psychiatric problems, with the process of

6  determining that they're incompetent and have to go to

7  Feliciana, and that some people who start off like that are in

8  there for a year.  What he doesn't know is the precise point at

9  which they are told to go to Feliciana.

10              The fact that it's taken a year to get somebody

11  in that state in, determine that they need to go to Feliciana,

12  and out I think is relevant, even though he can't pinpoint the

13  precise month within that time period.  But he knows that and

14  he can testify about that and I'll take that testimony.  So

15  your objection, to the extent that you're correcting the

16  record, is sustained, but I understand the parameters of his

17  testimony.

18              Proceed.

19          THE WITNESS:  Prior to Katrina, we had a prolonged

20  wait, frequently more than a year at both St. Tammany and

21  Orleans.

22          MS. BORDELON:  Objection, Your Honor.  He has not

23  testified that he worked for St. Tammany Parish prior to April

24  of 2006, which would have been prior to Katrina.

25          MS. LINDBLOM:  Excuse me.  I believe the testimony

1   was, 2004, he overlapped between St. Tammany and OPP.

2          **THE COURT:**  You started working at St. Tammany before

3   Katrina?

4          **THE WITNESS:**  April 2004.

5          **THE COURT:**  Okay.  Let me just get straight.  When

6   you say there was a wait for up to a year, what are you talking

7   about by "wait"?

8          **THE WITNESS:**  We would have patients that came in and

9   were obviously so mentally ill that it was obvious to the

10  medical staff at our facility they were not competent to stand

11  trial.  I would have discussions with Ms. Johannsen that

12  competency was pending, competency was done, we were awaiting a

13  bed.

14          I have never done a study on it to know at what

15  point -- if it takes a year or sometimes two years, at what

16  point could they have gone, has the competency issue been

17  determined.  But that whole process, I'm familiar with patients

18  that have taken a year or two years in our facility, and also

19  at the Orleans facility of patients that have taken that time,

20  and that is spanning back as far as 2000.

21          Now, it has changed dramatically post-storm, I

22  think, for two reasons.  We are seeing many, many more mentally

23  ill people at our facility as a result of, you know, the

24  effects of Katrina:  They've lost their providers; they went

25  off their medication; drugs and alcohol use have skyrocketed.

1   So we are taking in so many more mentally ill people.  But

2   also, as I understand it from Susan Johannsen, there have been

3   massive cuts in the number of inpatient beds at treatment

4   facilities.

5           **MS. BORDELON:**  Objection.  Ms. Johannsen will be here

6   to testify, and if that question would be raised -- I don't

7   think he is the appropriate witness for this question.

8           **MS. LINDBLOM:**  I understand her objection to be

9   hearsay.  This is a party admission.

10          **THE COURT:**  Johannsen is a party?  She's a

11  representative?

12          **MS. BORDELON:**  Yes.

13          **THE COURT:**  Then your objection is overruled.

14          Proceed.  You can answer the question.

15          **THE WITNESS:**  So that is my personal feeling.  Again,

16  I haven't looked into this issue or even been involved in this

17  issue until I, you know, was basically subpoenaed to be here,

18  but my feeling has been that the waits being more prolonged now

19  are a factor of we are definitely seeing many, many, many more

20  patients with serious mental illness be arrested; many, many,

21  many more people with serious drug and alcohol problems be

22  arrested.

23          I know from talking to them:  "My treatment

24  facility doesn't exist anymore."  "My psychiatrist isn't here.

25  He left during the storm."  So I think that our prolonged wait,

1   I attribute it to be both an increased number of people

2   requiring such treatment and a decreased amount of beds in the

3   community, at Feliciana and elsewhere.  I'm not just limiting

4   this to Feliciana.  I just think mental health services in this

5   state have been disseminated post-Katrina, at a time when the

6   number of cases have skyrocketed, and we are seeing that as

7   prolonged waits at our facility to get the severely mentally

8   ill out.

9   **BY MS. LINDBLOM:**

10  **Q.**   Let me focus back just for a moment on what happens at

11  St. Tammany.  If you have a person who has some acute

12  psychiatric problem at a time when the psychiatrist is not

13  there, what do you do?

14  **A.**   The majority of our acute problems are handled by the

15  staff physicians, nonpsychiatric physicians:  Myself; Dr. Gary

16  French; Dr. DiLeo, an internist as well.  So we deal with

17  removing people from suicide watch, you know, on a daily --

18  well, literally two or three a day.  I think we had four or

19  five on the list yesterday of people that were on suicide watch

20  that we had to see, reevaluate, and remove.  So we have

21  nonpsychiatrists making suicide/nonsuicide determinations, you

22  know, on the days that Dr. Higgins is not present in our

23  facility.

24          Now, he is wonderful and makes himself available 24

25  hours a day, 7 days a week by phone.  So if I have a question,

1    I can always call him, which is good, but it's not as good as

2    having a licensed psychiatrist seeing and evaluating a

3    potentially suicidal patient.

4            When these patients are seen for follow-up, they are

5    usually seen by the internist.  We reserve for Dr. Higgins the

6    sickest of the sicks:  The unstable ones; the people who

7    require multiple medications as opposed to a single agent; the

8    people that have failed a single agent and we need somebody who

9    knows, okay, what's your next step.

10           So Dr. Higgins sees the worst of the worst, but our

11   need for mental health services requires that the internists do

12   general mental health care as well.

13           **MS. LINDBLOM:**  Thank you, Dr. Inglese.

14           That's all my questions, Your Honor.

15           **THE COURT:**  Thank you.  Cross-examination.

16                      **CROSS-EXAMINATION**

17   **BY MS. BORDELON:**

18   **Q.**   Good morning, Dr. Inglese.  I'm Adrienne Bordelon on

19   behalf of the Department of Health and Hospitals.

20           You testified that you're the medical director for

21   St. Tammany Parish, and prior to that you were the medical

22   director at OPP here in Orleans; correct?

23   **A.**   Yes, ma'am.

24   **Q.**   Is it not true that the sheriff is responsible for medical

25   care of detainees in their facilities?

1    **A.**   Actually, you're going to have to defer that to legal

2    counsel because I believe the statute says that the care of

3    inmates in jails and who are incarcerated falls under the care

4    of the Charity system.

5          Now, I think that the jails have slowly developed

6    larger and larger medical departments because it's just become

7    impractical to try to get -- we see maybe 90 people -- 70 to 90

8    people a day in my medical department.  It would be impossible

9    to take all of those people to Charity Hospital, but I believe

10   that the law reads -- at least, the lawyers I've sat down

11   with -- that the health care of incarcerated individuals falls

12   under the jurisdiction of the Medical Center of Louisiana, the

13   Charity Hospital system.

14   **Q.**   Isn't it true that the Charity Hospital system is not the

15   Department of Health and Hospitals?

16   **A.**   I don't know the distinction.

17   **Q.**   You testified there are between 1,050 and 1,100 detainees

18   in the St. Tammany jail today?

19   **A.**   Yes, ma'am.

20             **THE COURT:**  Detainees or inmates?

21             **THE WITNESS:**  Inmates.  I'm sorry.

22   BY MS. BORDELON:

23   **Q.**   Do you happen to know the number of those 1,500 to 1,100

24   inmates who have actually been found incompetent to stand

25   trial?

1   **A.**    No, I do not.  I know there's about -- at any given time,

2   there's roughly nine people that are in the process.  Now,

3   whether they already have been found by Dr. Salcedo incompetent

4   and are awaiting a bed or whether he is still doing his

5   evaluation -- it can take up to six months to get that

6   evaluation.  That's what I'm being told by Susan.  Maybe these

7   questions are better addressed to her, who knows in specific.

8   **Q.**    Isn't it true that the Department of Health and Hospitals

9   is not responsible for these inmates until they become

10  incompetent pretrial detainees and have been ordered to

11  Feliciana?

12  **A.**    I don't know whose responsibility it is legally.  I don't

13  differentiate.  When I see them -- pretrial detainees, state

14  inmates, federal inmates -- I don't even look up the charges of

15  people I treat.  We just take care of their medical needs.  So

16  I'm not sure when it's somebody else's responsibility, it

17  becomes their responsibility, and when it's mine.  My rule is:

18  If they are underneath my roof, I'm responsible for them.

19  **Q.**    You testified as to the difference between the medical

20  department and facility of, say, St. Tammany Parish versus

21  Allen Parish.  Can you tell us how much time you spent in Allen

22  Parish.

23  **A.**    I've spent little time in any of the particular

24  facilities.  Most of it has been, you know, hours of reviewing

25  records and staffing in legal proceedings.  I know that they

1  have limited medical resources at the smaller jails without

2  spending time at the facility.

3  **Q.**    Isn't it true, Dr. Inglese, that not all psychiatric

4  inmates are pretrial detainees?

5  **A.**    Yes, ma'am.

6  **Q.**    So couldn't we say that there's a possibility in Allen

7  Parish that there may not be a pretrial detainee for which they

8  are awaiting a bed if they're at the Feliciana facility?

9  **A.**    I have no knowledge of it.  That would be a possibility,

10 absolutely.

11 **Q.**    You stated that you treated acute patients at the

12 St. Tammany jail for acute psychotic behavior, and you stated

13 that they should go to an inpatient hospitalization.  Have you

14 ever attempted to do a civil commitment so they would go into

15 an acute unit at Bogalusa Medical Center or another civil

16 inpatient hospitalization for purposes of treatment?

17 **A.**    Yes, ma'am.  They will not take an incarcerated individual

18 into any of those facilities.  Charity Hospital will not take

19 and cannot do it, to the best of my knowledge.

20 **Q.**    Are you aware that there are only three pretrial detainees

21 who are eligible for admission in St. Tammany Parish Jail that

22 is ordered to forensic?

23         **MS. LINDBLOM:**  Objection, Your Honor.  When she talks

24 about the number of pretrial detainees that are eligible for

25 admission, I think what she is trying to say is they have their

1   paperwork in order, and that's not what we are talking about.

2   We are talking about the people who have been ordered to

3   Feliciana.  She is trying to draw some distinctions here that

4   I'm not sure are material.  I just want to make sure we're

5   clear about that.

6          **THE COURT:**  I think we need to understand what you

7   mean by "eligibility," so lay a foundation for what you mean.

8   **BY MS. BORDELON:**

9   **Q.**   Are you aware that prior to admission to Feliciana

10  Forensic, the law provides that a pretrial detainee must have

11  certain paperwork in, medical records and other information has

12  to be provided to the hospital?

13  **A.**   I'm not involved in the process, so I'm not aware of what

14  it takes in the process whatsoever.

15  **Q.**   Isn't it true, Dr. Inglese, that you -- well, you did

16  testify that medication for the mentally ill has gotten

17  expensive.  Isn't it true that the law provides that

18  St. Tammany Parish can bill the Department of Health and

19  Hospitals for the medication for those pretrial detainees

20  ordered to forensic?

21  **A.**   To the best of my knowledge, we can get a per diem, but we

22  can't bill for all of the medications.  That's how it's been

23  explained to me.  I'll certainly look into it when I get back.

24  **Q.**   Are all inmates on suicide watch pretrial detainees?

25  **A.**   No, sir.

1   **Q.**   Are all inmates who are psychotic pretrial detainees?

2   **A.**   No, ma'am.

3   **Q.**   Wouldn't it be an accurate statement that the vast

4   majority of the inmates who are on suicide watch and psychotic

5   are not pretrial detainees?

6   **A.**   That's probably true.

7   **Q.**   You testified a few minutes ago that you believe that

8   there are approximately nine people at any given time who are

9   in the process of potentially being ordered to Feliciana

10  Forensic out of 1,100 inmates; correct?

11  **A.**   Yes, ma'am.

12  **Q.**   You also testified that your jail does not have a

13  full-time psychiatrist.

14  **A.**   Yes, ma'am.

15  **Q.**   You testified that you have no full-time nurse,

16  psychiatric nurse.

17  **A.**   Yes, ma'am.

18  **Q.**   Well, why not?

19  **A.**   Because, in general, the people that are not completely

20  incompetent we can deal with fine.  The difference is while the

21  vast majority of people on suicide watch may not be pretrial

22  detainees, one pretrial detainee may go on a suicide watch five

23  times in a given month.

24           I can handle the drunk person who comes in and says,

25  "Let me out or I'll kill myself."  I can put him on suicide

1  watch for a day, reevaluate him when he is sober, take him off,

2  and I don't need a psychiatrist for that or a psychiatric

3  nurse.  But the pretrial detainee who weekly says he is going

4  to kill himself or comes to medical, "I just swallowed

5  paperclips," or "I found a piece of glass and I crushed it,"

6  those are the people -- even if we only have three people

7  waiting, if they are waiting for a year and we can't provide

8  the level of care of Feliciana and they kill themselves, then

9  we have done a terrible thing.

10         So I don't care whether there's three or 3,000, I

11 would like to see people in a facility that can properly care

12 for their medical and psychiatric needs.

13 **Q.**   You have also testified that your guards don't have

14 training for inmates who have mental illness; correct?

15 **A.**   They have some.  They don't have the level that you would

16 have as a guard who works only at a mental health facility.

17 **Q.**   Isn't it true, Dr. Inglese, that the vast majority of your

18 inmates who are acting out in psychosis status is not a

19 pretrial detainee waiting to go to Feliciana?

20 **A.**   That's true.

21 **Q.**   So you're telling the Court that your facility hasn't

22 trained their staff to address the needs of not necessarily the

23 pretrial detainees but the inmates for which your facility is

24 responsible for.

25 **A.**   No.  I would deal with patients with HIV or contagious

1   tuberculosis or some other medical conditions differently than
2   a regular, standard patient.  Do I give the guards special
3   training on that?  A little bit.  I give them training on
4   mental health.
5           My guards are going to see so many different types of
6   patients that I give and security gives a little bit of
7   training about a lot of different things.  We can't spend all
8   of our time in training people for mental health when mental
9   health is a small piece of the pie that our guards are going to
10  have to deal with.  They also get training on how to deal with
11  antisocial patients, murderers, people that have been
12  convicted.  So they are being trained, but they have got to be
13  trained in the gambit to cover a multitude of different
14  problems from infectious, contagious problems, how do you deal
15  with a pregnant lady who is acting out, how do you deal with
16  the mentally ill.
17          So they get training, but we can't spend all of our
18  time training them on dealing with the mentally ill.  That's
19  why you send them to a mental hospital.  That's primarily the
20  only thing those guards have to deal with, so they are
21  specialists in dealing with the mentally ill patient.
22          That's exactly the point I'm making.  We can't spend
23  all our time because then another lawyer is going to say,
24  "Well, you know, these guards hurt this pregnant lady, and
25  don't you train the guards how to take down a pregnant lady who

1   is misbehaving?" and I can't say, "Well, I spent all my time

2   training them on mental illness."  They get training on a

3   multitude of different things, but in a mental hospital your

4   guards are specialists in providing security to the seriously

5   mentally ill.

6   **Q.**   Are you familiar with Dr. John Thompson?

7   **A.**   I am not.

8   **Q.**   Are you familiar with or are you aware that for the

9   pretrial detainees who are in acute psychosis, that have been

10   ordered to Feliciana, that the facility has an emergency

11   admissions?

12   **A.**   I don't know.  I don't go through them.  I would call

13   Ms. Johannsen.

14   **Q.**   You would notify Ms. Johannsen that a pretrial detainee is

15   acting out or appears to be in severe psychosis?

16   **A.**   That encompasses a significant fraction of our pretrial

17   detainees.  So every time they seem to be really acting out, I

18   do not call her.  She is well aware of it because I actually

19   tend to eat lunch at the same time as her, and we sit down and

20   talk about it all the time.  So she is well aware.  I let them

21   know when I think there's an actual immediate threat to their

22   health and safety:

23         "This person is really trying to kill himself."

24         "This person keeps beating their head against the

25   wall."

1          "This person for weeks has been screaming and

2     screaming and screaming and, you know, we don't know where to

3     put him.  I don't want to keep him in the suicide cell for

4     weeks and weeks.  Susan, I don't know what to do."

5     **Q.**    But you then notify Ms. Johannsen?

6     **A.**    Yes, I do.

7     **Q.**    Usually, is that inmate/pretrial detainee addressed by the

8     department?

9     **A.**    Susan is wonderful.  I mean, I have never -- when we were

10    at Orleans, I have never seen a Susan equivalent that helped me

11    when I ran Orleans the way Susan Johannsen helps us at

12    St. Tammany.  She is there all the time.  I mean, I see her so

13    many days a week.  She doesn't have a set schedule but, you

14    know, she appears and she knows the inmates.  She'll give me

15    little updates when we are standing in line, you know:

16          "This one is going to trial.  Keep your fingers

17    crossed."

18          "I have a competency evaluation pending.  Keep your

19    fingers crossed."

20          So she does a great job and she helps me as much as

21    she can, but I'm not the only jail she covers.  Despite her

22    efforts, there's a lot of people that stay there for a long

23    period of time.  I consider myself a good judge of character

24    and a good judge of work effort.  I think she is employed by

25    the Department of Health and Hospitals.  She is a fantastic

1  asset to your program and, I mean, she's wonderful.

2  **Q.**   Are you aware that when someone has been found incompetent

3  to stand trial and ordered to Feliciana, it is the department's

4  responsibility to attempt to restore them to competency?

5  **A.**   Yes.

6  **Q.**   Do you know if there are pretrial detainees in your jail

7  who have been restored to competency in the jail-based setting

8  and never went to the hospital?

9  **A.**   I do not.  I do not.

10            **MS. BORDELON:**  No further questions.

11            **THE COURT:**  Thank you.

12                 Redirect.

13                       **REDIRECT EXAMINATION**

14  BY MS. LINDBLOM:

15  **Q.**   I think I just have one question.  Ms. Bordelon referred

16  to emergency admissions.  Has Ms. Johannsen ever been able to

17  get someone taken from St. Tammany to Feliciana on an emergency

18  basis, meaning within a day, say?

19  **A.**   Not within a day.  I mean, I can recall two, maybe three

20  cases where within a week or two we were able to get someone

21  moved out of our facility.  There have been a couple of other

22  times where I had a person who really needed to get out fast

23  and, actually, I couldn't find a hospital that would take them.

24  I couldn't get them to Feliciana.  Actually, Orleans took one

25  of them -- he was a bad head-banger -- because their restraint

1   beds can stop a head-banger from banging his head.  So Orleans

2   was kind enough to take a very problematic patient from us and

3   hold him in their facility.  So within a day or two, no, I have

4   never known it to happen.

5          **MS. LINDBLOM:**  Thank you.

6          **THE COURT:**  On these emergency admissions, what is

7   the usual or the average amount of time it takes to get

8   somebody admitted if it's an emergency?

9          **THE WITNESS:**  Your Honor, it's only been about three

10  times, so I don't -- I would say several weeks to actually get

11  them out of our facility.

12         **THE COURT:**  That only happened three times there, but

13  what time period?

14         **THE WITNESS:**  At St. Tammany, since 2004 there's been

15  three, maybe four cases of me saying, "Susan, this one is

16  really a danger to their life.  I don't know what else to do

17  with them."

18         **THE COURT:**  Okay.  Thank you.  You may step down,

19  sir.  Thank you.

20         **MS. KLUGMAN:**  Your Honor, plaintiffs call Sheriff

21  Marlin Gusman.

22         (WHEREUPON **Marlin N. Gusman**, having been duly sworn,

23  testified as follows.)

24         **THE DEPUTY CLERK:**  Please state your full name and

25  correct spelling for the record.

1          **THE WITNESS:**  Marlin N. Gusman:  M-A-R-L-I-N,
2    G-U-S-M-A-N.
3          **MS. KLUGMAN:**  Good morning, Your Honor.  Maura
4    Klugman again for the plaintiff.
5                    **DIRECT EXAMINATION**
6    **BY MS. KLUGMAN:**
7    **Q.**    Good morning, Sheriff.  What's your current occupation?
8    **A.**    Sheriff, Parish of Orleans.
9    **Q.**    How long have you been the sheriff of Orleans Parish?
10   **A.**    Six years.
11   **Q.**    What are your responsibilities as the sheriff of
12   Orleans Parish?
13   **A.**    Responsible for the care, custody, and control of all
14   inmates arrested in Orleans Parish, as well as the executive
15   officer for the court system.
16   **Q.**    Does the Orleans Parish Sheriff's Office operate detention
17   facilities?
18   **A.**    Yes, we do.
19   **Q.**    Where are they?
20   **A.**    They are primarily in an area near the intersection of
21   Tulane and Broad.  It's about eight different facilities.
22   **Q.**    What are those eight different facilities, please, sir?
23   **A.**    Orleans Parish Prison, the House of Detention,
24   Templeman 5, South White Street, Temporary Detention Center,
25   and the Broad Street Work Release Center.

1   **Q.**   Sir, how many people are in these facilities?

2   **A.**   The population is about 3,400.

3   **Q.**   Are some of those people awaiting trial?

4   **A.**   Yes.

5   **Q.**   About how many?

6   **A.**   About 2,600 -- about 2,700.

7   **Q.**   Are you familiar with the Feliciana Forensic Facility?

8   **A.**   Generally, yes.

9   **Q.**   I'm going to refer to it as *Feliciana* if that's all right

10  with you.

11  **A.**   That's fine.

12  **Q.**   Does Orleans Parish Prison house individuals who have been

13  declared incompetent to stand trial?

14  **A.**   Yes, from time to time.

15  **Q.**   Have some of those individuals been declared incompetent

16  to stand trial also been committed by court order to Feliciana?

17  **A.**   Yes.

18  **Q.**   Do you know about how many of those people are in your

19  prison now?

20  **A.**   The last I looked, between 28 and 30.

21  **Q.**   That number is current as of what date, sir?

22  **A.**   I think that was, like, the beginning of this year.

23  **Q.**   I'm going to use the term *patient detainees* to refer to

24  those people if that's all right with you.

25  **A.**   Yes.

1   **Q.**   Does Orleans Parish have a mental health unit?

2   **A.**   We have a psychiatric unit on the tenth floor of the House

3   of Detention.

4   **Q.**   What services does this unit offer?

5   **A.**   Well, we have a psychiatrist who comes in and he

6   administers medications, sees people, and we also have nurses

7   who stay there.  We maintain it 24 hours, mostly for

8   medications.

9   **Q.**   So this unit is responsible for dispensing psychiatric

10   drugs?

11   **A.**   Yes.

12   **Q.**   Do you know what percentage of the Orleans Parish Prison

13   population is on psychiatric drugs?

14   **A.**   Based upon our prescription medications, it's about

15   8 percent, so right around 275, 280.

16   **Q.**   So this unit will be responsible for dispensing medication

17   to all those people?

18   **A.**   Yes.  The acute ones are located on the tenth floor; but

19   as they get on their meds and get stabilized, they are

20   distributed throughout the population.

21   **Q.**   You mentioned that this unit has a psychiatrist?

22   **A.**   Yes.

23   **Q.**   Is that just one psychiatrist?

24   **A.**   Just one.

25   **Q.**   So this is the only psychiatrist for all 3,700 inmates at

1   Orleans Parish Prison?

2   **A.**    3,400, yes.

3   **Q.**    Sorry.  You mentioned before that there were between 28

4   and 30 of these patient detainees, that is, those people who

5   have been ordered to Feliciana.  Are all of those people housed

6   on the tenth floor of the House of Detention in the psychiatric

7   unit?

8   **A.**    Not necessarily, no.

9   **Q.**    Now, do your facilities, including this tenth floor in the

10  House of Detention, offer services that are aimed at restoring

11  the competence of those patient detainees, that is, those

12  people who have been ordered to Feliciana?

13  **A.**    No.  We are basically just maintaining their medications.

14  We don't have a team of social workers or case managers.

15  Actually, we just hired another social worker for the entire

16  jail, so we have two social workers now.  But their primary

17  focus is not at trying to restore their competency and get them

18  ready for trial, no.

19  **Q.**    Why is that not their primary focus?

20  **A.**    Well, we are a jail.  Our primary focus is to keep people

21  in jail before they go to trial.

22  **Q.**    In other words, not to restore these people?

23  **A.**    I just don't have the resources to do that.

24  **Q.**    Sir, would you prefer to see these patient detainees

25  transferred to Feliciana as quickly as possible?

1  A.   Yes.

2  Q.   What effect does housing these patient detainees have on

3  your facilities?

4  A.   Well, I can tell you that it puts a great burden on our

5  facilities because our guards and our corrections officers are

6  not trained to provide the type of additional care that they

7  ought to be providing to psychiatric patients.  It puts a

8  strain on our budget because we have to pay for these

9  psychiatric meds, which aren't cheap.  It also adds another

10  level of risk to our security because we have to use additional

11  resources on those individuals that we can't spread around and

12  use for the rest of the facility.  So it creates a great

13  burden.

14  Q.   Are these patient detainees a danger to other guards or

15  employees at OPP?

16  A.   I think so.  I think a lot of them have histories of

17  violent behavior that's unpredictable.  It's one thing to have

18  someone who commits a violent act against someone, they're

19  involved with a drug deal or something like that, and another

20  one for them to commit a violent act against someone they just

21  don't know for no apparent reason.  So, yes, it puts us at a

22  greater risk.

23  Q.   Sir, you understand that plaintiffs here today are asking

24  for a preliminary injunction that would require these patient

25  detainees to be transferred to Feliciana within 30 days of a

1  finding that they're incompetent to proceed to trial and are

2  then ordered to Feliciana?

3  **A.**   Yes.

4  **Q.**   What do you think about that?  Do you support that?

5  **A.**   I think we ought to do that.

6        **MS. KLUGMAN:**  Thank you very much.

7        **THE WITNESS:**  Thank you.

8        **THE COURT:**  Cross-examination.

9                     **CROSS-EXAMINATION**

10  BY MS. BORDELON:

11  **Q.**   Good morning, Sheriff Gusman.  Adrienne Bordelon on behalf

12  of the Department of Health and Hospitals.  How are you this

13  morning?

14  **A.**   Fine.  And yourself?

15  **Q.**   Good.  Thank you.  Sheriff Gusman, you testified that

16  approximately 8 percent or 270 to 280 inmates of the 3,400

17  population is on your psychiatric ward; is that correct?

18  **A.**   No.  I said that they were on psychiatric medication.

19  **Q.**   Oh, I'm sorry.  Psychiatric medication.  Are all 275 to

20  280 on psychiatric medication pretrial detainees ordered to

21  forensic?

22  **A.**   They are, for the most part, all pretrial detainees; not

23  necessarily ordered to the Feliciana facility by court order,

24  no.

25  **Q.**   Isn't it true that the law provides that if a pretrial

1   detainee ordered to forensic is housed at your facility that
2   you get a per diem for that particular pretrial detainee?
3   **A.**   There is an additional per diem for that.
4   **Q.**   Isn't it also true that the psychotropic drugs or the
5   medications for these pretrial detainees are also provided for
6   in the law that the department will pay for those drugs for the
7   pretrial detainees ordered to forensic?
8   **A.**   Well, I think we have been having a lot of issues with
9   getting money for those.  If that's the law, then I'm glad to
10   hear it because I don't think we have been getting that money.
11   There's issues like related to the additional care that we have
12   to provide for them.  So we have had problems, I know talking
13   to my lawyers, in collecting for that, so I'm glad to hear
14   that.
15   **Q.**   Have you ever billed the department?
16   **A.**   Yes.  And I collected.
17   **Q.**   The question was:  Have you billed them?
18   **A.**   Yes, I have billed them.
19   **Q.**   Isn't it true that most mentally ill people or most
20   mentally ill inmates put your staff at risk?
21   **A.**   Yes.
22   **Q.**   So isn't it true that your staff is responsible for the
23   mentally ill that are not pretrial detainees ordered to
24   forensic?
25   **A.**   Yes.

1        **MS. BORDELON:**  I have no further questions.

2        **THE COURT:**  Thanks.

3             Any redirect?

4        **MS. LINDBLOM:**  No redirect, Your Honor.

5        **THE DEPUTY CLERK:**  You may step down, sir.  Thank

6   you.

7             Who is your next witness and how long is it

8   going to take?

9        **MS. LINDBLOM:**  Our next witness is our expert,

10  Dr. Joel Dvoskin.  I expect the director will take more than 20

11  minutes but probably less than half an hour.

12       **MS. BORDELON:**  Can we have a short recess,

13  Your Honor?

14       **THE COURT:**  We can stop for lunch.  Why don't we take

15  the luncheon break and come back at 10 minutes of 1:00.

16       **MS. LINDBLOM:**  Thank you, Your Honor.

17       **MR. ELLIOTT:**  Thank you.

18       **THE DEPUTY CLERK:**  All rise.

19                 **(LUNCHEON RECESS)**

20

21

22

23

24

25

1                    **<u>AFTERNOON SESSION</u>**

2                       **(June 22, 2010)**

3              **THE DEPUTY CLERK:**  All rise.

4                    Be seated, please.

5              **THE COURT:**  Good afternoon, everyone.  Call your next

6    witness.

7              **MS. LINDBLOM:**  The plaintiffs call Dr. Joel Dvoskin.

8              (WHEREUPON **Joel Dvoskin**, having been duly sworn,

9    testified as follows.)

10             **THE DEPUTY CLERK:**  Please state your full name and

11   correct spelling for the record.

12             **THE WITNESS:**  My name is Joel Dvoskin:  J-O-E-L,

13   D-V-O-S-K-I-N.

14                         **VOIR DIRE**

15   BY MS. LINDBLOM:

16   **Q.**   Dr. Dvoskin, have you been hired as an expert witness in

17   this case?

18   **A.**   Yes, I have.

19   **Q.**   Let's talk about your educational credentials.  Tell us,

20   please, about your college and post-college work.

21   **A.**   I graduated from the University of North Carolina at

22   Chapel Hill.  I have a degree in social science from -- or a

23   diploma in social science from the Stockholm University in

24   Sweden.  I have a master's degree and a PhD from the University

25   of Arizona.

1   **Q.**    In what field?

2   **A.**    In clinical psychology.  I have a doctoral minor from the

3   University of Arizona law school.  I have a clinical internship

4   at McClain Hospital in the Harvard Medical School and a

5   fellowship in forensic psychology at the Harvard Medical

6   School.

7   **Q.**    What is your current occupation?

8   **A.**    Currently, I have a mostly consulting practice in expert

9   forensic psychology and clinical psychology in Tucson, Arizona,

10  but I work all over the country.  I provide consultation to

11  governmental agencies, corporations, school districts, NCAA,

12  different organizations on a variety of topics.

13           Specifically, I do a lot of consulting on the

14  intersection of mental health and criminal justice and

15  institutions of -- both mental health and criminal justice

16  institutions, and the conditions of confinement in hospitals,

17  jails, and prisons all over the United States.

18  **Q.**    Have you held any leadership positions in the field of

19  forensic psychology?

20  **A.**    Yes.  I was president of the American Psychology Law

21  Society, which is Division 41 of the American Psychological

22  Association.  I was president of Division 18 of the American

23  Psychological Association, which is psychologists in public

24  service.  I was also chairman of the National Association of

25  State Mental Health Forensic Directors, which is the forensic

1  directors of each of the 50 states and the District of

2  Columbia.

3  **Q.**   Have you done any work in jails or prisons?

4  **A.**   Yeah.  Most of my adult life, I have worked in a variety

5  of ways with jails and prisons.  I started my career as a

6  prison psychologist, and for many years I supervised mental

7  health services directly in prisons.  Also, my responsibilities

8  in New York also included consultative assistance to the jails

9  across the state in suicide prevention and the provision of

10 mental health services.

11 **Q.**   Can you tell us what your responsibilities were in

12 New York.  What position did you hold there?

13 **A.**   Well, my last job, I was acting commissioner of mental

14 health for the state, so I ran the whole state mental health

15 system briefly.

16      Prior to that, for about almost 11 years, I was

17 associate commissioner and director of forensic services, where

18 I was directly responsible for the provision of all the

19 forensic mental health services in the state and all of the

20 correctional mental health services to the state department of

21 corrections.

22 **Q.**   That was in the state of New York?

23 **A.**   Yes, ma'am.

24 **Q.**   How many psychiatric hospitals did you supervise when you

25 were the acting commissioner of mental health in New York

1    state?

2    **A.**    31.

3    **Q.**    How many correctional institutions would you say you have

4    visited over the course of your career?

5    **A.**    Certainly hundreds.  I think approximately half or more

6    than half of the states I have consulted in the provision of

7    mental health services in criminal justice environments,

8    usually prisons, sometimes prison and/or jails, but it's

9    certainly been hundreds of correctional institutions.

10   **Q.**    Have you ever served as a federal court monitor?

11   **A.**    Yes, ma'am.  I am currently one of two monitors over the

12   Michigan Department of Corrections.  I also was a monitor of a

13   forensic hospital for the federal court in the state of

14   Washington and was one of two monitors over the forensic

15   hospital for the state of Colorado.

16            I also served in a monitoring role.  I think my title

17   was actually -- I think it was independent court expert in

18   Bernalillo County, New Mexico, which is the Albuquerque jail.

19   I oversaw the mental health services in the Albuquerque jail in

20   that role.

21   **Q.**    What familiarity do you have with Louisiana?

22   **A.**    For some years -- I think I'm still technically on the

23   faculty of the LSU Health Sciences Center.  Up until Katrina, I

24   came out here for a week every quarter, approximately, for a

25   number of years, and I was assisting LSU in its provision of

1  psychiatric, medical, and dental services to the juvenile

2  justice system for the State of Louisiana.  So all of the

3  juvenile facilities in Louisiana I became familiar with and I

4  visited on many occasions.

5        I met frequently with various officials of the state

6  around the issue of mental health services -- mainly mental

7  health but also medical services in juvenile corrections.  I've

8  also been an expert witness for the state in a lawsuit

9  involving Angola prison.

10 **Q.**   In your consulting with the State of Louisiana, did you do

11 any work relating to suicide hazards?

12 **A.**   Yes.  As part of my job with the juvenile justice

13 facilities, I was asked by both parties, the plaintiffs and the

14 state, to do an architectural, essentially, or capital plant

15 survey of suicide hazards in the juvenile justice facilities.

16 As a result, we made a great many modifications to certain

17 rooms or cells that were going to house potentially suicidal

18 youth.

19        **MS. LINDBLOM:**  Your Honor, I offer Dr. Dvoskin as an

20 expert in clinical, forensic, and correctional psychology and

21 administration of public mental health facilities.

22        **THE COURT:**  Is there any traverse?

23        **MS. BORDELON:**  No objection.

24        **THE COURT:**  The witness is accepted as an expert in

25 the field tendered.  You may proceed.

1    **MS. LINDBLOM:**  Thank you, Your Honor.

2                    **DIRECT EXAMINATION**

3    BY MS. LINDBLOM:

4    **Q.**   Dr. Dvoskin, are you familiar with the standard that's

5    used to assess when a defendant is incompetent to stand trial

6    in Louisiana?

7    **A.**   Yes.  My understanding is there is a case in Louisiana

8    called *Bennett*.  I don't recall the year, but it essentially

9    restates the standards that the Supreme Court articulated in

10   the *Dusky* case, which is what you find in almost every state.

11   **Q.**   That's the United States Supreme Court?

12   **A.**   Yes, ma'am.

13   **Q.**   Okay.

14   **A.**   Slight variations of the *Dusky* standard, but it's

15   essentially the same standard, which is a two-prong standard:

16   One prong being, generally, the person's ability to understand

17   the process, the likely consequences, and how the legal process

18   works, and the second prong being their ability to assist their

19   attorney in fashioning a defense.

20   **Q.**   What are the most common reasons that a criminal defendant

21   is found incompetent to stand trial?

22   **A.**   The two most common reasons, by far, in my opinion:  The

23   first would be severe or acute psychosis; and the second most

24   common reason would be cognitive difficulties, intellectual

25   disabilities, or traumatic brain injury, some type of inability

1  to learn and think.

2  **Q.**   Let's talk about that first prong first, the acute

3  psychosis.  Have you had the opportunity to read the affidavits

4  that were submitted by both plaintiffs and defendants in

5  connection with this motion?

6  **A.**   Yes, I have.

7  **Q.**   There's a reference in there to WB as seeing little men

8  who would come after him.

9         **MS. BORDELON:**  Objection, Your Honor.  The department

10  had filed a motion to strike the affidavit of Mr. Humann and

11  especially the hearsay provision of what WB said.  Again, if WB

12  had been subpoenaed to this hearing, WB could have testified.

13         **MS. LINDBLOM:**  Your Honor, we are not offering that

14  for the truth of WB actually seeing little men.  It's simply

15  that he reports that little men would come and attack him

16  during the night.

17         **THE COURT:**  I'm going to permit the testimony.  Plus,

18  an expert can rely on hearsay.  Go ahead.  Proceed.

19  **BY MS. LINDBLOM:**

20  **Q.**   Dr. Dvoskin, so this evidence that WB has reported that

21  little men come and attack him during the night, what's going

22  on there as far as you can tell?

23  **A.**   Well, it would be one of two things:  If he is seeing

24  things that other people can't see, we would call that a visual

25  hallucination, and that would be often a symptom of psychosis;

1  and/or it could be a delusion that little men were attacking
2  him, a delusion being a belief that someone holds that nobody
3  else holds, a highly improbable belief.  It could be either or
4  both of those.  Both of those are examples of psychotic
5  thinking.
6  Q.   Okay.  Thank you.  What typically does it take to quickly
7  restore an incompetent defendant who has psychosis?
8  A.   Well, for many people, if they are prescribed the correct
9  medication or medications, you can treat or reduce the acute
10 symptoms of psychosis pretty quickly.  Typically, that's done
11 in a hospital setting where people also have access to a
12 therapeutic milieu or environment, treatment staff around them,
13 some prosocial activities during the day, group and individual
14 therapies.
15         But it can happen pretty quickly.  In many cases,
16 civil patients who were acutely hospitalized for an acute
17 exacerbation of their illness will be helped to come back to
18 the baseline functioning fairly quickly.  That's certainly not
19 always true, but it's often the case.
20 Q.   Why is this milieu that you referred to important?
21 A.   Well, partly it's because people need to feel safe to
22 clinically improve.  One of the most important things about
23 psychiatric care is both a physical and psychological feeling
24 of safety that a person has, so you try to create an
25 environment that fosters that.

1    Secondly, one of the things we want patients to do is
2    to take their medication if it's prescribed and it really helps
3    them.  In order to do that, it's much better if the patient
4    accepts and understands the value of medication in their life
5    rather than forcing it on them.  And it takes time to do that,
6    and it takes trust.
7    So we talk about a therapeutic alliance, meaning the
8    patient believes that the doctor and the nurses care about
9    their well-being.  We are much more likely to take advice and
10   to sort of change our attitude based on the advice of somebody
11   that we trust and that we think wants to help us than somebody
12   we think of, you know, with anger or fear, for example.
13   Q.   How effective are jails, typically, in creating this kind
14   of therapeutic environment?
15   A.   Many jails try very hard to treat people with serious
16   mental illness.  It's very difficult to create a therapeutic
17   environment in any jail.  Some jails have a large psychiatric
18   staff with a lot of nurses.  That's very rare.  But even there,
19   it's very difficult in a jail to create a therapeutic
20   environment for a lot of reasons.
21   One of them is the stigma that being mentally ill in
22   jail causes so that almost -- the majority of correctional
23   institutions I have ever been in have kind of an ugly,
24   pejorative nickname for people with serious mental illness.
25   Even staff sometimes make fun of people, but certainly the

1   other inmates do.

2         Also, most people don't feel very safe in jail for

3   real and perceived reasons.  For many people, they don't want

4   to take medication in jail because they are worried about not

5   being able to be vigilant enough if they are tranquilized or if

6   they are under the influence of medication.

7         There's some degree -- I don't mean to blame the

8   officers for this.  I have a lot of respect for jail

9   correctional officers and detention officers.  There's some

10  fear and loathing that exists in jails because, you know, many

11  people have had bad experiences with the police.  The police

12  are who arrested them and put them in jail.  They are angry.

13  Some people, there's a lot of just fear and loathing, for want

14  of a better term, between officers and inmates.

15        Even in the best-run jails -- and there are plenty of

16  jails that are well-run -- that's something that's very

17  difficult to overcome because a lot of inmates, if somebody is

18  in a uniform, they are really not going to entertain the

19  possibility that the person is nice or their friend or wants to

20  help them, even if that's the case.

21  Q.   In talking about how effective jails are at creating this

22  therapeutic environment, what does the level of clinical

23  staffing have to do with that?

24  A.   Well, part of what creates a therapeutic environment is

25  the amount of prosocial activity that a person can engage in

1   during the course of a day.  That's both a physical plant

2   issue, it's a security issue, but it's also -- it takes staff

3   to do prosocial activities.

4           So, in a hospital, you will have group therapy.  You

5   will have individual therapy.  You will have various kinds of

6   recreational and occupational therapies that go on, all of

7   which are prosocial in the sense that you are doing something

8   productive.  You are learning something.

9           Jails, by their very nature, have a tremendous amount

10  of dead time.  I think, as my grandmother used to say, "Idle

11  time is the devil's workshop."  It's very difficult, when

12  people are spending a lot of unproductive time, to create an

13  environment of healing and learning that we would call

14  therapeutic.

15  **Q.**   How important is it to have individualized psychiatric

16  treatment?

17  **A.**   Well, I don't think there's ever been a book written about

18  treatment that didn't say that it needed to be individualized,

19  psychiatric treatment didn't need to be individualized.

20          The importance of it is, first of all, that the

21  treatment needs to match the person's problem.  There are a lot

22  of different problems that people have.  Even people with the

23  same diagnosis might have different problems that need

24  attention, different skill deficits, different things that they

25  need to learn in order to have a successful, richer life.

1          Also, because people have strengths -- and, frankly,

2     we don't do a good enough job of attending to those strengths.

3     But the more you individually assess somebody and get to know

4     them as a clinician, the more likely you can be to recognize

5     their strengths and build on those strengths to help them

6     overcome the challenges that their illness might cause them.

7          It's also, I guess, wasteful to not individualize

8     treatment because you end up giving some people something they

9     don't need and not giving other people stuff that they do need;

10    so that you waste some treatment on people, and then other

11    people stay more ill or more disabled because they're not

12    getting the treatment that they individually need.

13    **Q.**   How prone to disciplinary violations are incompetent

14    defendants?

15    **A.**   Well, incompetent defendants or any defendant who has a

16    serious mental illness, especially those who are psychotic in

17    jail, are much more likely to get write-ups.  Often they are

18    minor write-ups, but because of the number of them, they

19    frequently end up in segregation even if they don't have any

20    severe dangerous offenses.

21         What happens is like the disciplinary coordinator

22    might cut the guy a break the first time or the fifth time or

23    the sixth time.  Sooner or later they say, "If I see you in

24    front of me one more time, I'm putting you in lockup."

25         Almost every time we assess the mental health

1    services in any jail or prison, the very first place we go is

2    lockup -- whether it's called segregation, disciplinary lockup,

3    administrative segregation -- and you almost always find an

4    overrepresentation of inmates with serious mental illness,

5    including inmates who are incompetent, in those settings.

6            Also, as the sheriff mentioned earlier, some of them

7    are dangerous because of the mental illness, although most

8    probably are getting put into lockup even if they didn't do

9    anything dangerous, but certainly for some they can be very

10   dangerous for other inmates and to staff.

11   Q.   Have there been any studies done on the length of time for

12   which inmates with psychotic symptoms have been held before

13   trial as compared to those who do not exhibit such symptoms?

14   A.   There was one study.  It's something that, you know,

15   everybody believes to be true that does this.  The only study

16   on it was done many years ago as a dissertation in northern

17   Virginia by a man named Gary Axelson.  That's A-X-E-L-S-O-N.

18           In that study, he compared psychotic pretrial

19   detainees to nonpsychotic pretrial detainees and found that the

20   psychotic pretrial detainees stayed in jail six and a half

21   times longer despite having less serious charges and fewer

22   charges than the nonpsychotic detainees.  That's consistent

23   with the anecdotal reports from almost everybody that looks at

24   jail mental health.

25   Q.   Is that also consistent with what you have observed?

1  A.   Yes, ma'am.

2  Q.   What is the impact on psychotic inmates if they are housed

3  in a jail instead of in a psychiatric hospital?

4  A.   Well, one impact is -- partly because they're much less

5  likely to be willing to take medication -- that they stay

6  sicker longer or they get sicker, they become more disabled,

7  more acutely symptomatic than they would if they were willing

8  to take proper medications.

9       There's some research -- quite a bit of it relatively

10  recently, but there's research to show that every time a person

11  is allowed to have an acute exacerbation -- by that I mean a

12  serious worsening of their illness -- that their baseline can

13  drop, so that they are permanently harmed if they are allowed

14  to get really, really severely disabled by their psychosis.

15       Psychiatrists try to manage their illness both with

16  medication and with other kinds of interventions to prevent

17  that from happening.  That's much less likely to happen in a

18  jail.  That gets exacerbated when the jail has inadequate

19  mental health services.

20       So according to the American Psychiatric Association,

21  the recommended ratio for a jail psychiatrist is to have a

22  maximum of 100 patients on his or her caseload.  Any jail that

23  has a much lower ratio than that -- for example, the

24  Orleans Parish Prison, where one psychiatrist is medicating

25  almost 300 people and probably should be medicating twice that

1   number if you look at national prevalence rates -- it's even

2   worse in an understaffed jail, which I would describe

3   Orleans Parish Prison as.

4          The other thing that does is it means that -- and God

5   love him.  That psychiatrist is probably working astonishingly

6   hard, so I mean no criticism at all to that person, but they

7   don't have much time for each person.  They are racing around

8   from one person that they are medicating to the next.  They

9   don't see them as often.  They don't see them for as long.

10  That decreases the chances of talking a person into medication

11  and creating a therapeutic alliance between a doctor and a

12  patient that says, "I care about you."  The way we demonstrate

13  that we care about people is time.  If we don't have time to

14  spend with them, it's pretty unlikely that they are going to

15  come to trust us as well as they would if we had more time.

16         Nursing staff in most jails are extremely busy just

17  delivering medication.  It is an amazing challenge to the

18  entire jail, not just psych medications but all medications.

19  So the nurses don't have time to sweet-talk a person or

20  convince them that, you know, "Gosh, don't you really want to

21  take this?  Didn't I ask you nice?  Why don't you take it."

22         Well, the main reason people don't take medications

23  is because of side effects.  Nurses in a hospital typically

24  will report the side effects that a patient is experiencing to

25  the doctor so that the doctor can try a different medication or

1  change the dose.  That rarely happens, in my experience, in

2  jails.  So a lot of people refuse to take their medications

3  because they are experiencing side effects, but they don't feel

4  that the psychiatric service system is responsive to that and

5  so they won't take the medications.

6  **Q.**   Is there a recognized standard of care for taking care of

7  incompetent psychotic detainees?

8  **A.**   Yes.

9  **Q.**   Would you tell us what it is, please.

10 **A.**   In almost every state, what happens is when a person is

11 found incompetent to stand trial because they're psychotic,

12 they are sent to a state forensic hospital like Feliciana, and

13 there they receive comprehensive psychiatric services.  So they

14 would have an interdisciplinary treatment team, they would have

15 an individualized treatment plan with goals and objectives,

16 both short and long term, and interventions that were aimed at

17 each goal and each objective.

18        Part of that would be specifically aimed at

19 competence, so it might -- if the person didn't know about the

20 legal system, then they would be taught about the legal system

21 to see if they had the capacity to learn about it because

22 that's what the law -- the law doesn't require you to know it,

23 but it requires you to have the capacity to learn it.  So,

24 typically, you would try that, and most people learn it --

25 well, if they are medicated properly and if they are responding

1    well to the various kinds of treatment and their psychosis is

2    getting better, either they already know it or they will learn

3    it in their classes that they have.

4            For some people who might be psychotic and

5    intellectually disabled -- you can be both, what we call

6    co-occurring disorders -- then the educational part of that

7    would even take on a more prevalent or prominent role in their

8    treatment.

9            So, essentially, it's all of the expectations for

10   inpatient psychiatric care that you would see in the vast

11   majority of state hospitals.  Those are Joint Commission

12   accredited hospitals like Feliciana.

13   Q.   What effect does following this standard of care that you

14   have described have on preventing long-term problems for

15   incompetent, psychotic criminal defendants?

16   A.   Well, the main goal is to restore people to competency as

17   soon as possible so they can get a fair trial.  We take pretty

18   seriously the notion they are presumed innocent and that the

19   societal purpose of the treatment is to restore them to

20   competency so they can get their fair trial or plea bargain or

21   whatever the appropriate result of their criminal case is.

22           Because we are a hospital, while we have them, we

23   have duties to provide them hospital-based care, but the focus

24   of it is to restore competency.  People who are incompetent,

25   that languish in jail, are much likely to remain incompetent

1    for much longer.

2    Q.    You mentioned earlier the study that had been done about

3    the long-term effects of repeated acute psychotic episodes.  Is

4    that also a part of what following the standard of care helps

5    to prevent?

6    A.    Yes.  If you can prevent a severe worsening of their

7    condition, these studies -- there are multiple of them --

8    suggest that you can prevent the person from their baseline

9    level of functioning permanently becoming a little worse.

10            Obviously, you know, the goal is to help people

11   recover to get the maximum richness and productivity out of

12   their life, and the last thing we want to do is something

13   that's going to make them even a little bit worse permanently.

14   Q.    How long should an incompetent, psychotic criminal

15   defendant remain in jail before being transferred to an

16   inpatient hospital?

17   A.    Ideally, it should be almost immediately.  You know,

18   typically, especially in a state like Louisiana, there's

19   logistical challenges, distances to drive.  So, you know, I

20   would say immediately is probably unrealistic, but a few days

21   is how it should happen.

22            Once a person has been deemed incompetent, they're

23   supposed to go to the hospital in most states, under state law.

24   My understanding is, in Louisiana, there's a law that allows

25   some folks to have an effort to restore their competency in

1  jail.  I don't support that, but I understand that's the law.

2  But for people who are deemed to need hospital care, it should

3  happen immediately because a clinician and a court have said

4  that's what they need.

5  Q.   So we have talked about the psychosis side of things.  You

6  also mentioned intellectual disability as being a major reason

7  for a finding of incompetence.  Can you explain very briefly

8  what that means.

9  A.   It's what we used to call mental retardation, if a person

10  has sort of permanent cognitive difficulties before the age of

11  18, but also many people have cognitive problems that come from

12  either disease or brain injury after 18 so that they have

13  trouble learning and thinking.  So for some of those people,

14  they simply can't learn about the court process and would be

15  likely to be found permanently incompetent.

16         Typically, you have to try first, and that's

17  typically done in regular classes.  It might be five days a

18  week of competency restoration group, or three days a week,

19  where you're trying to teach them.  If they simply can't learn

20  it, then you would write a letter to the court saying this

21  person appears to be permanently incompetent.  If they do learn

22  it, you would write a letter to the court saying we think the

23  person has been restored to competence.

24  Q.   Is there a recognized standard of care for dealing with

25  such detainees?

1    **A.**    Yes.   Generally, the standard would be -- well, it

2    depends.   In some states, they would go to a facility that's

3    specifically a developmental facility, what we used to might in

4    the past would have called a mental retardation facility.   Now,

5    in many states, they would go to a state hospital.   Certainly,

6    if they had co-occurring disorders, where they also were

7    psychotic, they would probably go to a state hospital in most

8    states.

9              The standard in a habilitative center or a

10   developmental center would be a wide array of developmental

11   services aimed at teaching the person what they had the

12   capacity to learn to live a better life, but again the main

13   focus would be restoring them to competence through these

14   competency groups that are largely educational.   Typically,

15   they would be a couple hours a day at least three times a week,

16   often five times a week.

17   **Q.**    You mentioned earlier you had the opportunity to read all

18   of the affidavits that have been submitted in this case.   In

19   two of those affidavits of Dr. Thompson and Ms. Johannsen,

20   there were references to the Community Forensic Services or CFS

21   program.   What is your view of the CFS program, as described in

22   those affidavits, and how it compares to inpatient psychiatric

23   care?

24   **A.**    My view of it is that it's a way of throwing a little bit

25   of a service that a person needs a lot of, I assume because

1    it's cheaper, but it doesn't compare at all.  It's light years

2    short of inpatient psychiatric care.

3           According to Ms. Johannsen's affidavit, she's only

4    required to meet with people twice in a month, and it doesn't

5    even have a minimum duration of that visit.  The sense I get

6    from reading her affidavit is she works very hard at

7    essentially providing social work services to people trying to

8    move them through the system, but that's not competency

9    restoration services.  That's a very time-consuming thing.

10          It also doesn't include any of the essential

11   components of inpatient psychiatric care, which would be the

12   things I mentioned before:  A therapeutic milieu; a

13   psychiatrist with 24 patients instead of 100 or 300 or 600;

14   registered nurses around the clock available; various group

15   therapies; individual therapy; recreational therapy; so that a

16   significant portion of the person's day is spent in prosocial

17   learning and healing activities rather than sitting in a cell.

18          **MS. LINDBLOM:**  Thank you, Dr. Dvoskin.

19          **THE COURT:**  Cross-examination.

20                        **CROSS-EXAMINATION**

21   BY MS. BORDELON:

22   **Q.**   Good afternoon, Dr. Dvoskin.  Adrienne Bordelon on behalf

23   of the Department of Health and Hospitals.

24          You testified that you have looked at the State of

25   Louisiana's juvenile facilities and mental health facilities

1   for juveniles; is that correct?

2   **A.**   Yes, ma'am.

3   **Q.**   Have you ever looked at Louisiana's adult facilities?

4   **A.**   The Angola prison I have, yes.

5   **Q.**   So you have not looked at the facilities at Feliciana

6   Forensic or the Eastern Louisiana Mental Health System, which

7   encompasses the Feliciana Forensic Facility?

8   **A.**   No.  I've talked to people who ran it, but I have never

9   been there.

10  **Q.**   Are you familiar with Dr. John Thompson?

11  **A.**   I think I've met him.  I'm not sure.  But I know him by

12  reputation.

13  **Q.**   Have you ever spoken with him about the competency

14  restoration program provided by the Department of Health and

15  Hospitals?

16  **A.**   No, ma'am.

17  **Q.**   Are you familiar with the emergency admissions procedures

18  for pretrial incompetent defendants who may be in a jail

19  setting?  Are you familiar with the DHH emergency admission

20  procedures?

21  **A.**   You're talking about not competence, for --

22  **Q.**   Right.

23  **A.**   -- treatment purposes?

24  **Q.**   Right.

25  **A.**   Just generally.  I can't remember the exact language of it

1  or the process, but I have a general idea.

2  **Q.**   Isn't it true, Dr. Dvoskin, that not all psychotic or

3  seriously mentally ill inmates are pretrial detainees?

4  **A.**   I'm sorry.  Could you ask it again?  I didn't understand.

5  **Q.**   I'm asking isn't it true that not all psychotic or

6  mentally ill prison inmates are pretrial detainees who have

7  been found incompetent to stand trial?

8  **A.**   Oh, that's certainly true.

9  **Q.**   Isn't it true that a pretrial detainee who has been found

10  incompetent to stand trial could be restored in a jail-based

11  setting?

12  **A.**   Is it possible?  Sure.

13  **Q.**   Yes.  Isn't it true some pretrial detainees who have

14  initially by the sanity commission been determined to be

15  incompetent are actually malingerers?

16  **A.**   Is it true that some of them are actually malingerers?

17  **Q.**   Yes.

18  **A.**   It's undoubtedly true some could be malingering.

19  **Q.**   You testified that you had read the affidavits that

20  defense had submitted; specifically, Dr. John Thompson's

21  affidavit.

22  **A.**   Yes, ma'am.

23  **Q.**   If the goal for pretrial detainees is competency

24  restoration, does the fact that the department has provided

25  competency training and found that pretrial detainees have been

1   restored to competency in a jail-based setting speak to the

2   fact that the department is aware and attempting to do

3   something to assist?

4   A.   Well, the statistics you're referring to were very vague.

5   What Dr. Thompson said in his affidavit was that 33 percent are

6   either restored or diverted, so I don't know what percentage

7   were restored.  It didn't say that.

8         More importantly -- I mean, it's certainly good if

9   you are diverting them.  I'll give you all the credit in the

10  world for that.  But more importantly is it might have taken a

11  lot longer.  There's no evidence that it happened as quickly as

12  it would have happened in the hospital; and that's a third as

13  opposed to, on average, 75 percent that would be restored in a

14  hospital setting.  So it's certainly something.  It's not

15  nothing.  I respect the department tried to throw something at

16  the problem.

17  Q.   Isn't it true, Dr. Dvoskin, that not all pretrial

18  detainees are ever restored to competency?

19  A.   Yes.  Some people are found permanently incompetent, and

20  often the charges have been dropped against the person.

21            MS. BORDELON:  No further questions.

22            THE COURT:  Thank you.

23               Any redirect?

24            MS. LINDBLOM:  No redirect, Your Honor.

25            THE COURT:  Thank you, sir.  You may step down.

1          THE WITNESS:  Thank you, Your Honor.

2          MS. LINDBLOM:  Your Honor, that completes our

3  witnesses.

4          THE COURT:  Are you prepared to proceed?

5          MS. BORDELON:  Yes, Your Honor, I am prepared to

6  proceed, but could we have a short recess?

7          THE COURT:  Sure.  We will take 10 minutes.

8          THE DEPUTY CLERK:  All rise.

9          (WHEREUPON the Court took a brief recess.)

10          THE DEPUTY CLERK:  All rise.

11          THE COURT:  Before we start on the defense's case,

12  there was a motion to strike some of the plaintiffs' evidence

13  that was not responded to.  I want to know what the plaintiffs'

14  response is to the motion.

15          MS. LINDBLOM:  Yes, Your Honor.  Is Your Honor

16  referring to both aspects of that or just the professional

17  rules aspect?

18          THE COURT:  The professional rules aspect first.  The

19  other one, I think --

20          MS. LINDBLOM:  Your Honor may rule on the hearsay

21  issues.

22          THE COURT:  Right.  The hearsay issue I think is

23  different.

24          MS. LINDBLOM:  First, under the professional rules,

25  under Rule 3.7(a)(3), an attorney is allowed to submit a

1    declaration where disqualification of the lawyer would work a

2    substantial hardship on the client.  We think that's just this

3    kind of situation here, where we do not think that WB could

4    have submitted a declaration on his own behalf.

5                Perhaps even more importantly, the rule does not

6    prohibit attorneys from testifying at trial about facts

7    essential to the case.  This was actually not a motion to

8    disqualify but, rather, just a motion to strike the affidavit.

9                Also, federal courts can look outside of the

10   local ethics rules on motions to disqualify counsel.  If that's

11   what they want to turn it into, we actually would want an

12   opportunity to brief the disqualification issue.

13               The case of *Crowe v. Smith*, which is a

14   Fifth Circuit case from 1998, 151 F.3d 217, at page 233 it says

15   that "The court may also consider the motion governed by the

16   ethical rules announced by the national profession in the light

17   of the public interest and the litigant's rights."

18          **THE COURT:**  Is that *Crowe v. Smith*?

19          **MS. LINDBLOM:**  Yes.

20          **THE COURT:**  I'm familiar with that case.

21          **MS. LINDBLOM:**  The main reason, as Your Honor

22   probably knows, that attorneys are not allowed to testify

23   typically is that, in jury cases, there is a fear that the jury

24   will either accord the testimony undue weight or won't be able

25   to tell the difference between what is the attorney's testimony

1   that's offered under oath and what are the legal arguments that

2   are offered in rhetorical support of the case, and I'm

3   paraphrasing there.  That's from the *Crowe* case.  Of course,

4   that's not a danger here, and especially this being a

5   preliminary injunction hearing.

6                    "Preliminary injunctions are typically granted

7   on the basis of procedures that are less formal and evidence

8   that is less complete than in a trial on the merits."  That is

9   a quote from the *University of Texas v. Camenisch* case,

10  United States Supreme Court, 451 U.S. 390 at 395, and that's a

11  1981 case.

12                   So given that the reasons for striking an

13  affidavit or striking a lawyer's testimony would be to avoid

14  jury confusion, that simply doesn't apply here, and there is

15  not an ethical bar because it does come within that exception.

16           **THE COURT:**  All right.  I'll take it under

17  advisement.

18           **MS. LINDBLOM:**  Thank you, Your Honor.

19           **THE COURT:**  Proceed.

20           **MS. BORDELON:**  Your Honor, the defense calls Chris

21  Arnold.

22           (WHEREUPON **Christopher Arnold**, having been duly

23  sworn, testified as follows.)

24           **THE DEPUTY CLERK:**  Please state your full name and

25  correct spelling for the record.

1        **THE WITNESS:**  Christopher Adam Arnold.

2                    **DIRECT EXAMINATION**

3    **BY MS. BORDELON:**

4    **Q.**   Mr. Arnold, where are you employed?

5    **A.**   I'm sorry?

6    **Q.**   Mr. Arnold, where are you employed?

7            **MS. BORDELON:**  Mr. Arnold has a hearing problem,

8    Your Honor.  Would it be okay if I got closer?

9            **THE COURT:**  He may not hear you, but sure.

10   **BY MS. BORDELON:**

11   **Q.**   Thank you.  Can you hear from here?

12   **A.**   Yes.

13   **Q.**   Where are you employed?

14   **A.**   I'm employed at Central Louisiana State Hospital.

15   **Q.**   How long have you been employed at Central Louisiana State

16   Hospital?

17   **A.**   Approximately 18 years.

18   **Q.**   What position do you hold at Central Louisiana State

19   Hospital?

20   **A.**   Hospital admissions tech.

21   **Q.**   What are your responsibilities as a hospital admissions

22   tech?

23   **A.**   Process the admissions paperwork and admit the patients

24   and keep up with their legal status and put the patients'

25   information into the system.

1  **Q.**   What type of patients are admitted to Central Louisiana

2  State Hospital?

3  **A.**   We have psychiatric patients.

4  **Q.**   Does Central Louisiana State Hospital have electronic

5  medical records?

6  **A.**   Yes.

7  **Q.**   Are there adults as well as juveniles admitted to Central

8  Louisiana State Hospital?

9  **A.**   Yes.

10 **Q.**   They are not housed in the same wards and units, are they?

11 **A.**   I'm sorry.  They are not what?

12 **Q.**   They are not housed in the same --

13 **A.**   No.  They have separate units for the adults and for the

14 adolescents.

15 **Q.**   When a juvenile patient is admitted, who completes the

16 patient's summary information?

17 **A.**   Usually, I do or either my backup staff when I'm not

18 available.

19 **Q.**   Is the patient summary entered into the electronic medical

20 records?

21 **A.**   Yes.

22 **Q.**   When is it usually entered into the medical records, the

23 patient summary?  When is the patient summary usually admitted

24 into the medical records?

25 **A.**   It's usually admitted at the time of admission.  If they

1    come after hours, which is 4:30, it is admitted the next

2    morning.

3    **Q.**    Did you work on May 27, 2010?

4    **A.**    Yes.

5    **Q.**    Did you work past your normal hours that day?

6    **A.**    Yes, I did.

7    **Q.**    Why did you work past your normal hours that day?

8    **A.**    They were short of nursing staff and they needed help in

9    admitting the patients.

10   **Q.**    Was there a new juvenile admitted that day?

11   **A.**    Yes.

12   **Q.**    Was that juvenile Patient 77089?

13   **A.**    Yes.

14   **Q.**    To your knowledge, is Patient 77089 WB?

15   **A.**    Yes.  Uh-huh.

16   **Q.**    Did you complete the patient summary information on

17   Patient 77089?

18   **A.**    Yes.

19   **Q.**    When did you complete it?

20   **A.**    I did it on the next morning.

21   **Q.**    What unit was Patient 77089 admitted to?

22   **A.**    Unit 8-C.

23   **Q.**    What types of patients are admitted to Unit 8-C?

24   **A.**    We have adolescent males there.

25             **THE COURT:**  Adolescent what?

1        **MS. BORDELON:**  Males.

2   **BY MS. BORDELON:**

3   **Q.**   Was he admitted for competency restoration services

4   pursuant to a court order?

5   **A.**   Yes.

6   **Q.**   When a juvenile is discharged from the facility, are you

7   notified?

8   **A.**   Yes, I am.

9   **Q.**   Have you been notified that Patient 77089 has been

10  discharged?

11  **A.**   No.

12  **Q.**   So Patient 77089 is still at the hospital?

13  **A.**   Yes.  Uh-huh.

14  **Q.**   In the course of your duties, did you have an opportunity

15  to generate a copy of Patient 77089's patient summary sheets?

16  **A.**   Yes.

17        **MS. BORDELON:**  Your Honor, may I approach?

18        **THE COURT:**  Sure.

19  **BY MS. BORDELON:**

20  **Q.**   Is this a copy of his summary sheet?

21  **A.**   Yes.

22        **MS. BORDELON:**  At this time I would like to offer,

23  file, and introduce as DHH Exhibit 1 the patient summary sheet

24  for Patient 77089 and, in conjunction with his testimony, a

25  certified copy of the order from the Orleans Parish court

1  ordering him to Central State Hospital.  I have no further

2  questions for this witness.

3          THE COURT:  Cross-examination.  Those exhibits are

4  admitted.

5          MS. KLUGMAN:  Is this Exhibit 2?

6          MS. BORDELON:  Yes.

7          THE COURT:  Any questions for this witness?

8          MS. KLUGMAN:  No cross-examination.

9          THE COURT:  When someone is no longer a minor and

10  they are in your facility, what happens to them?

11          THE WITNESS:  Say that one more time.

12          THE COURT:  Suppose they are a minor and they come of

13  age, they turn 18.  What happens to them?

14          THE WITNESS:  It usually depends.  It can vary.  They

15  can be either admitted to the adult unit, transferred there, or

16  either they will be discharged to another facility or

17  elsewhere.

18          THE COURT:  What kind of other facility?

19          THE WITNESS:  Well, it depends.  Whatever the

20  discharge planning has planned for.

21          THE COURT:  Who makes that determination?

22          THE WITNESS:  Usually, the treatment team.

23          THE COURT:  Do you-all typically get court-ordered

24  juveniles?  Is that how you get your juvenile patients?

25          THE WITNESS:  We do have quite a few.

1           **THE COURT:**  Thank you.

2           **MS. KLUGMAN:**  Your Honor, may I ask one question?

3           **THE COURT:**  Sure.  She'll get redirect.

4           **MS. KLUGMAN:**  Absolutely.

5                       **CROSS-EXAMINATION**

6  BY MS. KLUGMAN:

7  **Q.**  Are patients allowed to stay in the ward where this

8  patient is?  After they turn 18, are they allowed to stay in

9  the juvenile ward?

10  **A.**  Are they allowed to stay --

11  **Q.**  After a juvenile is no longer a juvenile patient, is he

12  allowed to remain in the juvenile ward?

13  **A.**  No.  Once they turn 18, they move them.  They are either

14  discharged to wherever the discharge plan would plan or either

15  transport them to the adult.

16            **MS. KLUGMAN:**  Thank you.

17           **THE COURT:**  Any redirect?

18           **MS. BORDELON:**  No, Your Honor.

19           **THE COURT:**  You may step down, sir.  Thank you.

20           **MS. BORDELON:**  At this time, Your Honor, defense

21  calls Michelle Duncan.

22        (WHEREUPON **Michelle Duncan**, having been duly sworn,

23  testified as follows.)

24        **THE DEPUTY CLERK:**  Please state your full name and

25  correct spelling for the record.

1          **THE WITNESS:**  Michelle Duncan:  M-I-C-H-E-L-L-E,

2  D-U-N-C-A-N.

3                     **DIRECT EXAMINATION**

4  BY MS. BORDELON:

5  **Q.**   Good afternoon.  Where are you employed?

6  **A.**   At Eastern Louisiana Mental Health System.

7          **THE COURT:**  Ma'am, if you could get a little closer

8  to the microphone.  Thank you.

9  BY MS. BORDELON:

10  **Q.**   What is the Eastern Louisiana Mental Health System?

11  **A.**   It's the hospital.  I work for the forensic division at

12  Feliciana Forensic.

13  **Q.**   What position do you hold?

14  **A.**   I am the director of Community Forensic Services.

15  **Q.**   What is Community Forensic Services?

16  **A.**   Our staff is in the jail when they restore -- try to

17  restore competency for people that are in the jail.  They also

18  follow the not guilty by reason of insanity persons and also

19  the Lockharts.

20  **Q.**   What is a Lockhart?

21  **A.**   Someone that is irrestorable to competency and the court

22  established that they will not regain competency.

23          **THE COURT:**  Did you say "law clerk"?  I'm not hearing

24  the second word.

25          **MS. BORDELON:**  Lockharts, L-O-C-K-H-A-R-T-S.

1  BY MS. BORDELON:

2  **Q.**   Who is responsible for the waiting list to get into

3  Feliciana Forensic?

4  **A.**   That's our department, my department.

5  **Q.**   What is the waiting list?

6  **A.**   Persons who have been ordered to go to forensic.

7  **Q.**   How many people have been ordered -- how many pretrial

8  detainees are eligible for admission that are currently in

9  parish jails awaiting transfer to forensic?

10  **A.**   About 53.

11  **Q.**   How do you become eligible for admission?

12  **A.**   Well, if court ordered, and there's also -- according to

13  the statute, there's seven different documents that have to be

14  sent to forensic or my department before they are eligible to

15  be admitted.

16  **Q.**   Can you tell us what those documents are.

17  **A.**   We need the name of the attorney that represents the

18  defendant, name and address.  We need the rap sheet, the

19  offense report, the police report, the sanity commission

20  report, and the order from the court.  There's one other one

21  that I'm blanking on.

22  **Q.**   Who's responsible for providing that information to

23  Feliciana?

24  **A.**   Well, the statute says the court.

25  **Q.**   Do the courts usually provide you with that information?

1  **A.**   Well, my staff actually has to go get a lot of the

2  information.

3  **Q.**   In what order is a pretrial detainee admitted to

4  Feliciana?

5  **A.**   A court order.

6  **Q.**   No, in what order.

7  **A.**   By the date of the court order.

8  **Q.**   Does Feliciana Forensic admit minors to its facility?

9  **A.**   No.

10  **Q.**   Why not?

11  **A.**   Well, the department has juvenile facilities.  Ours is an

12  adult facility, and we don't usually mix juveniles with adults,

13  especially since there's two other hospitals in Louisiana that

14  take juveniles.

15  **Q.**   How is it that WB wound up on the waiting list?

16  **A.**   Well, we get orders, I guess, from -- I don't know what

17  court that came from.  I mean, I think it was an adult court,

18  but we get the orders and usually we, you know, check the birth

19  date.  If it's not an adult, we'll send it to Baton Rouge

20  legal.

21            **THE COURT:**  Send it where?

22            **THE WITNESS:**  Baton Rouge legal department.  The

23  Baton Rouge DHH legal department.

24            **THE COURT:**  Is there some legal provision that says

25  you don't take juveniles?

1       **THE WITNESS:**  No.  There's a children's statute that
2   tells the juvenile court what to do, and they have to have a
3   contradictory hearing before they are allowed to mix with the
4   adult population at Feliciana Forensic.
5       **THE COURT:**  So there's a statute that deals with
6   juvenile commitments?  Is that what you're saying?
7       **THE WITNESS:**  Yes, ma'am.
8   BY MS. BORDELON:
9   **Q.**   Once the document is sent down to the DHH legal
10  department, what usually happens to that person?
11  **A.**   Then they are transferred to a juvenile facility, juvenile
12  mental health facility.
13  **Q.**   Does the Community Forensic Services have a jail-based
14  outreach program?
15  **A.**   Yes.
16  **Q.**   What is the mission or the purpose of the jail-based
17  outreach program?
18  **A.**   Well, to see if the person that's been ordered to
19  Feliciana Forensic is able to be diverted -- and that would be
20  a misdemeanor or a nonviolent crime -- and also to set
21  priorities on admissions.  There could be an emergency or a
22  priority.  As I just said, we go by court order date, but
23  sometimes there's an emergency order or a priority that needs
24  to come before that.
25  **Q.**   Then how does the Community Forensic Services administer

1   their jail-based outreach program?

2   A.   Through our district forensic coordinators.

3   Q.   What is a district forensic coordinator?

4   A.   That's a person that is master-level social worker or

5   nurse.  We also have masters of psychology staff, and they are

6   the ones that go in the jail and do the competency restoration.

7   They also follow the not guilty by reason of insanity and the

8   Lockharts.

9   Q.   How many district forensic coordinators are employed with

10  the Community Forensic Services program?

11  A.   We have nine right now.

12  Q.   What type of training does the district forensic

13  coordinator obtain to perform the functions of their job?

14  A.   Well, we have a training manual, but also either a

15  psychologist or psychiatrist train them on the competency

16  restoration.

17  Q.   What types of things are they trained on for purposes of

18  competency restoration?

19  A.   Well, we have quarterly meetings, and we usually get

20  either a psychologist or a psychiatrist to come -- either the

21  FIT-R, which is a training manual for competency, and we also

22  use the training manual that was developed at the hospital.  If

23  someone is hired before and it's going to be a while before the

24  meeting, then I'll get someone to train them individually.

25  Q.   So they have all undergone individual training and then

1  they do quarterly meetings?

2  **A.**   Yes.

3  **Q.**   How is a pretrial detainee assigned to a district forensic

4  coordinator?

5  **A.**   By region.

6  **Q.**   Once a pretrial detainee is assigned to the district

7  forensic coordinator, what is the initial responsibility of

8  that district forensic coordinator?

9  **A.**   Well, the district forensic coordinator needs to go to the

10  jail and meet the client, and there's lots of paperwork that

11  they are going to fill out about that person.  They're also

12  going to check the jail records to see how that person has been

13  doing.  They are going to talk to the staff, see if they are on

14  medication.  They are going to start getting their records from

15  other hospitalizations, if they had some, or wherever their

16  records might be.  Talk to everybody possible, make sure we

17  have a court order, make sure the bill of information -- I

18  think that's the seventh thing I forget.  We have to have a

19  bill of information to see the exact crime, and I think that's

20  the initial visit.

21  **Q.**   Are the district forensic coordinators trained to assess

22  potential psychosis needs?

23  **A.**   Yes.

24  **Q.**   Who would train them on that?

25  **A.**   Either the psychologist or the psychiatrist.

1      THE COURT:  These are nurses?  Who are these people
2  again, the nurses?
3      THE WITNESS:  Social workers.
4      THE COURT:  Social workers.  What kind of social
5  workers?  MSWs?
6      THE WITNESS:  Yes, ma'am.
7  BY MS. BORDELON:
8  Q.   After the initial contact with the pretrial detainee, what
9  is the district forensic coordinator's responsibility?
10 A.   To meet with that person at least twice a month to start
11 doing competency restoration.
12 Q.   If someone has been accused of a misdemeanor --
13 A.   Or they can try to divert them from the waiting list,
14 either do outpatient competency restoration or -- if it's not a
15 violent offense, a lot of times the courts will allow them to
16 go to a group home, if we are able to find a group home, or
17 residential treatment, and they are to assess whether that's
18 available to that person.
19 Q.   If a pretrial detainee appears to be acutely psychotic or
20 the jail notifies the district forensic coordinator the
21 detainee is acting out, what is the responsibility of the
22 district forensic coordinator?
23 A.   The DFC, district forensic coordinator, needs to go see
24 that person immediately.  If they also agree with the jail
25 staff that the person is psychotic and throwing feces or

1  whatever they are doing, then they are going to call our
2  office, the main office, and we are going to get a consultant
3  to go out immediately to evaluate whether that person needs to
4  come in as an emergency or a priority.
5  **Q.**   What is an emergency admission?
6  **A.**   Someone that needs to get in immediately.
7  **Q.**   How long does it take to get someone in under an emergency
8  admission?
9  **A.**   One or two days.
10 **Q.**   What is a priority admission?
11 **A.**   Someone that needs to come in, but it's not an emergency.
12 We are not going to move people around to try to get them in.
13 They will get the next bed, whether it's a couple days or maybe
14 a week.
15 **Q.**   How long does it take to get a priority admission?
16 **A.**   Usually, within a week.
17 **Q.**   How does the pretrial detainee receive that emergency or
18 priority admission?
19 **A.**   What do you mean?  How do they get in?
20 **Q.**   Yes.  If you have been told that they need to have an
21 emergency admission and your DFC contacts you and you send your
22 consultant out, how are they then admitted?  Does the
23 consultant do anything?  Does the DFC do anything?  What steps
24 are taken?
25 **A.**   The consultant is going to call my office and say, "Yes,

1  this is an emergency.  He needs to come in immediately," and

2  then we are going to try to find a bed immediately.

3              **THE COURT:**  If you stabilize them, do you send them

4  back or do you keep them?

5              **THE WITNESS:**  No, we'll keep them.

6  **BY MS. BORDELON:**

7  **Q.**   If the district forensic coordinator believes that the

8  pretrial detainee has been restored to competency prior to

9  admission, what is the DFC supposed to do?

10  **A.**   They call our main office, and I'll send a consultant out

11  to evaluate whether that person is competent.  If the

12  consultant says, yes, they are competent, then they will

13  prepare a report that is sent to the court.

14  **Q.**   Who are your consultants?

15  **A.**   Dr. Charles Vosberg, Dr. Artecona, Dr. Colon, and

16  Dr. Dorian (phonetic).

17  **Q.**   Are these psychologists or psychiatrists?

18  **A.**   One is a psychologist, that's Dr. Vosberg, and the other

19  three are psychiatrists.

20  **Q.**   If the consulting psychiatrist or psychologist agrees they

21  are competent, what is the district forensic coordinator

22  supposed to do?

23  **A.**   Well, they are going to help get a court date, get the

24  report to the court and get a court date, and be there for the

25  court.

1    **Q.**   What type of public servants do your district forensic

2    coordinators work with?

3    **A.**   Public servants?

4    **Q.**   Besides the DHH staff, is there any other public entity or

5    public --

6    **A.**   They work with the attorneys that either represent or are

7    prosecuting the defendant.  They work with the judges.  They

8    work with the mental health center.  Lots of people.

9    **Q.**   What other nonhospital restoration services does Community

10   Forensic Services provide?

11   **A.**   We do some outpatient competency restoration, and we have

12   a large amount that's in New Orleans at the forensic aftercare

13   clinic.

14   **Q.**   Does the district forensic services coordinator provide

15   outpatient restoration services also?

16   **A.**   Yes.

17   **Q.**   Where is the outpatient clinic or aftercare clinic?

18   **A.**   On Tulane Avenue.

19   **Q.**   Who can access this outpatient clinic?

20   **A.**   It has to be by court order.

21   **Q.**   Would you happen to know how many court orders are to the

22   outpatient clinic on a yearly basis?

23   **A.**   We usually have 50 clients there.

24   **Q.**   At any given time?

25   **A.**   Yes.  It goes from 40 to 60.

1          **THE COURT:**  Is that separate from the court orders

2     you get to take them if they have been determined that they

3     can't be restored in -- is this a separate court order process

4     to go to this outpatient?

5          **THE WITNESS:**  Yes, ma'am.

6          **THE COURT:**  So these coordinators are dealing with

7     those people and the people in the prison?

8          **THE WITNESS:**  Yes, ma'am.

9     BY MS. BORDELON:

10    **Q.**   Isn't it the patient is ordered to the outpatient

11    restoration clinic?

12    **A.**   Are they ordered there?

13    **Q.**   Yes.

14    **A.**   Yes.

15    **Q.**   Is that usually because the district forensic services has

16    requested diversion of some type?

17    **A.**   It can be, yeah, diversion, or some of them are -- you

18    know, might go not guilty by reason of insanity.  They got out

19    of hospital.  We are following those too.  And they can go to

20    forensic aftercare.

21    **Q.**   The not guilty by reason of insanity?

22    **A.**   Right.

23    **Q.**   What services are available at this outpatient clinic?

24    **A.**   We have numerous different groups.  We have substance

25    abuse.  We drug test all of them.  We help them find housing.

1   It's almost like a case monitor.  You know, we are putting

2   together all services.  If we don't have something, we will

3   find it in the community.  And, of course, the competency

4   restoration outpatient.

5   **Q.**   Which region of the state is allowed to send patients to

6   the outpatient clinic?

7   **A.**   The parishes?

8   **Q.**   Yes.  Which parishes?

9   **A.**   Plaquemines, St. Bernard, New Orleans -- and did I say

10  St. Bernard?

11  **Q.**   Uh-huh.

12  **A.**   It seems like there's one more.

13  **Q.**   Is it Jefferson?

14  **A.**   Yes.  Jefferson.

15  **Q.**   Legislatively, what has the department recently done to

16  alleviate the waiting list?

17  **A.**   House Bill 462, where we are trying to -- we took some of

18  the misdemeanors out that can be ordered to Feliciana Forensic

19  and a lot of the drug offenses.

20       **THE COURT:**  Is that law or is this a proposal?

21  **BY MS. BORDELON:**

22  **Q.**   Has this bill passed?

23  **A.**   It was signed by the Governor last night.

24       **THE COURT:**  So what's the name of it again?

25       **MS. BORDELON:**  We currently do not have an act

1   number, but it is House Bill 462.

2           THE COURT:  Can you get me a copy of that?

3           MS. BORDELON:  I have a copy, Your Honor.  Sure.

4           THE COURT:  I'm sorry to interrupt.

5           THE WITNESS:  That would be more outpatient

6   competency restoration than actually being ordered to the

7   hospital.

8   BY MS. BORDELON:

9   Q.   This would also alleviate those who are in a jail-based

10  setting awaiting admission?

11  A.   Yes.

12          THE COURT:  Explain that to me.  I don't understand

13  that.

14          THE WITNESS:  Instead of being ordered to the

15  hospital, our district forensic coordinators would do

16  outpatient competency restorations.  They wouldn't be in the

17  jail; they would be out of the jail doing the competency

18  restoration for certain crimes.

19  BY MS. BORDELON:

20  Q.   They would be in the community?

21  A.   Right.

22          THE COURT:  For certain types of offenses?

23          THE WITNESS:  Yes, ma'am.

24          THE COURT:  So is this somebody who's been determined

25  that they are incompetent to stand trial?

1      THE WITNESS:  Yes, ma'am.

2      THE COURT:  I'm not clear on how this changes the law

3   that currently exists.  Maybe you can explain it to me as a

4   lawyer.

5      MS. BORDELON:  Yes, Your Honor.  What the law does,

6   it amends Louisiana Code of Criminal Procedure Article 648.  It

7   provides that if a person who has been found incompetent to

8   stand trial has a misdemeanor charge, except for domestic

9   disputes or charges under the uniform controlled substance law,

10  which is mostly possession charges, that the courts would not

11  be allowed to order them to Feliciana Forensic for inpatient

12  hospitalization; that they would either order them to 90-day

13  jail-based, and if the court felt they could not be restored

14  within 90 days, then the court would be required to order them

15  to outpatient restoration services and then release them from

16  the jail.

17     THE COURT:  A lot of the people you get referred to

18  are misdemeanor people?

19     THE WITNESS:  I don't know if I would say "a lot."

20  We do have some misdemeanors, but we do have a lot of drug

21  offenses.

22     THE COURT:  Possessory offenses?

23     THE WITNESS:  Yes, ma'am.

24     MS. BORDELON:  I have no further questions at this

25  time.

1        **THE COURT:**  Cross-examination.  Proceed.

2        **MS. LINDBLOM:**  Thank you, Your Honor.

3        **CROSS-EXAMINATION**

4 BY MS. LINDBLOM:

5 **Q.**   Good afternoon.  My name is Marjorie Lindblom.  I'm with

6 the law firm of Kirkland & Ellis.  I represent the plaintiffs

7 in this case.  We have never met before, have we?

8 **A.**   No, ma'am.

9 **Q.**   First, I would like to get straight since you talked about

10 a couple of different things.  You talked about outpatient

11 therapy and jail-based treatment and in-house treatment.  I

12 just want to be clear about some things.

13       When a sanity commission makes a recommendation to a

14 court, the sanity commission can recommend and a court can

15 choose what kind of treatment that is appropriate; right?

16 **A.**   Yes, ma'am.

17 **Q.**   One of those is outpatient treatment; correct?

18 **A.**   Yes, ma'am.

19 **Q.**   A second alternative that a commission can recommend and a

20 court can order is 90 days of jail-based treatment; correct?

21 **A.**   Yes, ma'am.

22 **Q.**   The third thing that a commission can recommend and a

23 court can order is inpatient treatment at the Feliciana

24 Forensic unit; right?

25 **A.**   Right.

1  **Q.**   So when we talk about what kind of treatment has been

2  ordered, those people who have been ordered to be inpatients at

3  Feliciana are not people who have been ordered to get

4  outpatient or 90 days of jail-based treatment; correct?

5  **A.**   Not necessarily.  I mean, sometimes the order says both,

6  jail-based and commit to Feliciana Forensic.

7  **Q.**   So they say sometimes 90 days of jail-based treatment; if

8  that doesn't work, commitment to Feliciana?

9  **A.**   Correct.  I actually don't think that by statute it talks

10  about outpatient competency.  That is something that they do by

11  bond.  You know, they will put in the bond that this person can

12  be released if they go through outpatient competency, but I

13  don't think it's anywhere in the statute.

14  **Q.**   We don't need to debate about the statute.  We have three

15  different types of court orders, and only some of the pretrial

16  detainees who are found incompetent are ordered for inpatient

17  treatment; correct?

18  **A.**   Correct.

19  **Q.**   By the way, I might use the term *patient detainees* to

20  refer to those people who have been ordered for inpatient

21  treatment.

22  **A.**   Okay.

23  **Q.**   You understand, don't you, that *inpatient treatment* means

24  treatment at the Feliciana Forensic unit?

25  **A.**   Yes, ma'am.

1  **Q.**   The Community Forensic Services program that you testified

2  about that these district forensic coordinators do, that is not

3  inpatient treatment, is it?

4  **A.**   No.

5  **Q.**   No, it is not; correct?

6  **A.**   Correct.

7  **Q.**   I'm sorry.  When I ask a negative, I just want to make

8  sure I get a clear question.

9        So when you are talking about providing the CFS

10  program to any of these patient detainees who have been ordered

11  to get inpatient treatment, you are talking about providing

12  something different than what the court has ordered; right?

13  **A.**   Yes.

14  **Q.**   You talked about -- oh, excuse me.  Can I just ask you

15  about how many of the people who have been found to be

16  incompetent to stand trial fall into each of those three

17  categories:  Outpatient, ordered to 90 days of jail-based

18  treatment, or inpatient?  If you know.

19  **A.**   I don't know the exact numbers.

20  **Q.**   Approximately.

21  **A.**   There's not very many -- well, except in Orleans, there's

22  not very many outpatient competency restoration that's ordered.

23  I would say East Baton Rouge probably has one or two at a time.

24  The jail-based, I don't know how many have been ordered because

25  we do it -- we are going to provide it even if it's not

1  ordered.

2  **Q.**   The people who have been ordered for inpatient treatment

3  appear on that patient waiting list; correct?

4  **A.**   Correct.

5  **Q.**   Let's talk for a minute about the district forensic

6  coordinators.  Are any of these DFCs, I'll call them,

7  psychiatrists?

8  **A.**   No.

9  **Q.**   Are any of them medical doctors?

10 **A.**   No.

11 **Q.**   Are any of them psychologists?

12 **A.**   No.

13 **Q.**   Are any of them psychiatric nurses?

14 **A.**   No.

15 **Q.**   Do any of the psychiatrists from the East Louisiana Mental

16 Health System see any of those patient detainees who have been

17 ordered for inpatient treatment at any time prior to the time

18 those people are admitted to Feliciana?

19 **A.**   They might have through the sanity commission.

20 **Q.**   Through the what?

21 **A.**   Sanity commission.

22 **Q.**   Oh, okay.

23 **A.**   And one of our consultants works at Feliciana Forensic but

24 is our consultant also.

25 **Q.**   If someone served on a sanity commission that then

1    recommended inpatient treatment, it would be fair to assume

2    that that doctor had recommended the inpatient treatment;

3    correct?

4    **A.**    If the sanity commission recommended it?

5    **Q.**    Recommended inpatient treatment.

6    **A.**    Yes.  I mean, I would assume it would be ordered.

7    **Q.**    Here's what I'm trying to understand.  We have got these

8    people who have been ordered by a court.  After a

9    recommendation has been made by a sanity commission, they have

10   been ordered to get inpatient treatment, and what I want to

11   understand is:  Do any of the psychiatrists or psychologists

12   who are affiliated with Feliciana make an independent judgment

13   that these people do not, in fact, need to get inpatient

14   treatment at Feliciana?

15   **A.**    No.

16   **Q.**    So they don't get out and examine the detainees to

17   determine if the court was wrong; correct?

18   **A.**    Correct.

19   **Q.**    These social workers you have talked about, I think I

20   heard you say on direct "if they agree with the jail staff

21   about the diagnosis."  The only training they have is what they

22   have been trained as social workers or in these meetings you

23   described on direct examination; right?

24   **A.**    Yes.  Some of them have worked, you know, at Feliciana

25   Forensic before, so they have experience in their prior job.

1   **Q.**   Let's talk about this wait list a little bit.  I think you

2   said, in response to a question on direct examination, that

3   about 53 people were *eligible* for transfer to Feliciana.  When

4   you used that word or agreed with that word, do you mean to say

5   that there were 53 people whose paperwork was all ready for

6   admission to Feliciana, who had been ordered there for

7   inpatient treatment?

8   **A.**   Yes, ma'am.

9   **Q.**   In addition to those 53 people whose paperwork is

10  complete, are there almost 100 other people that are on the

11  waiting list who are waiting to get all those pieces of

12  paperwork done?

13  **A.**   Yes, but they are not all pretrial.

14  **Q.**   Some of them are not guilty by reason of insanity?

15  **A.**   Correct.

16  **Q.**   How many of them are pretrial as opposed to the NGRI?

17  **A.**   I can't tell you a certain number, but there's more

18  pretrials than not guilty.

19  **Q.**   The vast majority are pretrial, aren't they?

20  **A.**   Yes.

21  **Q.**   Is it sometimes or all the time that your group makes sure

22  that that paperwork gets done so they are eligible for

23  admission?

24  **A.**   That's not something that we like to do, but sometimes we

25  have to do that.

1  **Q.**   Why do you only do it sometimes?
2  **A.**   Because that's not really our job.  But to get them in, if
3  it's a priority or, you know, an emergency, we are going to
4  have to find the paperwork from the court.
5  **Q.**   That reminds me.  When you talked about, on direct,
6  priority admissions taking about a week, is that after the time
7  that they have been evaluated by the jail and evaluated by your
8  DFC social worker and the consultant has evaluated them, and
9  then it's a week after that?
10  **A.**   Yes.  Because that usually takes two days to get the
11  consultant out, to get a report from that consultant.
12  **Q.**   Are you a medical doctor?
13  **A.**   No.
14  **Q.**   What's your professional background?
15  **A.**   I'm an attorney.
16  **Q.**   Maybe I should have asked you about the law.  If you had
17  enough room at Feliciana to take all the people off the wait
18  list and you could get their paperwork all done, would you do
19  that?
20  **A.**   Yes.
21          **MS. LINDBLOM:**  Thank you.  That's all my questions.
22          **THE COURT:**  Redirect.
23                         **REDIRECT EXAMINATION**
24  BY MS. BORDELON:
25  **Q.**   Not all the people on the original list that are the

1   subject of this lawsuit are pretrial detainees?

2   **A.**   Correct.

3   **Q.**   Do you know how many are NGRI?

4   **A.**   I don't.  I don't know an exact number.

5   **Q.**   Besides pretrial detainees and NGRIs, is there another

6   status for those, the waiting, the 130 that is the subject of

7   this lawsuit?

8   **A.**   Some of them are what we used to call Lockharts.  Some of

9   the courts are still ordering Lockharts or still finding people

10  Lockhart even though the law has changed, so we are having to

11  fix those.

12  **Q.**   Some of the people on the waiting list have been restored

13  to competency and are awaiting hearing?

14  **A.**   Yes.

15  **Q.**   Do you happen to know about how many those are?

16  **A.**   I really don't.

17  **Q.**   Isn't it true that some of the people, of the 130 for

18  which are the subject of this hearing, are actually not in

19  jail?

20  **A.**   Yes.  There's some that are getting medical treatment out

21  in the community, but they're still on our waiting list.

22  There's a few that have escaped from the jail or AWOL.  Until

23  we are ordered to take them off the list, we are not going to

24  take them off, even though we might not know where they are.

25  **Q.**   So they could be on the list for two or three years but

1  not actually in the jail?

2  **A.**   Correct.

3           **THE COURT:**  So they could be out in the community?

4           **MS. BORDELON:**  That's correct.

5           **THE WITNESS:**  Yes, ma'am.

6           **THE COURT:**  That's wonderful.

7  **BY MS. BORDELON:**

8  **Q.**   You just testified on direct examination that if the

9  district forensic coordinator believed that the person was

10  competent that your consultant would go out?

11  **A.**   Correct.

12  **Q.**   The consultant could then make a recommendation to the

13  court as to competency at that time?

14  **A.**   Yes.  They will do a report, and then they will ask for a

15  competency hearing.

16  **Q.**   Do you know if the law provides that the report by the

17  consultant could be accepted in lieu of a sanity commission

18  hearing?

19  **A.**   Yes.

20  **Q.**   Is that usually done?

21  **A.**   In lots of cases.

22           **THE COURT:**  What law is that?  We are talking about

23  all this law.  It doesn't do me any good to have somebody or

24  this witness to talk about law if I don't see the black letter.

25  Law is not the province of witnesses; it's the province of the

1    Court.  So I need to see statute numbers and black letter if
2    you are going to tell me what the law is.
3    **BY MS. BORDELON:**
4    **Q.**   Would you know the statute number?  Is it Code of Criminal
5    Procedure Article 649?
6    **A.**   I know it's around that area.
7              **THE COURT:**  You can put it in the post-trial briefs
8    and just tell me what it is.  I just need to see it and read it
9    myself.
10             **MS. BORDELON:**  Okay.
11   **BY MS. BORDELON:**
12   **Q.**   There are some pretrial detainees who are restored in the
13   jail?
14   **A.**   Yes.  I think about 30-something percent are.
15   **Q.**   And they never come to the hospital?
16   **A.**   Correct.
17   **Q.**   We talked about diversion.  What is diversion?
18   **A.**   Getting them off of the waiting list, either by doing
19   outpatient competency restoration or finding the person
20   housing.  A lot of times, that's the problem.  If it's, you
21   know, minor crimes, anything we can -- mainly outpatient
22   restoration.
23             **MS. BORDELON:**  Thank you, Your Honor.
24             **THE COURT:**  Thank you.
25             **MS. LINDBLOM:**  May I have just a --

1          **THE COURT:**  No.  I don't do recross.

2                    You may step down.  Thank you.

3          **MS. BORDELON:**  At this time, the defense calls Susan

4     Johannsen.

5                    (WHEREUPON **Susan Johannsen**, having been duly sworn,

6     testified as follows.)

7          **THE DEPUTY CLERK:**  Please state your full name and

8     correct spelling for the record.

9          **THE WITNESS:**  Susan Johannsen:  S-U-S-A-N,

10    J-O-H-A-N-N-S-E-N.

11                        DIRECT EXAMINATION

12    BY MS. BORDELON:

13    **Q.**   Ma'am, what's your educational background?

14    **A.**   I have a master's in social work.

15    **Q.**   Where are you employed?

16    **A.**   I'm employed through the State of Louisiana with Community

17    Forensic Services.

18    **Q.**   What is Community Forensic Services?

19    **A.**   It's a division out of Office of Mental Health, which

20    works as the outside sources to work with the local jails and

21    courts for those people who are pretrial detainees or those

22    people on conditional release.

23    **Q.**   When you say "conditional release," what do you mean?

24    **A.**   For those people who have already been determined to be

25    not guilty by reason of insanity, released on probation, and

1   then we also follow some of those who are conditional

2   discharges.

3   Q.   What is your position with the Community Forensic

4   Services?

5   A.   I am the district forensic coordinator.

6   Q.   How long have you been a district forensic coordinator?

7   A.   Better than 10 years.

8   Q.   In what region of the state are you assigned?

9   A.   I'm assigned to Region 9, which consists of St. Helena,

10  Livingston, Tangipahoa, Washington, and St. Tammany, and then I

11  handle parts of Region 2 just strictly for the

12  conditional-release clients.

13  Q.   What are your responsibilities as the district forensic

14  coordinator?

15  A.   My responsibility is for competency restoration for those

16  individuals who are in the jail and those who I do on an

17  outpatient community-based competency restoration, and then I

18  also do the monitoring for those individuals who are on

19  conditional release in my region and those that I am assigned

20  to in Baton Rouge.

21  Q.   Have you been trained in competency restoration?

22  A.   Yes, I have.

23  Q.   Who trained you?

24  A.   I was trained through Community Forensic Services.

25  Q.   What types of professionals trained you?

1  **A.**   Oh, I've been trained by mostly psychiatrists,

2  psychologists, primarily those two professionals, but they are

3  licensed and certified, forensic trained.

4          **THE COURT:**  They are or you are?

5          **THE WITNESS:**  They are.  They were.

6  **BY MS. BORDELON:**

7  **Q.**   In what areas of competency restoration have you been

8  trained on?

9  **A.**   Well, we are trained in a lot of different divisions:  For

10 malingering; for using the Georgia Court Competency eval, the

11 testing measure that we use to kind of give us a measurable

12 number on how a person is doing and their understanding of the

13 roles in court; training understanding IQ; understanding

14 developmentally disabled individuals; substance abuse; and

15 mental health issues.

16 **Q.**   Things that prison or jail inmates would potentially

17 suffer from?

18 **A.**   Yes.

19 **Q.**   Are you familiar with the *Bennett* guidelines?

20 **A.**   Yes, I am.

21 **Q.**   Can you tell the Court what those are.

22 **A.**   Well, the *Bennett* guideline is basically being able to

23 help the individual have an understanding of the proceeding

24 against them and be able to assist their attorney in their

25 defense, and those things compile several different factors.

1          They have to be able to understand the role of the

2     court.  They have to be able to understand what their legal

3     rights are.  They have to be able to have the ability to locate

4     witnesses.  They have to be able to understand the different

5     verdicts, know the difference between guilty, not guilty, not

6     guilty by reason of insanity, and the consequences to those

7     verdicts.

8          They have to understand the range of different

9     verdicts that can happen.  We have to teach them all the

10    different ranges and make sure they have a clear understanding

11    what those ranges are.  We also make sure that they are able to

12    withstand the stress of trial.

13         Pretty much, those are some of the guidelines.

14    Q.   How often do you undergo competency restoration training?

15    A.   That might be a good question.

16    Q.   How often do you undergo training?

17    A.   We have training scheduled quarterly during the year, but

18    we also take on other training along with that that we do

19    voluntarily.

20    Q.   As a district forensic coordinator, what kind of public

21    servant do you work with?

22    A.   Oh, gosh.  I work very closely with all my local mental

23    health clinics, sheriff's office, police department, medical

24    departments in my jail, Office for Citizens with Developmental

25    Disabilities, substance abuse clinics, Louisiana Rehabilitation

1    Services.  It goes on and on.  Basically, I address the needs

2    of the person whom I'm working with.

3  **Q.**   When you say the person you're working with, that --

4  **A.**   The defendant.

5  **Q.**   Do you believe you have a good working relationship with

6    these individuals?

7  **A.**   Yes.

8  **Q.**   As a district forensic coordinator, is it your

9    responsibility to provide competency restoration to the

10   pretrial detainees determined to be incompetent by a court?

11 **A.**   Yes, pretrial detainees.

12 **Q.**   So how are you notified when somebody has been assigned to

13   you?

14 **A.**   If an individual has been found incompetent to proceed in

15   court, I'm usually notified either by the clerk of court -- the

16   judge's secretary sometimes.  Nine times out of ten, I'm going

17   to be already aware of the case.

18 **Q.**   Why would you already be aware of the case?

19 **A.**   Typically, I'm more than likely working with them.

20 **Q.**   Even though they have not been found incompetent to stand

21   trial?

22 **A.**   Yes.

23 **Q.**   Well, why would you work with them if they had not been

24   found incompetent to stand trial?

25 **A.**   I have a very close working relationship with all the

1    jails I work with.  When they have somebody who comes in the

2    jail who they see might have mental health issues, I'm usually

3    contacted to see if I can help them receive services or help

4    them try to get things through court with them.

5    **Q.**   If they are not ordered to the department, what kind of

6    services would you assist with?

7    **A.**   Oh, I assist with placement in civil facilities; work with

8    the judges, DAs, defense attorneys for those individuals; will

9    take a look at what they are charged with to see if they would

10   consider setting some sort of bond; that if I'm able to get

11   them into an inpatient setting, that they would release them to

12   the facility, based that if I'm able to get them in a hospital.

13           We have had cases where we have been able to set up

14   other services and the DA's office was willing to *nolle pros*

15   charge.  It just depends on what they are charged with a lot of

16   times to determine what I am and what I am not able to do.

17   **Q.**   When you say you will get them into a hospital, do you

18   mean something besides Feliciana Forensic?

19   **A.**   Yes.

20   **Q.**   What type of hospital?

21   **A.**   What we would do is that, in some instances, if I'm

22   working with a local mental health clinic and they feel that

23   they meet criteria for commitment and I'm able to talk to the

24   courts and the commissioner about helping me be able to get a

25   bond, usually the mental health clinics will help me expedite

1    placement into a hospital by providing a PEC.

2             If I don't take it through the mental health clinics,

3    then sometimes the jail personnel will help, one of the doctors

4    in the jail will do a PEC for me, and we will transport them to

5    the emergency room.  Sometimes we are able to just transport

6    them directly to the emergency room for commitment.

7             **THE COURT:**  Commitment to the emergency room?  How do

8    you do that?

9             **THE WITNESS:**  No, have the emergency room do the

10   commitment.  Do the commitment.

11            **THE COURT:**  Oh, I thought you said commitment to an

12   emergency room.  I couldn't tell what that meant.  So they

13   would do the commitment in the emergency room.

14            **THE WITNESS:**  In the emergency room.  The kind of

15   ideal thing about that is if there's a bed not available, then

16   that emergency room has to hold them until a bed does become

17   available through the state system, you know, by those

18   providers that can --

19            **THE COURT:**  You can only commit them for a few days.

20   I mean, the emergency room can't commit them --

21            **THE WITNESS:**  They can do a PEC, emergency

22   physician's certificate, and that is good for 72 hours.  A

23   court will have to see them and extend it for 15 days.

24            **THE COURT:**  Go ahead.

25

BY MS. BORDELON:

Q.   Some of these pretrial detainees who have been sent to the civil hospital, if they just need mental health treatment, do you assist them to divert their criminal charges?

A.   We are able to try to work out -- depending on what the charge is, you know, I'm able to help assist in looking at doing some -- defer the charges, and hopefully they will get the services they need and not be back in the criminal system.

Q.   Where do you provide competency restoration services?

A.   In Region 9.

Q.   The physical location.  Physically, where would you provide competency restoration?

A.   Oh, okay.  In all of the parish jails in Region 9, which would be in Greensburg jail; it would be in Livingston jail; it would be in the jail in Franklinton, Louisiana; it would be the jail in Covington, Louisiana; and Amite.

        But I also do competency restoration in the community, which means that I have individuals that I actually go to their home or meet them at the mental health clinic to do competency restoration with them.

Q.   If they are not in the jail, how do you determine where you are going to do your competency restoration services?

A.   Typically, the sanity commission doctors will make that recommendation, and sometimes they will touch base with me to make sure I'm comfortable -- which I hadn't ever turned one

1    down -- that I would go in the community and see them there.

2            So if the sanity commission doctors feel that they

3    are on bond -- these are usually individuals already on bond,

4    so this way we don't have to remand anybody into the jail to do

5    the 90 days in jail; that I'm willing to go in the community

6    and see them in the community to do competency restoration.

7            That can mean hooking them up with services with

8    mental health, follow-up mental health, making sure they are

9    staying on their medications, just kind of doing some

10   education, and it could be sometimes it's strictly that's all

11   they need is some education on court proceedings.

12   Q.   Once you have been assigned a pretrial detainee to do

13   90-day jail-based restoration, what do you do with these

14   pretrial detainees?

15   A.   Well, 90-day pretrial, one of the things that's determined

16   is, if medication is needed for the individuals, to make sure

17   that the medical department is providing the medications they

18   need, that they are seeing -- if they are going to the mental

19   health clinic, making sure they are going to the mental health

20   clinic, making sure they are taking their medications.

21           I will meet them in the jail.  We will go over the

22   Georgia Court Competency evaluation testing.  I would educate

23   them about what they are charged with, make sure they have a

24   clear understanding of what that charge is.

25           I will go over all of the discovery information with

1    them so we can understand -- I'm not telling them they did or

2    didn't commit an offense.  I just strictly want them to know

3    what they are charged with and what those range of charges are

4    and the consequences of those charges, and then just clearly

5    make sure they have an understanding of what it is they are

6    going to be proceeding under.

7    **Q.**   If you are providing the initial 90-day jail-based

8    restoration, based on your training and experience, if you

9    believe you can restore somebody without admission to the

10   hospital but it may take longer than 90 days, what would you

11   do?

12   **A.**   What typically happens is when the court does order a

13   90-day jail-based restoration, we try to set them on the docket

14   prior to the expiration of those 90 days, where I can come into

15   the court and let them have an idea of where I'm at in regards

16   to providing competency restoration.

17          I have on occasions asked the court to give me an

18   extension -- 30, 60 days, depending what it feels like how

19   close I am of being able to get that person competent, and I'm

20   usually always -- well, I have always been granted that, so

21   that way they can ask to delay the sanity commission doctors to

22   evaluate him just at that point, maybe give me another 30 days

23   and then have the doctors come back and reevaluate, or another

24   60 days and then do it.

25   **Q.**   After you have completed the competency restoration and

1    you believe -- you believe -- that the person is competent,
2    what steps do you take?
3    A.   I try to get them on the docket as quickly as possible.
4    One of the two things we do -- and it depends on which court
5    I'm in.  I'm either going to ask for a consultant forensic
6    psychiatrist to come in from Community Forensic Services to do
7    an evaluation, to make a determination if our doctor feels that
8    individual has met criteria to proceed; and then there's other
9    times, if they are already preset to be reevaluated and I felt
10   that they have met that, then I will let the sanity commission
11   doctors know where I am at and they will go back, and then we
12   will set them back on the docket as soon as possible.
13   Q.   Through your training and experience, do you believe you
14   know when a pretrial detainee may have an intellectual
15   deficiency which is the barrier to competency?
16   A.   I have worked with many people with developmental
17   disabilities that have the cognitive limitations where they are
18   not ever going to clearly understand the charges nor are they
19   going to be able to assist in their defense.  Those individuals
20   are the ones that I will get in touch with the Office for
21   Citizens with Developmental Disabilities first to find out if
22   they are already receiving services, have they already
23   qualified for services through them; and if so, then we'll try
24   to get more releases done so I get as much information as
25   possible.

1        I will also get our consulting forensic psychologist

2   to come down and do an update, psychological testing, and a

3   Vineland, which is adaptability scales, which you have to have

4   in order to qualify for Office for Citizens with Developmental

5   Disabilities.

6        So what I try to do is take a lot of steps, the

7   things that they would need later, try to go ahead and get it

8   done now, and so that way we can have a clearer picture of what

9   that person's limitations truly are at this time.

10  **Q.**   If it's determined by the psychologist that the person's

11  probably not going to reach restoration of competency, what

12  would you do to assist that person?

13  **A.**   I would petition the court to allow them to have one --

14  they either stipulate to our report from forensic that that

15  person is unrestorable, and they would do a 848(B)(3), I think

16  that's what it is -- 648(B)(3) or one of those.  I can't

17  remember all the statutes.  Basically, that's saying that that

18  individual would go into DHH custody and then it would be

19  determined if they would be released or civilly committed.

20        But what I try to do, particularly those individuals

21  who I know are going to qualify for OCDD criteria, we have

22  already taken the steps of already having the psychological

23  done, already having the Vineland done, and most of the records

24  already have been received.  So those things really save them a

25  lot of time and help that person be able to proceed out of the

1   system a lot quicker.

2   **Q.**   Are these people ever admitted to Feliciana?

3   **A.**   Well, not the developmentally disabled people, not the

4   ones who have cognitive disabilities.

5   **Q.**   That you have worked with?

6   **A.**   Right, that I have worked with.  We have placed many in

7   group home settings, and we have actually released many into

8   the community under some other structured care.

9   **Q.**   Would you say that that is a diversion?

10  **A.**   Yes.

11  **Q.**   Through your training and experience, do you believe you

12  can determine when a pretrial detainee may have acute

13  psychosis?

14  **A.**   Yes, I do believe I can make that determination.

15  **Q.**   If someone is acutely psychotic and is acting out, what

16  steps would you take to assist that person?

17  **A.**   Well, there's many steps.  First of all, if they are

18  actively psychotic, I want to make sure that the jail staff is

19  aware of what's going on.  If they have a medical department, I

20  get with the medical department to see if I can get them to be

21  seen by the doctor as quickly as possible so we can see about

22  getting them started on meds.

23          If there's not a medical department within the jail,

24  then I'm able to work with the local mental health clinics, and

25  they are very good to me.  They will tell me to set them up

1    right away, to bring them straight to the mental health clinic

2    to be seen by one of the psychiatrists there.

3    **Q.**    And they would prescribe medication?

4    **A.**    Yes.

5    **Q.**    If a pretrial detainee who has been ordered to Feliciana

6    is truly psychotic and may be a danger to self or others, what

7    steps would you take then?

8    **A.**    If I have somebody who's on the waiting list, who is

9    actively a danger to themselves or others, I will call the

10   hospital.  I will let Michelle Duncan know, I will let John

11   Thompson know, and they have always accommodated me within a

12   day or two of getting them admitted straight into the hospital.

13   **Q.**    Is that an emergency admission?

14   **A.**    That's an emergency.  If they are a danger to themselves,

15   actively a danger to themselves or dangerous to others, they

16   have been very good about trying to get them moved out of the

17   jail and placed into a hospital.

18   **Q.**    What is the normal turn-around time for that?

19   **A.**    Two days.  That's provided they are on the waiting list.

20   **Q.**    If you are notified through the community mental health

21   clinic or the jail that somebody has a mental health issue but

22   they are not court ordered to DHH for either competency or

23   impatient, what actions or steps would you take to assist those

24   inmates?

25            THE COURT:  Why are we going into that?

1        **MS. BORDELON:**  What I'm trying to show, Your Honor,

2  is that Ms. Johannsen takes steps to either begin competency

3  restoration and that, actually, they would be restored to

4  competency prior to their competency hearing, or attempt to

5  divert them so that they don't get into our system, such that

6  they are on the waiting list and awaiting admission to

7  Feliciana.

8        **THE COURT:**  Okay.

9        **THE WITNESS:**  And that's so very often the case.  I

10  get notified immediately by the community mental health

11  clinics.  If one of the clients is now detained in the jail, I

12  get notified by the jail.  I get notified by the medical

13  departments, when they have somebody in the jail who is having

14  a lot of psychiatric issues, to see if there's anything I can

15  do to either try to expedite things for getting help for them,

16  and we have been able to -- I spend a majority of my time doing

17  that in order to really assist those individuals with mental

18  health needs instead of waiting for the court to tell me to do

19  something.  I think it's really important that you get in there

20  and help that individual as quickly as possible as you can.

21  BY MS. BORDELON:

22  Q.   Why would you do that?

23  A.   I just can't see having somebody decompensate waiting for

24  something to happen.  I like to make sure that if there's an

25  issue that it's addressed as quickly as possible, and let's

1   take a look at what's going on.

2           If their charges are very serious and I know that I'm

3   not going to be able to get a bond out, I'm the first one to go

4   talk to the defense attorney or the DA or somebody and say,

5   "Let's take a look at these charges.  We need to order the

6   sanity commission.  We need to be able to move on this.  Let's

7   get something going."

8           Because I don't want that person decompensating worse

9   than they are.  I'm not going to keep them from trying to get

10  the care they need.  But you are going to run into cases where

11  they are not going to take meds, you know, or it's not going to

12  be something I can just divert and try to get them placed in a

13  hospital or another setting.  It's that the charges are to the

14  point that I don't have an option but to try to put them on our

15  waiting list.

16  **Q.**   Are you responsible for St. Tammany Parish?

17  **A.**   Yes, I am.

18  **Q.**   Would you happen to know how many inmates are in

19  St. Tammany jail?

20  **A.**   I asked that question just recently.  I thought it was

21  like 1,200, but I think it's 1,100.

22  **Q.**   Would you happen to know, of that 1,100, how many are

23  pretrial detainees on the waiting list?

24  **A.**   Three.

25  **Q.**   Have you worked with all three of these pretrial

1    detainees?

2    **A.**    Yes.

3    **Q.**    Have you restored any of them to competency?

4    **A.**    The ones that are right now on the list?

5    **Q.**    Correct.

6    **A.**    One I'm waiting to get on the docket -- that's in

7    St. Tammany; right?  One, I just need to get her on the docket.

8    We were able to get her competent at the jail, and I just need

9    to get a hearing date on her.

10   **Q.**    And some medical professional, either a psychologist or

11   psychiatrist --

12   **A.**    I had Dr. Artecona, who is our consultant forensic

13   psychiatrist with Community Forensic Services, come by and

14   perform a competency evaluation, and he also agrees that she

15   now meets the *Bennett* criteria.  We are going to be able to set

16   her on the docket, so the court can either choose to stipulate

17   to his report or we go to the sanity commission.

18   **Q.**    Now, why is this person still on the waiting list?

19   **A.**    Not until they are found competent by the court can I

20   remove them.

21   **Q.**    Based on your training and experiences, what are the

22   benefits of providing competency restoration in a jail-based

23   setting?

24   **A.**    Well, one of the benefits is that when I'm doing the

25   Georgia Court Competency, there's a diagram of a courtroom, and

1    it's amazing that when you ask a client where does the

2    defendant sit, they usually point to the jury box or they point

3    in the audience.  Well, they are used to coming in for

4    arraignment or other things and that's where they sit.

5            So it does help them in some sense you know their

6    court, you know who their judge is, you know who their defense

7    attorney is.  You are able to say, "Okay.  Now, this is for

8    arraignment."

9            They are partially right, you know, in their

10   thinking.  It's not that they are totally off base with their

11   answer, but you have to keep making sure they understand if

12   this was your trial -- not just if you go to court, but if this

13   was your trial -- and for them to understand, you know,

14   sometimes in some courtrooms the defense sits on the right side

15   and sometimes they are on the left side.  It just depends how

16   that courtroom is set up.

17           So when they go to explain things, it makes better

18   sense; that when they do say those questions like that, they

19   are not completely off base.  They have been in court.  And,

20   yes, at times this is where they have been.  So it helps them

21   understand.

22           Plus, they see me so frequently in the court with

23   them, you know.  They see me as a strong support system for

24   them, also, because I'm kind of, you know, their connection

25   between them and the jail.

1   **Q.**   As a district forensic coordinator, do you attempt to

2   establish a rapport with these pretrial detainees?

3   **A.**   It's absolutely necessary that you have a rapport, they

4   can trust what you are saying, you know.  And like I tell them,

5   "You're not going to like always what I have to tell you, but

6   I'm going to tell you the truth and this is what you're looking

7   at.  I'm not saying you are guilty.  I'm not saying you are not

8   guilty.  My job is to make sure you clearly understand what you

9   are charged with.  I'm not telling you this is what to say or

10  not.  I'm telling you this is what the reports are saying."

11         I just want to make them understand that, you know,

12  I'm not either for or against, so they really kind of trust

13  that you are not going to lead them in any wrong direction.

14  **Q.**   Because you have this rapport, are you able to encourage

15  them to take their medications?

16  **A.**   Yes.  And one of the first things we do when we do meet

17  our defendants, we give them what's called a notice to the

18  defendant.  Right off the bat on there it says "we," but I

19  always have to correct myself and say, "I work for the Office

20  of Mental Health.  I do not work for the sheriff's office.  I

21  do not work for the district attorney.  I'm here to help assist

22  you in understanding your charges.  Anything you say to me

23  cannot be used against you unless you or your attorney decides

24  to raise an insanity defense or a similar defense.  Nothing you

25  say to me can be used against you.  You know, the only thing I

1    can testify about is what a state of mind was at the time of
2    the offense."

3             And they clearly understand that it's important, they
4    can be as honest with me as possible, and nothing they tell me
5    can be used against them.  So they like the concept of being
6    able to say, "Well, Ms. Susan, what about this?  What about
7    this?"  Then I will say, "Well, that's important.  You need to
8    tell your attorney."

9             I have been around the jails for a long time.  They
10   may not be placed on the waiting list for months before all
11   this proceeding happens, but they see me frequently in the
12   jail, and they see me with other inmates, and other inmates
13   tell them, "You can talk with Ms. Susan."  So it makes them
14   feel comfortable that there's somebody there they feel like
15   they can trust.

16            **MS. BORDELON:**  No nothing further questions at this
17   time.

18            **THE COURT:**  Thank you.

19                 Is there cross-examination?

20            **MR. HUMANN:**  There is.  Thank you, Your Honor.

21                         **CROSS-EXAMINATION**

22   BY MR. HUMANN:

23   **Q.**   Adam Humann for the plaintiffs.  Good afternoon,
24   Ms. Johannsen.  Thank you for being with us today.

25   **A.**   Good afternoon.

1   **Q.**   As a quick point of clarification, you testified about a
2   PEC?

3   **A.**   Physician's emergency certificate.

4   **Q.**   Now, are detainees for whom the PEC is relevant looking to
5   be released from jail?

6   **A.**   I would have already had bond arrangements taken care of
7   before we could do that.

8   **Q.**   So they would be people who would be released from jail
9   after the PEC?

10  **A.**   Yes.

11  **Q.**   You testified on direct that you're a district forensic
12  coordinator.  If I refer to *DFC*, you'll understand that's what
13  I mean?

14          **THE COURT:**  Wait a minute.  You talk about as fast as
15  she does.

16          **MR. HUMANN:**  Oh, I'm sorry.  I'll slow down.  Let's
17  try that again.

18  **BY MR. HUMANN:**

19  **Q.**   You testified on direct that you're a district forensic
20  coordinator?

21  **A.**   Yes.

22  **Q.**   If I refer to *DFC*, you will understand that's what I mean?

23  **A.**   Yes.

24  **Q.**   You're one of nine DFCs, aren't you?

25  **A.**   Yes.

1   **Q.**   Those nine DFCs service the entire state of Louisiana;
2   right?
3   **A.**   Yes.
4   **Q.**   All 64 parishes?
5   **A.**   My understanding, yes.
6   **Q.**   Do you know anything about what the other eight DFCs do?
7   **A.**   I can only answer to what I do as a district forensic
8   coordinator and what we were all trained to do.
9   **Q.**   Once again, can you remind me what the parishes are that
10  comprise Region 9.
11  **A.**   St. Tammany Parish, Washington Parish, Tangipahoa Parish,
12  St. Helena Parish, and Livingston Parish.
13  **Q.**   Thank you.  Once a patient detainee -- excuse me.
14          You understand that after a sanity commission has
15  provided a court with an assessment, a court may find that a
16  detainee requires inpatient treatment and orders them to
17  Feliciana; correct?
18  **A.**   Yes.
19  **Q.**   If I refer to *patient detainee*, will you understand that's
20  what I mean?
21  **A.**   I understand what you are talking about.
22  **Q.**   Once a patient detainee is committed to Feliciana, he or
23  she is put on a waiting list; is that right?
24  **A.**   Correct.
25  **Q.**   Before the patient detainee is transferred to Feliciana,

1    he or she is under the care of whatever medical staff is
2    provided by a parish jail; is that right?
3    A.    Right.
4    Q.    As the DFC for Region 9, you're familiar with the jails in
5    Region 9, aren't you?
6    A.    Oh, yes.
7    Q.    You are familiar with the medical staffs in those jails?
8    A.    Oh, yes.
9    Q.    We heard a little bit this morning from Dr. Inglese, who
10   was talking to us about St. Tammany.
11   A.    Yes.
12   Q.    I would like to walk through some of the other parish
13   jails and the medical staff and services they provide, so let's
14   start with Livingston.  Does Livingston have a full-time
15   board-certified psychiatrist on staff?
16   A.    No, they do not.
17   Q.    Do they have a full-time medical doctor?
18   A.    They do.
19   Q.    How many?
20   A.    I believe they have one.
21   Q.    Do they have a psychologist on staff?
22   A.    No.
23   Q.    What about a psychiatric nurse?
24   A.    No.
25   Q.    What about a psychiatric aide?

1   **A.**   No.

2   **Q.**   What about a full-time nurse?

3   **A.**   They have numerous nurses on staff.

4   **Q.**   Do you know about how many?  Less than six?

5   **A.**   There is staff 24/7.

6   **Q.**   Same questions for St. Helena:  Does St. Helena have a

7   full-time board-certified psychiatrist?

8   **A.**   No.

9   **Q.**   What about a medical doctor?

10  **A.**   No.

11  **Q.**   What about a psychologist?

12  **A.**   No.

13  **Q.**   Psychiatric nurse?

14  **A.**   No.

15  **Q.**   Psychiatric aide?

16  **A.**   No.

17  **Q.**   What about a nurse?

18  **A.**   No.

19  **Q.**   You're smiling about St. Helena.  I mean, do you have

20  thoughts on the quality of care they provide?

21  **A.**   They are very little.

22  **Q.**   What about -- and I apologize if I botch this, but I think

23  it's Tangipahoa?

24  **A.**   Tangipahoa.

25  **Q.**   Do they have a full-time board-certified psychiatrist on

1    staff?

2    **A.**   No.

3    **Q.**   What about a full-time medical doctor?

4    **A.**   I don't know if he is full-time.  I know he comes in, but

5    I don't know how frequent.

6    **Q.**   What about a psychologist?

7    **A.**   No.

8    **Q.**   A psychiatric nurse?

9    **A.**   No.

10   **Q.**   What about a psychiatric aide?

11   **A.**   No.

12   **Q.**   Or a nurse?

13   **A.**   Nurse.  They have two.

14   **Q.**   Let's finish up with Washington.  Does Washington have a

15   full-time board-certified psychiatrist on staff?

16   **A.**   No.

17   **Q.**   What about a medical doctor?

18   **A.**   Yes.  I don't know how many hours, but I think he is

19   board-certified in psychiatry and internal medicine.

20   **Q.**   So he is a psychiatrist?

21   **A.**   I believe so.

22   **Q.**   Is he full-time?

23   **A.**   I think he's consulting.  He comes in on a consultant

24   basis.

25              **THE COURT:**  Is that in addition to the doctor?

1        **THE WITNESS:**  No, it's the same one.  It's all just

2   the one doctor.

3   **BY MR. HUMANN:**

4   **Q.**   What about a psychiatric nurse?

5   **A.**   No.

6   **Q.**   Or a psychiatric aide?

7   **A.**   No.

8   **Q.**   Or a nurse?

9   **A.**   Nope.

10  **Q.**   Are you familiar with any of the jails in Region 2?  I

11  know you testified on direct you have some familiarity.

12  **A.**   I have only been twice in Baton Rouge, East Baton Rouge

13  jail.

14  **Q.**   Do you know anything about the medical staff there?

15  **A.**   I think Dr. Blanche is there, and I know the social

16  worker.  Other than that, I really couldn't say anything in

17  regards to that.

18  **Q.**   You understand inpatient treatment means at a hospital;

19  right?

20  **A.**   Yes.

21  **Q.**   You testified during your direct about the Community

22  Forensic Services program; right?

23  **A.**   Yes.

24  **Q.**   CFS doesn't provide inpatient treatment; is that right?

25  **A.**   You mean --

1  **Q.**   I'm sorry.  CFS, it does not provide inpatient treatment,
2  does it?

3  **A.**   Community Forensic Services does not provide inpatient --

4  **Q.**   Inpatient treatment; correct?

5  **A.**   We are the outreach for the hospital.

6  **Q.**   Do you know -- and maybe you don't know.  Do you know if
7  CFS provides inpatient treatment itself, the program?

8           **THE COURT:**  In a hospital.  Do you provide treatment
9  in a hospital?

10          **THE WITNESS:**  I have a hard time trying to separate
11  the two because I feel like we are connected with the forensic
12  hospital.

13          **THE COURT:**  Well, just answer his question.  He is
14  asking do you provide treatment in a hospital, in a psychiatric
15  hospital.  Do you go to a psychiatric hospital and provide
16  treatment to patients there?

17          **THE WITNESS:**  I have gone into psychiatric hospitals
18  and provided treatment.

19          **THE COURT:**  Is that part of your job as a DFC?

20          **THE WITNESS:**  Yes.

21          **THE COURT:**  How often do you do that?

22          **THE WITNESS:**  Just if there's -- I've only done it on
23  a few occasions, where they were placed at Southeast Hospital
24  or if they have been placed at another treatment program that I
25  have gone into those facilities and provided competency

1   restoration.

2   **BY MR. HUMANN:**

3   **Q.**   Do you believe CFS provides equivalent care to what a

4   patient would receive at Feliciana?

5   **A.**   Different.

6   **Q.**   How is it different?

7   **A.**   You know, the thing is you're asking -- and this is the

8   hard thing.  I don't see us separate from the hospital, and I

9   think that's one problem I'm having trying to understand.  I

10   see us as part of the hospital.

11   **Q.**   District forensic coordinators themselves -- strike that.

12          You, as a DFC, don't provide inpatient treatment, do

13   you?

14   **A.**   Not as the --

15          **MS. BORDELON:**  Objection:  Asked and answered.

16          **THE COURT:**  Her answer is somewhat evasive, so he can

17   ask the question.

18          **THE WITNESS:**  I have provided services in inpatient

19   settings in the past.

20   **BY MR. HUMANN:**

21   **Q.**   How often have you done that?

22   **A.**   Several times.  If they're housed there, I will provide

23   services.  If I'm ordered to do it, I have no problem going to

24   that hospital and doing it.

25   **Q.**   What kind of services have you provided?

1    **A.**    Competency restoration services.

2    **Q.**    Specifically, what have you provided?  What have you done?

3    **A.**    I have provided training under -- getting education under

4    the Georgia Court Competency evaluation, understanding what

5    their legal charges were, work as a liaison between the

6    hospital and courts.

7           **THE COURT:**  This is where somebody goes to someplace

8    other than Feliciana?

9           **THE WITNESS:**  Yes, ma'am.

10          **THE COURT:**  I thought it was unusual for some of

11    these other hospitals to take these detainees.

12          **THE WITNESS:**  I've had some that were already in

13    those facilities, where they were at Southeast for --

14          **THE COURT:**  Are these waiting list people of yours or

15    Feliciana that you're talking about?

16          **THE WITNESS:**  They were placed -- they were already

17    in a psychiatric facility, the couple that I have seen, and I

18    went in and continued to do competency restoration, or I had

19    some that were in the community that decompensated.  I was able

20    to do it from the community to get them into a civil setting

21    and continued competency restoration.

22          **THE COURT:**  Proceed.

23    **BY MR. HUMANN:**

24    **Q.**    If you could get everyone who is on the waiting list into

25    Feliciana today, would you do that?

1  **A.**   No.

2  **Q.**   Why not?

3  **A.**   It would not be appropriate for all of them to go.  Some

4  of them do not have psychiatric illnesses.  Some of them have

5  developmental disabilities.  They really need to be considered

6  for other services other than a psychiatric facility.

7  **Q.**   How do you know that?

8  **A.**   By working with them.

9  **Q.**   How many people are we talking about that you have worked

10  with were on the list?

11  **A.**   That's presently on the list?

12  **Q.**   Correct.

13  **A.**   Right now, I have -- well, my list is very small right

14  now, and my list is usually small because I usually work on it

15  before they get on the list.

16         So right now, at this point in time, I'm working on

17  several that I'm going to be looking at doing some diversionary

18  things that's community-based.

19  **Q.**   So you work with more individuals who are not on the list

20  than who are on the list, don't you?

21  **A.**   Yes.

22  **Q.**   Does that take up the majority of your time?

23  **A.**   I would say it would take about 30 percent of my time.

24  **Q.**   What takes up the other 70 percent of your time?

25  **A.**   Well, I also have conditional-release people in the

1   community, then I have those people in the jail, and then I
2   also have to be in court a lot.  And then I do, every once in a
3   while, have to write a report or two.
4   Q.   Understandably.  If you could put a percentage on it, what
5   percentage of your time is devoted to dealing with people who
6   are on the list?
7   A.   I would say 30 percent of my time.
8          MR. HUMANN:  Nothing further.
9          THE COURT:  Is there redirect?
10          MS. BORDELON:  Just a couple questions, Your Honor.
11                       REDIRECT EXAMINATION
12   BY MS. BORDELON:
13   Q.   How many pretrial detainees that are ordered to Feliciana
14   Forensic are in St. Helena Parish?
15   A.   Zero.
16   Q.   How many pretrial detainees ordered to Feliciana Forensic
17   are in Tangipahoa Parish?
18   A.   One.
19   Q.   How many pretrial detainees ordered to Feliciana Forensic
20   are in Washington Parish?
21   A.   One -- no.  One.  One.
22   Q.   How many pretrial detainees ordered to forensic are in
23   St. Tammany Parish?
24   A.   Three.
25   Q.   How many pretrial detainees ordered to forensic are in

1   Livingston Parish?

2   **A.**   Zero.

3   **Q.**   Over the years, how many clients have you worked with who

4   have been on the waiting list?  In the years.  Just could you

5   give us an estimated number.

6   **A.**   I could tell you this much.  I looked at my list.  And I

7   know of those people who I had on the list, I diverted 30

8   people.

9   **Q.**   Over the years you have diverted 30 or this year you've

10  diverted 30?

11  **A.**   In the past 12 months.

12  **Q.**   In the past 12 months, you have diverted 30?

13          **THE COURT:**  30 people from the list?

14          **THE WITNESS:**  Yes.  30 people who have been found

15  incompetent through the courts.

16          **MS. BORDELON:**  Thank you.  No further questions.

17          **THE COURT:**  You may step down, ma'am.

18              We are going to take a break and come back in 10

19  minutes.

20          **THE DEPUTY CLERK:**  All rise.

21          (WHEREUPON the Court took a brief recess.)

22          **THE DEPUTY CLERK:**  All rise.

23          **THE COURT:**  You gave me a copy of the bill?

24          **MS. BORDELON:**  Yes, Your Honor, and I provided

25  plaintiffs' counsel with a copy as well.

1            THE COURT:  Okay.  This "B" provision on dangerous

2    substances, that's just for possessory offenses; is that what

3    that is?

4            MS. BORDELON:  It's for possessory and distribution.

5            THE COURT:  Possessory and distribution?

6            MS. BORDELON:  Yes, Your Honor.  Your Honor, it is

7    only some of the lower distribution charges, not major

8    distribution charges.

9            THE COURT:  Okay.  Do you think you can get me a list

10   that weeds off people who are not guilty by reason of insanity

11   and anybody who's not just at Feliciana, a person waiting to go

12   to Feliciana?  Can we get a list that culls the people that we

13   don't care about so I can figure out what I'm looking at?

14           MS. LINDBLOM:  Your Honor, we were provided a copy of

15   an unredacted list.  We had not filed an unredacted list with

16   the Court because of the Advocacy Center's obligations to

17   maintain confidentiality.  They have provided a list that has

18   147 people on it as of May 26.  Of that -- we did a count -- 17

19   are marked NGRI, and that actually appears on this list.  I

20   don't know what we should do about submitting it to the Court

21   because of the confidentiality issues.

22           MS. BORDELON:  Your Honor, we have today a redacted

23   list that I haven't put into evidence, but I can, which shows

24   that there are 53 people who are pretrial detainees who have

25   all their paperwork in and are ready for or potentially ready

1   for admission, which takes off the ones that -- there may be

2   one or two that we have restored to competency and could be

3   removed, but that had their paperwork in, they are --

4            THE COURT:  Well, let me tell you the issue about the

5   paperwork.  I understand, from your viewpoint, until they do

6   the paperwork, you can't receive them, but the issue is the

7   constitutionality of the system.  So I really need to know how

8   many people were told to go to Feliciana and they are not

9   there.

10            MS. LINDBLOM:  I would just need to consult with the

11   Advocacy Center about the redactions that would be necessary --

12            THE COURT:  I don't need names.  I just need to

13   know --

14            MS. LINDBLOM:  It's just that our only copies have

15   names.

16            MS. BORDELON:  Your Honor, the list they have been

17   provided are not just NGRIs and pretrials.  Those are also

18   Lockharts who have been ordered.  I mean, there are five areas

19   which I'm fixing to get into with my next witness as to who can

20   actually be ordered to Feliciana Forensic, so those are not --

21   the 147 people that she is talking about are not all pretrial

22   detainees who have been found incompetent to stand trial.

23            THE COURT:  Well, your list is people who have all

24   that paperwork done.  I want a list of the pretrial detainees

25   who are supposed to be in Feliciana whether or not they have

1    their paperwork done.

2         **MS. LINDBLOM:**  Your Honor, Ms. Klugman just pointed

3    out to me that Your Honor was, in fact, already supplied in

4    camera with a copy of the May 26 patient waiting list by

5    region.

6         **THE COURT:**  But that one, she says, has people who

7    don't belong on it.

8         **MS. LINDBLOM:**  Well, no, this has --

9         **THE COURT:**  Let me see what you are talking about.

10        **MS. BORDELON:**  Your Honor, that list that she's

11   talking about that you're fixing to look at are not all just

12   pretrial detainees that are the subject of our hearing today.

13        **MS. LINDBLOM:**  Right.  If I might just point out, for

14   example --

15             Do you have a copy?  I have an extra one, I

16   think.

17             So if you look, for example, Your Honor, on page

18   1 of 22, the very first page of the list, it has "Date of Court

19   Order" and then "Status."  Those are two columns right next to

20   each other.  So, for example, you look at the first person,

21   where it says "Date of Court Order," it's followed by "PT."

22   It's my understanding that means pretrial.

23             If you look down at the last name --

24        **THE COURT:**  It has "NGRI."

25        **MS. LINDBLOM:**  Exactly, not guilty by reason of

1   insanity.  We went through and did a count.  We came up with 17

2   names on this list which are NGRI.  All the others I understand

3   to be PT, although I haven't recounted it recently.  According

4   to the last page of this list -- and this is a handwritten

5   marking, but it is as supplied to us -- there are 147 people on

6   this list.  So that would leave 130 who are pretrial detainees.

7            **MS. BORDELON:**  Other than, Your Honor, some of

8   these -- this list is very fluid.  It's a very fluid list and

9   it literally changes daily.

10           **THE COURT:**  Well, I understand that, but I have to

11  get an understanding as of some point in time.  This was done

12  as of a point in time.  I mean, I understand it's approximate,

13  but my question is:  Does this have Lockharts on it?

14           **MS. BORDELON:**  Yes, Your Honor.

15           **THE COURT:**  Why are they called PTs or NGRIs?  Why

16  aren't they called Lockharts?

17           **MS. LINDBLOM:**  Your Honor, I haven't heard any

18  testimony or seen any evidence about these Lockharts except for

19  the testimony that we heard today, which did not relate to any

20  of these people.

21           **MS. BORDELON:**  Your Honor, page 11 of 22, at the very

22  bottom, it will say "LVA" next to the date placed on -- I'm

23  sorry, the date of court order, "LVA," that's *Lockhart v.*

24  *Armistead*, which is the --

25           **THE COURT:**  Oh, so there's one --

1      **MS. BORDELON:**  Well, I'm not sure there's just one.

2  That's just one I saw very quickly.  In any event, they're

3  shown.

4      **THE COURT:**  I see three more.  Well, I can take care

5  of this.  I can just subtract out the not guilty by reason of

6  insanity and the LVAs and see what's left, and then

7  understanding that some of them might not have their paperwork

8  done.

9      **MS. BORDELON:**  Also, Your Honor, there are probably

10  some we have restored to competency.

11      **THE COURT:**  I understand, but there's going to be a

12  waiting list.  I mean, I understand you-all are doing your

13  best.  I understand that, but I have to have some benchmark at

14  some period of time.  And whether a few of these people have

15  been restored to competency, there's still a waiting list.  I

16  hear some are out of jail, but out of jail how?

17      **MS. BORDELON:**  Because they have been probably

18  restored or diverted.

19      **THE COURT:**  This is an official document as of a

20  certain date.  If stuff has happened since then, then it can be

21  noted in the record that stuff has happened since then.  I hate

22  to be so inarticulate.  I have to have some part to start with

23  to understand that, as of a certain period of time, this is

24  what it looks like.  While it may have changed, it may have

25  been different a year ago too.

1              So, I mean, this is fine.  I have something to

2    work with.  I understand that there could be changes since the

3    date, and I also understand that there are people on this list

4    that don't have their documents in order.  You have a list

5    that's going to reflect that; right?

6              MS. BORDELON:  Yes, Your Honor.  A redacted list,

7    yes, Your Honor.

8              THE COURT:  Put that into evidence, too, so we can

9    make sure it's all complete.

10              MS. LINDBLOM:  Just to be clear, this unredacted list

11    is not going to appear in the public record; correct?

12              THE COURT:  Which is what?

13              MS. LINDBLOM:  It is the May 26 list, the ones with

14    the people's names and identifying information.  We need to ask

15    that that be kept under seal and not made public.

16              THE COURT:  Well, this will be ordered under seal.

17    This is dated May 28?

18              MS. LINDBLOM:  The cover letter is May 28.  The list

19    itself in the lower left-hand corner says "Wednesday, May 26,

20    2010."

21              THE COURT:  Is this a trial exhibit?  Why don't you

22    make it a trial exhibit.

23              MS. LINDBLOM:  Sure.  We can make it a defense

24    exhibit.

25              MS. BORDELON:  The names of our patients, we are

1    bound by confidentiality --

2            **THE COURT:**  There is no reason in the world to have

3    patients' names in the public record, so that will be under

4    seal.

5            **MS. LINDBLOM:**  I'd rather be too careful.  Thank you.

6            **MS. BORDELON:**  Also, Your Honor, if you are willing

7    to allow to us do a post-trial memorandum, we can provide you

8    with an accurate list of just pretrial detainees as of today.

9            **THE COURT:**  If you-all want to do pretrial memos,

10   that's fine.  It will be short.

11           **MS. BORDELON:**  Post-trial.  I'm sorry.

12           **THE COURT:**  Post-trial.  It will be a short time

13   frame.  You can exchange them in, like, seven days.

14           **MS. BORDELON:**  Absolutely.  At this time, defense

15   calls Dr. John Thompson.

16           (WHEREUPON **John W. Thompson, Jr.,** having been duly

17   sworn, testified as follows.)

18           **THE DEPUTY CLERK:**  Please state your full name and

19   correct spelling for the record.

20           **THE WITNESS:**  It's John W. Thompson, T-H-O-M-P-S-O-N,

21   Jr., M.D.

22                           **DIRECT EXAMINATION**

23   BY MS. BORDELON:

24   **Q.**   Good afternoon, Dr. Thompson.  What is your occupation?

25   **A.**   I'm a psychiatrist, forensic psychiatrist and addiction

1   psychiatrist.

2   **Q.**   What is your educational background?  Where did you attend

3   college and get your degrees?

4   **A.**   I attended the University of Texas medical branch in

5   Galveston.  My residency training was at the University of

6   Florida, where I completed a fellowship in forensic psychiatry.

7   I finished that in 1990.  So that's my formal education as a

8   psychiatrist, an MD.

9   **Q.**   Are you board-certified in psychiatry?

10  **A.**   Yes.  I'm board-certified in psychiatry with added

11  qualifications in forensic psychiatry and addiction psychiatry.

12  **Q.**   Where are you employed?

13  **A.**   I'm employed at Tulane University here in New Orleans.

14  I'm the director of forensic neuropsychiatry, which is sort of

15  a fancy term for a group of psychiatrists and neurologists and

16  neuropsychologists that come together to provide services.

17  **Q.**   At Tulane University?

18  **A.**   At Tulane, and to teach as well.  I direct a fellowship in

19  forensic psychiatry at Tulane.

20  **Q.**   Does that make you the chair of the division of

21  neuropsychiatry for Tulane?

22  **A.**   We use the title "chief."  There's usually a chairman of

23  the department of psychiatry and then there's -- you know, I'm

24  the chair of adult psychiatry, and there's also a chair of

25  child psychiatry, so we kind of sit under the chair.

1  **Q.**   In that position, do you provide services to the

2  Department of Health and Hospitals, Office of Mental Health?

3  **A.**   Yes.  Since 1993, we put together what we call a joint

4  university collaboration agreement to provide services to the

5  mentally ill in various state hospital systems.  Initially, I

6  was involved with primarily the forensic hospital system, in

7  helping to put that together, recruit psychiatrists to be

8  involved in taking care of the patients, as well as training

9  and teaching activities for the State of Louisiana.

10  **Q.**   Do you hold a position with the -- or through your

11  position with Tulane, do you provide -- or what position would

12  you hold at the Eastern Louisiana Mental Health System?

13  **A.**   Presently, I'm what's called the chief of staff.  We

14  merged the hospitals -- the civil hospital, the forensic

15  hospital -- and Greenwell Springs, which is an acute hospital,

16  in 2002.  So when that merger occurred, I went from the

17  director of the forensic hospital to the chief of staff of that

18  system, which I'm basically responsible for the psychiatric

19  care and the medical care of the folks in the hospital system.

20  **Q.**   How long have you been the chief of staff there?

21  **A.**   Since 2002.

22  **Q.**   What position did you have prior to being chief of staff?

23  **A.**   The title was called clinical director of Feliciana

24  Forensic Facility.  It was formally known as Feliciana Forensic

25  Facility.  Then when the merger occurred, we were merged as

1  ELMHS, and it became ELMHS forensic division, the component
2  that takes care of the forensic population.
3  **Q.**    When did you become clinical director for Feliciana
4  Forensic?
5  **A.**    In 1993.
6  **Q.**    So you have been 17 years with the system?
7  **A.**    Yes.  I have half-a-million miles on my car to prove it.
8  **Q.**    Who can be admitted to Feliciana Forensic Facility?
9  **A.**    Well, you know, by statute -- there's statutory components
10  as to who can be admitted there.  They are primarily
11  individuals who are adjudicated incompetent to stand trial; not
12  guilty by reason of insanity; individuals who are unrestorably
13  incompetent to stand trial, felt to be dangerous, and in need
14  of inpatient hospitalization; transfers from other state
15  hospitals, where the level of acuity gets so high that they
16  need more security to treat those individuals; and then rarely
17  we will get transfers from the Department of Corrections into
18  the facility from not the jail system but the prison system,
19  where either they are unmanageable or their psychiatric illness
20  becomes so acute they have to be moved there.
21  **Q.**    Plaintiffs allege today that there are 130 pretrial
22  detainees awaiting admission to forensic.  Is that true?
23  **A.**    Well, we have a list of all the people who have initial
24  orders, and then we have a list of individuals who have all
25  their paperwork ready and are ready to be admitted into the

1    hospital.  By statute, there's six or seven -- I believe seven

2    different components they have to have in place in order to be

3    actually admitted into the hospital.  To my knowledge,

4    presently there are roughly between 50 and 55 that have all

5    their paperwork ready to come in.

6              Pretrial detainees, the list, the big list, includes

7    NGRIs, people who are Lockharted, that may need additional

8    treatment and other kind of issues, but presently it's roughly

9    that number, between 50 and 55.

10             **MS. BORDELON:**  May I approach, Your Honor?

11             **THE COURT:**  You may.

12   **BY MS. BORDELON:**

13   **Q.**   Can you identify this document?

14   **A.**   Yes.  That's what we call the waiting list that we

15   generate by region that is generated periodically by Community

16   Forensic Services.

17   **Q.**   Are these people who have their paperwork complete or is

18   this noncomplete as well?

19   **A.**   These are all individuals who have their paperwork

20   complete.

21   **Q.**   How many does that list say are ready with their paperwork

22   complete?

23   **A.**   53.

24             **MS. BORDELON:**  At this time, Your Honor, I would like

25   to offer, file, and introduce as DHH Exhibit 3, I believe --

1        **THE DEPUTY CLERK:**  No, it's going to be 4.

2        **MS. BORDELON:**  4, the redacted list of completed

3   paperwork.

4        **THE COURT:**  Admitted.

5        **MS. LINDBLOM:**  No objection.

6        **THE COURT:**  Admitted.

7   BY MS. BORDELON:

8   **Q.**   In what order are pretrial detainees admitted to forensic?

9   **A.**   We would like to admit them by the date of the order.  So

10  the person with the oldest order will come in first or at the

11  top of the list, but it really depends on their level of

12  acuity.  So in addition to, you know --

13       **THE COURT:**  "Acuity," you said?

14       **THE WITNESS:**  Yes, acuity.  How sick they are, how

15  mentally ill they are.  So that we have a list, an emergency

16  list so if there's someone who has an emergent problem in the

17  jail or they have difficulty and they need to be admitted

18  rapidly, then there's a mechanism for them to come into the

19  hospital rapidly.

20  BY MS. BORDELON:

21  **Q.**   Now, would that be the emergency admissions procedure or

22  the emergency admissions --

23  **A.**   Right.  There's an emergency admissions list or the

24  emergency admissions procedure.  So, in essence, what would

25  happen is, if someone was acutely mentally ill and thought to

1   be suicidal or homicidal -- or sometimes they are just, you

2   know, causing the local jail so much trouble they can't take

3   care of them -- the local jail will contact the DFC, the

4   district forensic coordinator.  Then they can either contact

5   our psychiatrists that are on consult or psychologists on

6   consult to do a second evaluation, or call me directly, or call

7   one of the assistant clinical directors directly to have them

8   admitted into the hospital.

9   **Q.**   How long does it take to get somebody in under emergency

10  admission?

11  **A.**   Not long at all.  It usually will take somewhere between

12  24 and 72 hours depending on what's going on.  More likely,

13  it's less than 24 hours from the time they call me.

14  **Q.**   We had testimony here by Dr. Joel Dvoskin that there are

15  usually two reasons why someone is found incompetent to stand

16  trial, and that's acute psychosis and/or intellectual

17  deficiency.  Is it possible to address these two issues in a

18  jail-based setting?

19  **A.**   I think what we would like to try and do, you know, is

20  individualize whatever is going on with the particular client

21  that's awaiting jail to come in or is in jail awaiting

22  admission.  But, yeah, there are varying levels of psychiatric

23  illness that a person can manifest with, or psychosis, what we

24  commonly refer to as psychosis, which basically means the

25  person is either hallucinating, hearing voices talking to them,

1   or delusional, meaning they have a fixed false belief about one

2   thing or another.  You can have various levels of psychosis.

3        So we have some people that have psychotic symptoms

4   that respond just to medications, other people that have

5   psychotic symptoms that respond to medications plus a more

6   therapeutic environment.  It really depends on that particular

7   individual.

8        So one of the things that we like to do, you know,

9   when we get a call that there's someone in the jail that's

10  having difficulty is actually have one of our psychiatrists or

11  psychologists go directly to that person, evaluate them, then

12  report back to us what's going on.  They can give us, you know,

13  the level of psychosis, because what is reported to me

14  indirectly through the jail or through the local sheriff

15  sometimes doesn't pan out to be true when my psychiatrist goes

16  out and sees the patient and evaluates them.

17       So they may say, you know, the guy is on medication

18  right now.  He is taking his medication willingly.  He's not

19  showing, you know, active signs of psychosis, and he's not

20  really causing trouble in the jail.  You know, this may be

21  someone who can wait a little bit before we have to admit them.

22       Whereas they may go and see him and say this guy is

23  tearing up the jail.  He is acutely psychotic.  He is refusing

24  medication.  He won't take them.  We really think we need to

25  get him in.

1          So there are varying levels of evaluation that can

2     occur and various interventions that we can do.

3     **Q.**   What steps has the department taken to address the issue

4     of pretrial detainees with intellectual disabilities?

5     **A.**   Well, again, the intellectual disabilities that present in

6     these cases can be wide-ranging.  So you can have someone who

7     may just need some education that can occur periodically, or

8     you may have an individual that needs more intense or

9     one-on-one type of evaluation or type of training and

10    remediation, I guess, as far as their ability to understand the

11    different aspects of what happens in the courtroom.  Because

12    that's one of the arms of competency.  We often have to address

13    that issue in the evaluations that we do and also in the

14    treatment.

15         So the DFCs are trained to do, within the jail

16    context, for those individuals who have minor deficits and may

17    just need one or two areas of education.  If we move them

18    inpatient, we have much more intense level of treatment for

19    that particular issue.  You know, we could even go individual

20    or do one-on-one.

21         So there are varying, different levels that you can

22    use within the system to maximize both what you expect to get

23    out of that particular patient to move them towards competency

24    as well as to provide it in an expedient and cost-effective

25    manner.

1  **Q.**   What type of training does a district forensic coordinator

2  receive?

3  **A.**   Well, we have a schedule for them to have quarterly,

4  regular meetings in order to address different topics that come

5  up.  They can come in and discuss that with Michelle Duncan,

6  who is the head of Community Forensic Services.  Clay Calhoun

7  was the head before her.

8         Our psychiatrists and our psychologists will go to

9  those meetings periodically to address certain issues.  Like,

10 you know, they may say, "What do we do when we have this

11 particular kind of case where it's providing us difficulty?"

12 and we try and troubleshoot what's the best way to handle that

13 particular case.

14        They also get periodic training on how to perform the

15 Georgia Court Competency Test, how to do the FIT-R.  We just

16 did a FIT-R training with them recently because we think that's

17 a better instrument to use in certain kinds of cases for them

18 to assess competency or where the person is in their

19 restoration to competency.  So we train them in how to perform

20 those kinds of instruments and to address the issues that we

21 need with a particular individual.

22 **Q.**   Are they trained in looking for signs of malingering?

23 **A.**   Yes.  Obviously, this has become less and less an issue

24 over time as sort of the forensic community and the forensic

25 evaluating community becomes more sophisticated.

1          In 1993, probably 20 percent of the people that were

2     being admitted to Feliciana Forensic were clearly malingering.

3     We had those numbers, we looked at that, and then we started

4     going through a process of training in how do you look at those

5     issues, how do you tell inconsistencies in what they are

6     reporting, how do you address psychiatric symptoms that are

7     common versus psychiatric symptoms that are not common.

8          So they are trained to look at those issues, and they

9     do have a lot of experience dealing with individuals both in

10    mental health systems and jail systems to where they can

11    identify those things and bring it up to the evaluator.  A DFC

12    would almost never get in front of the court and say that an

13    individual is malingering.  They would trigger an evaluation by

14    the psychiatrist or the psychologist to come in and evaluate

15    them and make that determination.  So they have to be trained.

16         In addition to that, some of the sanity commission

17    evaluators, if they have -- you know, if they are seeing a lot

18    of people on a particular day and the docket is really heavy

19    will make recommendations where they want the patient to come

20    to the hospital for a malingering evaluation or something along

21    those lines.  In those cases, that usually triggers a second

22    evaluation by the psychiatrist or the psychologist to go in and

23    do a malingering evaluation, along with testing, to try and get

24    an idea of whether, you know, we need to retrigger a hearing,

25    but the sanity commission member was just doing a screening and

1   didn't have a time to do a full-blown malingering evaluation.

2           So there's two ways malingering can come up as an

3   issue, and the DFCs are trained in how to work with those

4   things.

5   **Q.**   In the situation you just described, where the sanity

6   commission says, "Let's send them to forensic for an

7   evaluation," could that be done in the jail?

8   **A.**   You mean the actual evaluation?

9   **Q.**   The evaluation to determine if it's a malingering issue.

10          **THE COURT:**  Is that what we are talking about?  We

11  are not talking about that.

12          **MS. BORDELON:**  Well, Your Honor, what happens is

13  when --

14          **THE COURT:**  Just tell me.  Are we talking about that

15  with these pretrial detainees or not?

16          **MS. BORDELON:**  Absolutely.  We are talking about it

17  because sometimes the sanity commission will find them to be --

18  they have the courts order them to Feliciana Forensic to do an

19  evaluation to determine if they're malingering, and then they

20  get on the waiting list for their admission for their

21  evaluations.  That is what some of the competency -- I mean,

22  the sanity commission's reports say to the court.

23          **MS. LINDBLOM:**  Your Honor, if that's the case, then I

24  think we need some testimony about that, not just the attorney

25  telling us that.

1       **THE COURT:**  Well, that's what she is trying to do.

2              Go ahead.

3  **BY MS. BORDELON:**

4  **Q.**   So because of the documents that have to be submitted

5  before admission, would one of the documents be the sanity

6  report?  Is that correct?

7  **A.**   That's correct.

8  **Q.**   That's one of the things we look at to determine whether

9  to send someone out to do a malingering assessment in the jail?

10  **A.**   That's correct.

11  **Q.**   So that doesn't prohibit that individual from being placed

12  on the waiting list for admission?

13  **A.**   No, it does not.

14        **THE COURT:**  I still don't understand.  Are you

15  telling me that the court orders somebody to Feliciana for a

16  malingering evaluation?  There are court orders in the record.

17  They don't say "malingering evaluation."

18        **MS. BORDELON:**  Well, those court orders are very

19  standard.  What it is, it's based on the sanity commission's

20  report, and it's whatever the sanity commission has -- what's

21  the term I'm looking for -- recommended to the court.  So what

22  happens is the sanity commission recommends, pursuant to the

23  sanity commission report or their testimony, that this person

24  go to --

25        **THE COURT:**  I mean, how often are we talking about

1  something like this happens?  Are you telling me a lot of

2  people on the list are waiting for malingering tests?

3          **MS. BORDELON:**  I would defer to Dr. Thompson to

4  answer that question.

5          **THE WITNESS:**  I mean, the number has steadily come

6  down to where it's probably around 5 percent to 7 percent of

7  the people that are on the list would meet a trigger to have

8  that kind of evaluation done.

9          **THE COURT:**  All right.  Proceed.

10 **BY MS. BORDELON:**

11 **Q.**   Dr. Thompson, when a district forensic coordinator is

12 assigned a pretrial detainee, what are the district forensic

13 coordinator's responsibilities towards that pretrial detainee?

14 **A.**   Well, when they are assigned to one that's pretrial and

15 the person is in the process of being -- or they have been

16 ordered to the hospital and they are in the process of doing

17 that, the DFC tries to engage the patient to develop a

18 therapeutical alliance with them; talk to them about whether

19 they would be willing, while they are waiting, to come in to

20 start medications or participate in the process of competency

21 restoration, where they can start some education and training

22 with them and assess them.

23          So really what we are trying to do is not necessarily

24 do that in lieu of hospitalization, but in the process of time

25 while they are waiting to come in there are individuals who can

1    be restored with, you know, a minimal amount of education and
2    just being started back on their standard psychiatric
3    medications that they take.
4            So they are trying to start that process, to get that
5    going so that we can move the folks back into the court system
6    as rapidly as possible.  Sometimes that's referred to by people
7    as diversion, but it's not really diversion.  It's sort of the
8    process of trying to institute their care or get them into care
9    as soon as possible.
10   Q.   If a pretrial detainee has a mental illness and not
11   necessarily a developmental disability, but they're stable in
12   the jail-based setting, what would you expect the district
13   forensic coordinator to do to assist that pretrial detainee to
14   maintain stabilization?
15   A.   Well, it would depend on, you know, usually when the
16   sanity commission will address what their issues are as far as
17   what kind of problems they think a person has with being
18   competent in the first place.  So the primary goal is to
19   address those issues and see whether or not we can, you know,
20   meet both treatment standards as well as education standards,
21   so that when the sanity commission reevaluates them, they see
22   that they have improved and they're competent to stand trial
23   and the court can move forward.  So it really depends, you
24   know, on the individual and what the individual's needs are.
25   Q.   Do you know approximately what percentage of pretrial

1   detainees are restored to competency during the initial 90-day

2   jail-based treatment?

3   **A.**   It really depends on, you know, how you identify those.

4   We take about a third of the people off of, you know, what we

5   refer to as the big list, or the allcomers list, a year.

6   That's through various different mechanisms.  Some of it is

7   through jail-based treatment.  Some of it's through diversion.

8   Some of it's through other kinds of mental health care that we

9   try and get for the individuals that are --

10           **THE COURT:**  How long does it take to do that?

11           **THE WITNESS:**  To do what?

12           **THE COURT:**  You said you take about a third of the

13   people off the big list a year.  How long does it take you to

14   get them off the list?

15           **THE WITNESS:**  You know, again, that's highly

16   variable.  Some people respond really rapidly and so, you know,

17   to tell you that it takes an average of 43 days probably

18   wouldn't do it justice.  I mean, what we collect data on is

19   over the course of a year how many people are presented to the

20   system.  Roughly, it's a couple hundred.  In any given year, it

21   varies from about 180 to 225, roughly, and about 60 of those

22   are taken off of the list by Community Forensic Services.

23           But, you know, there are so many different

24   variables involved, it can take a short period of time for one

25   person presenting with the same psychiatric symptoms in one

1   court versus another person presenting in another court.  So we

2   can have a hearing that would be delayed.  We have had some

3   hearings delayed, you know, one month to the next month to the

4   next month and even --

5           THE COURT:  No, I'm not talking about how long does

6   it take to have the hearing.  I'm talking about how long does

7   it take therapeutically to get them up to where they are in a

8   position where you think they are restored and then you're

9   ready to put them pack in the court system.

10          THE WITNESS:  Again, Your Honor, that's highly

11   variable.  I mean, we have people who present to our system

12   with fairly minimal psychiatric symptoms, and then we have

13   other people who have been chronic nonresponders to medications

14   who have three and four previous state hospitalizations for up

15   to a month to six months at a time, and they are not naive to

16   medications.  They have tried several medications.  So it

17   really is individual, depending on the persons that are coming

18   before you.

19          THE COURT:  Is it, like, longer than 90 days?

20          THE WITNESS:  Yes, it can be longer than 90 days.  It

21   just depends, you know, with the particular individual.  We try

22   to get that done in a 90-day jail-based competency restoration.

23   If that time frame is not met, usually the court will say,

24   "Well, we definitely want them to go to forensic."

25          They are still on the list and they're still in

1    line with the other people.  In fact, even if the court loses

2    them -- I had one a couple, you know -- I don't know -- three

3    or four months ago, or maybe less than that ago, and the court

4    just lost the paperwork, never sent the paperwork to us.  Once

5    we found the paperwork and found the appropriate date, we put

6    that person in line where they should have been if we had known

7    what the date was.  But, you know, I would say on average it

8    probably takes 90 days for someone who is going to respond, but

9    there are a lot of people --

10             **THE COURT:**  I'm a little confused because I thought

11   that the people that were on the list, somebody had determined

12   that 90 days isn't going to cut it.  Is that right?

13             **THE WITNESS:**  That can occur.  So let's say if an

14   individual goes to court and the DFC says, "Let's try 90-day

15   jail-based, you know, because this is a person, you know, who

16   looks like they are going to respond in 90 days.  Let's try

17   that," and then we start that process and, for whatever reason,

18   that 90 days, it doesn't look like that's going to happen.

19   Then that usually triggers another hearing, and the judge would

20   say, "Well, 90 days isn't going to cut it.  They need to go

21   into the hospital," but we still work on trying to restore them

22   while we are waiting.  Does that make sense?

23             **THE COURT:**  It makes perfect sense from a medical

24   standpoint.  It makes sense from the testimony.  I'm trying to

25   work it into the understanding of this list.

1          What I'm trying to understand is that when you

2     say you restore people, the people that you restore from the

3     list, those are people you-all have already -- they have

4     already tried 90 days, and somebody said send them to

5     Feliciana?  Is that what you're talking about, that there are

6     some of those people that you-all restore before you ever get

7     them off the list and into the facility?

8          **THE WITNESS:**  There are some people that are diverted

9     that never get onto the list -- and Ms. Johannsen may have

10    talked to that -- but that's usually a fairly minor charge.

11    She'll say, "You know, I think this guy could benefit from just

12    straight mental health treatment at the mental health center,"

13    or maybe an acute hospitalization at Bogalusa in the mental

14    health center, and the court decides to drop the charges.

15    That's what we would refer to as a pure diversion.

16          But someone where the court has adjudicated this

17    person is incompetent and he needs to go to Feliciana, the

18    court can say they are incompetent and need to go to Feliciana,

19    but let's try a 90-day jail-based or let's order 90-day

20    jail-based, that person would still be on, you know, what I'm

21    referring to as the big list or the allcomers list while we are

22    trying that process.  Okay?

23          So we know where these people are, and we are

24    constantly trying to work with them to get them better and

25    using all the options that we have to get them better, but they

1    wouldn't necessarily go on the 90-day jail-based and not be on

2    the other list.  We would still put them on the other list

3    because we know where they are, and we want to continue to

4    treat them.  I sense I'm confusing you.

5         THE COURT:  Yes, because I thought the statute gave

6    you three -- that you either did 90 days and then, at the end

7    of 90 days, the court makes a determination -- if the court

8    makes a determination that 90 days is not going to be

9    sufficient, then they issue an order to go to Feliciana.  My

10   understanding was that the list were the people who had been

11   determined that 90 days were not going to make it and that they

12   were to go to Feliciana.

13        THE WITNESS:  That's not my understanding.  Usually,

14   if you're talking about the 50 that we are talking about today,

15   the 53, that's probably true of those 53, because those are

16   ones that have been on the list for a while.  They have gotten

17   all their paperwork in and they have everything together.  But

18   if we are talking about anybody who has an order that says

19   either 90-day jail-based treatment or the --

20        THE COURT:  The orders don't say "either 90-day

21   jail-based treatment."  They say go to Feliciana.

22        THE WITNESS:  I understand the orders that you

23   probably have reviewed or the limited number of order that you

24   have reviewed in this would probably say that, but every court

25   handles this in a different way.  I mean, there's a guideline,

1    a statutory guideline.  But I can tell you from being in court

2    and doing them on a day-to-day basis, and with Ms. Johannsen in

3    court doing them on a day-to-day basis and so many other

4    things, there are lots of different permutations of that that

5    occur.  So there can be a 90-day -- sometimes the court

6    reorders another 90-day in jail-based treatment.

7              THE COURT:  You're telling me they're on your list

8    while that's going on?

9              THE WITNESS:  Well, we know where everybody is.  I

10   mean --

11             THE COURT:  That's not my question.  I'm trying to

12   figure out who's on the list and who's not.  So the court is

13   ordering these 90-day jail-based treatments.  Why would they be

14   on your list if that's what the court has ordered?

15             THE WITNESS:  Well, it's been -- we have always

16   looked at it as, you know, they could eventually be on that

17   list, so we need to know where they are and try to provide them

18   some kind of treatment while that's going on.  We are

19   responsible for the 90-day too, you know, so we need to know

20   where they are.  We keep track of where they are.  But the

21   actual they're ready to come to the hospital is the 53 that we

22   have talked about.

23             THE COURT:  Proceed.

24   BY MS. BORDELON:

25   Q.   Dr. Thompson, once someone is ordered 90-day jail-based

1    restoration, whether they've been ordered to Feliciana Forensic

2    or not, they are placed on the waiting list?

3    **A.**   Yes.

4          **THE COURT:**  Why does the waiting list have the court

5    order date on it?

6          **MS. BORDELON:**  Because that's the date that the

7    department is ordered to do something, whether it's 90-day

8    jail-based; or whether it's 90-day jail-based, then if it

9    doesn't work out, go to forensic; or straight go to forensic.

10         **MS. LINDBLOM:**  Your Honor, I object to Ms. Bordelon

11   testifying.  That is not what the testimony was from

12   Ms. Duncan, who is the person who testified she was responsible

13   for the list.

14         **THE COURT:**  Where is Ms. Duncan?

15         **MS. BORDELON:**  She is in the hall, Your Honor.

16         **THE COURT:**  Well, we'll just find out what everybody

17   has to say about the list, and I'll make my decision on what I

18   think it means.

19   **BY MS. BORDELON:**

20   **Q.**   Dr. Thompson, it's your understanding that --

21         **THE COURT:**  Don't lead him.  Just ask him.

22   **BY MS. BORDELON:**

23   **Q.**   Once DHH has been ordered to do something, that person's

24   name is placed on the list?

25   **A.**   Yes.

1      **THE COURT:**  That was a leading question, but that's

2   okay.

3      **MS. BORDELON:**  I'm sorry, Your Honor.

4      **THE COURT:**  That's okay.

5   BY MS. BORDELON:

6   **Q.**   Dr. Thompson, what is the East division of the ELMHS

7   system?

8   **A.**   That's what we commonly refer to as the civil side of the

9   hospital or the portion of the hospital allocated to take care

10  of people who are under involuntary civil commitment.

11  **Q.**   Would you happen to know how many licensed beds there are

12  in the forensic division?

13  **A.**   Presently, I believe there are 235.

14  **Q.**   Would you happen to know how many licensed beds are there

15  at the East division?

16  **A.**   305.

17  **Q.**   Today do you happen to know how many East division

18  licensed beds are taken up by forensic patients?

19  **A.**   You know, again, it varies, but roughly 175.

20  **Q.**   The people admitted to the forensic division are strictly

21  forensic patients?

22  **A.**   Yes.  Unless they are in the civil system and they are

23  acting out in the civil system and need to be moved to a more

24  restrictive environment, then we can do that for 30 days or 60

25  days.

1   Q.   There are approximately 540 licensed beds between the two
2   hospitals or two divisions?
3   A.   Yes, that's correct.
4   Q.   There are approximately 410 that are taken up with
5   forensic patients?
6   A.   Yes, that's correct.
7   Q.   Dr. Thompson, would you say that based on those numbers
8   that in Louisiana it appears that more and more forensically
9   involved people are taking up the civil or the nonforensically
10  involved beds?
11             MS. LINDBLOM:  Objection:  Leading.
12             THE COURT:  Sustained.
13  BY MS. BORDELON:
14  Q.   What is the percentage of forensically involved patients
15  that are taking up the entire system?
16  A.   Again, that varies from place to place.  We have 235 plus
17  roughly the 175 we talked about before.  So there's roughly 400
18  or so that have what we call forensic involvement or they're
19  involved with legal charges in some way or another in the
20  hospital system or in the ELMHS hospital system.
21  Q.   What other community outreach services does the forensic
22  division or Community Forensic Services offer?
23  A.   We contract to provide group home services.  Harmony
24  forensic center, the Harmony group home is a step down from the
25  forensic system into the community so that we have group home

1    beds.  We also have a forensic aftercare clinic in New Orleans.

2         There's a more intensive level of aftercare follow-up

3    that individuals can have that are in the forensic system where

4    they have their own mental health clinic where they can follow

5    as well.

6         We also have the district forensic coordinators that

7    we have heard testimony about.  So we have nine of those

8    throughout the state that help to interface various aspects of

9    the care of individuals when they go out into the community.

10   Q.   Are juveniles admitted to the forensic division?

11   A.   No.

12   Q.   Why not?

13   A.   We have had 18-year-olds basically admitted to the

14   forensic hospital since I've been there.  There's never been a

15   separate juvenile hospital system.  What we have done or what

16   the state has done is to choose to deal with the juveniles

17   individually and place them in the best setting in the juvenile

18   facilities that we have around the state.

19   Q.   Do you happen to know how many juvenile facilities the

20   State of Louisiana, Department of Health and Hospitals has?

21   A.   No.  I would be guessing.

22   Q.   Does two sound right now?

23   A.   Yes, two now.

24   Q.   What recent steps has the department done to assist in

25   reducing the waiting list?

1   A.   Well, I mean, you know, over the course of the time that
2   I've been there, we have opened up specialized units for
3   competency restoration.  We opened up 50 beds prior to Katrina
4   for specialized competency restoration, where those units were
5   focused on competency restoration.

6          Subsequent to Katrina, we opened up another 25 beds.
7   That is what we call our fast-track competency restoration unit
8   for individuals we think that are on the list but can be
9   restored fairly quickly, or responded to antipsychotic meds in
10  the past rather quickly, so we can admit them to that
11  particular unit.

12         We were responsible for looking for an appropriate
13  group home setting, helping to develop the group home setting
14  so that it would be attune to forensic clients, and we
15  interface with them on a regular basis.  Community Forensic
16  Services, in general, was started in order to try and help
17  facilitate some of the issues that we have to deal with going
18  back and forth between the courts and between the various
19  places where the individuals are located, the different jails
20  and such.
21  Q.   Even with all this activity, has that alleviated the
22  waiting list?
23  A.   It's still remained there.  And, you know, if we open up a
24  certain number of beds, it drops down for a little bit and then
25  it kind of creeps back up.  So, you know, it really depends on

1   how many people are being presented and how rapidly we can

2   restore them and what their acuity level is when they come into

3   the hospital.

4           There are times when it's dropped down into

5   probably -- for individuals who have all their paperwork done,

6   it's probably dropped down into the 30s or 40s at some times,

7   and it's probably been as high into the 90s at times with

8   people who had all their paperwork none.

9   **Q.**   Is there any good reason to maintain a waiting list for

10  pretrial detainees?

11  **A.**   Well, some of the issues that we talked about before is

12  that the actual sanity commission evaluation itself is sort of

13  a snapshot in time of an individual's mental health history.

14  They only see them at a portion in time, and we know that

15  mental illness kind of waxes and wanes.

16          So we have some individuals that when they are

17  initially ordered to come in may be having some difficulties,

18  and when they start on their meds in the jail they get better.

19  Even in two or three weeks after they have been in the jail

20  they may be better.  So those individuals wouldn't necessarily

21  need to go to inpatient hospitalization.  If they are

22  competent, we have someone go in and look at them and trigger a

23  rehearing and find them competent, then they wouldn't have to

24  come into the hospital.  For people who can go to outpatient

25  and be treated outpatient, we have options for looking at those

1    issues as well.

2          So not everybody that's found by the court to be

3    incompetent to stand trial necessarily has to go into inpatient

4    hospitalization.

5          **MS. BORDELON:**  No further questions.

6          **THE COURT:**  Thank you.

7          Cross-examination.

8                        **CROSS-EXAMINATION**

9    BY MS. LINDBLOM:

10   **Q.**   Good afternoon, Dr. Thompson.  My name is Marjorie

11   Lindblom.  I'm representing the plaintiffs in this case, the

12   Advocacy Center and Charrie Butler, as mother and next friend

13   of WB.  Pleased to meet you.

14   **A.**   Hello.

15   **Q.**   I just want to get a few things straight here, to talk

16   about the procedure as you understand it.  Now, when an issue

17   of incompetence is raised for a pretrial detainee, is the

18   detainee then examined by a sanity commission?

19   **A.**   Yes.

20   **Q.**   Does the sanity commission then make a recommendation to

21   the court as to whether to find the pretrial detainee

22   incompetent?

23   **A.**   That's correct.

24   **Q.**   Can the sanity commission also recommend the type of

25   treatment for that person?

1  A.    They can.

2  Q.    Do you know is it typical for the sanity commission to

3  make a recommendation as to the type of treatment?  If you

4  know.

5  A.    Well, yeah.  I mean, there's wide variability in the types

6  of reports that we get from the sanity commission members.

7  Certain sanity commission members routinely just report on

8  competency or incompetency; others may make medication

9  recommendations; other ones may comment on those things plus

10 whether or not the person is dangerous and in need of inpatient

11 hospitalization.  So the reports do vary.

12        We have encouraged the sanity commission evaluators

13 and actually trained the sanity commission evaluators over the

14 years to try and give us specific deficits that they find in

15 competency to stand trial so we can target, either through the

16 DFCs or when they come into the hospital, the treatment to

17 address those specific deficits.  Some sanity commission

18 members will place that in the reports; others will not.

19 Q.    Is the reason that you ask that those specific deficits be

20 targeted because individualizing treatment is key to making

21 that treatment successful?

22 A.    Yes, it is.

23 Q.    So the court then takes the sanity commission

24 recommendation and makes a ruling as to what to do with the

25 detainee; correct?

1   A.   Yes.

2   Q.   A court has basically four options.  One is to say, "No, I

3   don't agree.  This person is not incompetent."  Right?

4   A.   Yes.

5   Q.   But if the court agrees or decides, contrary to the sanity

6   commission, that the detainee is incompetent, then the court

7   has three options under the statute for how it can order

8   treatment; right?

9   A.   That's correct.

10  Q.   One option is to order outpatient treatment; right?

11  A.   Yes.

12  Q.   Is another option to order 90 days of jail-based

13  treatment?

14  A.   That's correct.

15  Q.   The third option is to just right away order inpatient

16  treatment at Feliciana; correct?

17  A.   Yes.

18  Q.   Now, we have looked at this waiting list some.  Who is it

19  that is responsible for maintaining the waiting list?

20  A.   Community Forensic Services and Michelle Duncan, and then

21  the secretary that works under her is Sheila Jordan.  They

22  maintain the waiting list and then send it out periodically.

23  Q.   That's not your responsibility to maintain the waiting

24  list; right?

25  A.   No, it's not my responsibility to maintain it.

1    Q.   Now, there has been a list offered.  Let me just show you
2    a copy.
3              MS. LINDBLOM:  Do we have another copy of the
4    unredacted list?
5              THE COURT:  You can use mine.
6              MS. LINDBLOM:  Thank you.  May I approach,
7    Your Honor?
8              THE COURT:  Sure.
9    BY MS. LINDBLOM:
10   Q.   I'm handing you a document that has been offered into
11   evidence as Defense Exhibit 3, and I would like you not to read
12   any patient names as we look at this, please.
13   A.   Okay.
14   Q.   This is the unredacted patient waiting list by region as
15   of May 26, 2010; right?
16   A.   Yes.
17   Q.   Yes?
18   A.   Yes.
19   Q.   When it says "Patient Waiting List by Region," that means
20   waiting to go to Feliciana?
21   A.   Again, this list would generate all individuals who have
22   orders to go to Feliciana, from my understanding.
23   Q.   Do you see anything anywhere on this list that says
24   anything about people who have been ordered for 90 days of
25   jail-based treatment?

1    **A.**    On this particular document you said?

2    **Q.**    Yes.

3    **A.**    No, I don't.

4    **Q.**    Okay.  You can put that aside.  Thank you.

5    **A.**    Okay.

6    **Q.**    I may use the term *patient detainee* to refer to those

7    people who have a court order in place that says they are

8    ordered to go to Feliciana.

9    **A.**    Okay.

10   **Q.**    If we use the term *patient detainee* to mean those people

11   who have been ordered to get inpatient treatment, that

12   inpatient treatment is given at Feliciana; correct?

13   **A.**    Yes, it can be given at Feliciana, and that's the place

14   where they are ordered to go to.  But there are times when a

15   person who is on the list comes in and we will trigger an

16   evaluation, will go back and evaluate them, have a rehearing,

17   and that person may never come into the hospital.

18   **Q.**    We'll talk about those a little bit later --

19   **A.**    Sure.

20   **Q.**    -- but first I want to understand.  When a detainee has a

21   court order that says they are ordered and, as the statute puts

22   it, "for inpatient treatment," that means treatment at a

23   hospital; right?

24   **A.**    I think that's the intention of the court, is to have them

25   go to the hospital and get treated, yes.

1   **Q.**   We have been hearing today about the Community Forensic

2   Services program.

3   **A.**   Yes.

4   **Q.**   That CFS program is not inpatient treatment; right?

5   **A.**   That's not inpatient treatment.

6   **Q.**   When you testify about people providing this CFS service

7   to patient detainees, people who have been ordered to get

8   inpatient treatment at Feliciana, what you are saying is you

9   are providing something different than what the court has

10  ordered; right?

11  **A.**   In essence, it's not inpatient treatment, that's correct.

12  **Q.**   As you have said, sometimes what you are trying to do is

13  to get a head start on inpatient treatment that may come later;

14  right?

15  **A.**   Or to evaluate whether they require that level of

16  treatment and whether we can provide other levels of treatment

17  and move them through the system quicker than if they waited to

18  come for inpatient treatment.

19  **Q.**   I heard you testify on direct about the emergency

20  procedures that you have.

21  **A.**   Yes.

22  **Q.**   Is the fact that a patient detainee threatens suicide

23  reason enough to get admitted as an emergency patient at

24  Feliciana?

25  **A.**   The fact alone that a person threatens suicide?

1   **Q.**   Yes.

2   **A.**   I would say in some instances it may be; in other

3   instances it may not.  What we would like to do is, when that

4   occurs, to have either a DFC or a second evaluator go take a

5   look at them and make a determination about whether they need

6   acute psychiatric hospitalization or not.

7   **Q.**   You have a DFC who is a social worker making an assessment

8   as to whether or not they need hospitalization?

9   **A.**   Well, they trigger the second evaluation that we talked

10  about before, by a psychiatrist or a psychologist making that

11  determination.

12  **Q.**   If you have got somebody at a jail where a medical person

13  associated with that jail says, "I have this person who is a

14  suicide threat, and I think they need to go to emergency

15  services at Feliciana," and you send that DFC out there,

16  whether it's Ms. Johannsen or somebody in one of those other

17  regions, does that DFC have the authority to say, "No, I don't

18  agree," and there is no further evaluation?

19  **A.**   Not routinely.  If the medical personnel at the jail want

20  to call me directly, they can call me directly about that

21  particular issue.  We have met with them on several occasions

22  to try and open lines of communications; if they have concerns

23  about a particular individual being suicidal or being at risk,

24  that they can call me directly or call the assistant clinical

25  director for forensic directly and get the person admitted.

1          I would rather err on the side of safety.  I think

2  historically it's been a very safe process, but I would like to

3  err on the side of safety.  So if the DFC calls me and says, "I

4  think the person needs to be in," or the medical personnel from

5  the jail call me and say, "I really think this guy needs to be

6  in," I take those seriously and try to get the patient in as

7  quickly as possible.

8  Q.    How many emergency admissions per year do you have?

9  A.    There's really not that many.  I mean, I would say

10  probably 10 or less a year of the total number that are

11  presented.

12  Q.    Are about 200 patient detainees, on average, committed to

13  Feliciana for inpatient treatment?

14  A.    Per year?

15  Q.    Per year.

16  A.    It would average about out to that if you went back, you

17  know, several years or roughly 10 years or so.  It fluctuates.

18  Post-Katrina it really dipped down quite a lot because Orleans

19  was impacted and the courts weren't running.  Once the courts

20  came back up running, we had a higher number the following

21  year.  So it varies, but it's about 200.

22  Q.    In your affidavit, I think you said that the two-year

23  average of people who were court ordered to Feliciana but are

24  restored or diverted without ever going to the hospital is 66,

25  which you said was about 33 percent per year?

1   **A.**   That's correct.  Those are rough numbers.

2   **Q.**   So those rough numbers show you that at least 67 percent

3   of the people are not restored or diverted by the CFS program;

4   correct?

5   **A.**   Yes.

6   **Q.**   This just might be a wording issue, but in your

7   affidavit --

8   **A.**   Do you have a copy of that?

9   **Q.**   I'll get you one.

10   **A.**   Okay.

11   **Q.**   I am handing you the affidavit of John W. Thompson.  I

12   believe this is already in evidence in connection with the

13   preliminary injunction response.

14           What I'm looking at is paragraph 15, and this is

15   purely a clarification issue.  You say the two-year average of

16   individuals court ordered to Feliciana and restored or diverted

17   without ever going to the hospital is 66, or 33 percent per

18   year.  I'm just not sure I understand what you mean by a

19   two-year average.  Does that mean 66 people per year or 66

20   people over a period of two years?

21   **A.**   It's my understanding that it is 66 per year over the last

22   two years.

23   **Q.**   When you said that people are diverted -- and you used

24   that in your direct exam as well -- does that mean that some of

25   those people have actually had their charges dropped?

1    **A.**    Yes.

2    **Q.**    Does diverted also include people who are let out on bail?

3    **A.**    Individuals who would be let out on bail meaning --

4    **Q.**    Well, when you talk about people who are restored or

5    diverted from this waiting list.

6    **A.**    Right.

7    **Q.**    I'm trying to understand what *diverted* means.

8    **A.**    It would be either restored to competency --

9    **Q.**    Right.

10   **A.**    -- or the judge and the DA and the defense attorney get

11   together and decide that the charges can be dropped and that

12   person can be treated in our standard mental health system.

13   **Q.**    Now, someone who has already waited in jail under an

14   incompetency order for more than a maximum sentence that they

15   could serve and who was, therefore, let out, would that also

16   count as a diversion?

17   **A.**    We routinely monitor whether or not someone is at that

18   point and either bring that issue up with the court or try and

19   address that issue if that's the case, but I don't know that I

20   have specifics on those particular cases that I could talk to

21   today.

22          **THE COURT:**  Is that a diversion or not?

23          **THE WITNESS:**  No, I wouldn't consider that a

24   diversion.

25

1   **BY MS. LINDBLOM:**

2   **Q.**   Of the 66 people per year you say are either restored or

3   diverted, how many are restored to competency as opposed to how

4   many are diverted?

5   **A.**   Again, I would have to go back and look at those specific

6   numbers.  I didn't parse that out.

7   **Q.**   Now, I would like to talk to you about the kind of

8   services that are provided at Feliciana or what I guess you now

9   said is called ELMHS Forensic.

10  **A.**   Right.

11  **Q.**   But if I call it Feliciana, that's okay?  You'll

12  understand?

13  **A.**   It's fine with me.

14  **Q.**   At Feliciana, do you use interdisciplinary treatment

15  teams?

16  **A.**   Yes.

17  **Q.**   Do you consider them to be highly qualified?

18  **A.**   Yes.

19  **Q.**   Do your teams include a psychiatrist?

20  **A.**   Yes.

21  **Q.**   Do your teams include psychiatric nurses?

22  **A.**   Yes.

23  **Q.**   Do your teams include social workers?

24  **A.**   Yes.

25  **Q.**   Do your teams include psychiatric aides?

1  A.   Yes.  Or people who are dual-trained, but they are what --

2  we refer to them as CGTs, or correction guard therapeutic,

3  where they are dual-trained in both security issues and also

4  trained like other psych aides.

5  Q.   I see.  So they might be psychiatric aides or therapeutic

6  guards?

7  A.   Right.

8  Q.   Does your treatment team also include a psychologist?

9  A.   Yes.

10  Q.   Does it include an activity therapist?

11  A.   Yes, recreation therapist.

12  Q.   A dietitian?

13  A.   Yes.

14  Q.   Medical practitioner?

15  A.   Yes.

16  Q.   A work-therapy coordinator?

17  A.   That goes under recreation therapy, but yes.

18  Q.   And clergy people?

19  A.   Yes.

20  Q.   Do these professionals routinely interface to meet the

21  needs of the patients they serve?

22  A.   Yes.

23  Q.   Do you attempt, at Feliciana, to develop treatment

24  programs that are based on the individual's needs and

25  interests?

1  **A.**    Yes.

2  **Q.**    You spoke a little bit on direct even about the value of

3  individualizing the competency training itself; right?

4  **A.**    Yes.

5  **Q.**    Do you, at Feliciana, provide assessment and therapies

6  directed toward treatment and stabilization of psychiatric

7  disorders?

8  **A.**    Yes, we do.

9  **Q.**    Do you provide treatment of substance abuse disorders?

10 **A.**    Yes, we do.

11 **Q.**    Do you provide behavior management?

12 **A.**    Yes.

13 **Q.**    Do you provide enhancements of interpersonal skills?

14 **A.**    Yes.

15 **Q.**    Do you provide psychotherapy?

16 **A.**    Yes, we do.

17 **Q.**    All of these questions were at Feliciana, you understood I

18 was asking; right?

19 **A.**    Yes.

20 **Q.**    Now, is psychotherapy provided as part of the CFS program?

21 **A.**    Probably more supportive but not specific psychotherapy,

22 like cognitive behavioral therapy or those kinds of therapies.

23 **Q.**    But you do provide those kind of therapies at Feliciana?

24 **A.**    Yes.

25 **Q.**    At Feliciana, do you provide behavioral therapy?

1  **A.**   Yes.

2  **Q.**   Is behavioral therapy part of the CFS program?

3  **A.**   They're components of behavioral therapy, but a person

4  would not get a specific behavioral plan or have a particular

5  kind of specialized behavioral therapy through CFS.

6  **Q.**   In the ASSA unit -- first, can you tell me what the ASSA

7  unit is, please.

8  **A.**   The acronym is for admissions/special security unit.  So

9  it is a unit where individuals are being restored to

10  competency, but it's also referred to as our maximum security

11  unit.  So individuals that have had rules violations or

12  behavior problems will move to that unit or gravitate to that

13  unit.

14  **Q.**   Now, do all people who come in off of this waiting list to

15  Feliciana come in through the ASSA unit?

16  **A.**   They do their initial medical evaluation and screening

17  either through that particular unit or the Oakcrest unit.  It's

18  preferable that they come into that unit and then they can go

19  briefly to the Oakcrest unit.

20  **Q.**   It's preferable that they come in through the ASSA unit?

21  **A.**   Yes, ma'am.

22  **Q.**   Why is that?

23  **A.**   Well, we just have it set up easily to do for the medical

24  aspects, the initial medical screening that we do.

25  **Q.**   At this ASSA unit, are the people there kept under 24-hour

1   observation?

2   **A.**   Yes.  I mean, they are in the hospital 24 hours and

3   there's staff manning the hospital for 24 hours, yes.

4   **Q.**   Are they actually in units where they have individual

5   rooms that surround a large common area?

6   **A.**   Yes, they are.  The layout of the building has individual

7   rooms for each of the patients or clients, depending on how you

8   like to use the terminology, but for each individual patient.

9   Then there's a common area.  There's a separate area that's

10  glassed in where they can watch television or where they may

11  need more close observation or separated from some of the other

12  individuals.

13          Then there's an actual nursing station where the

14  nurses and/or the security guard therapeutic folks stay and do

15  their paperwork and then interface back and forth with the

16  patients.  That's one of the pods, and there's four of those

17  pods with a common area where you can -- you know, the patient

18  can come out for various kinds of group therapies or come out

19  for interfacing with the treatment team.

20  **Q.**   In each of those pods, is that 19 beds?

21  **A.**   Roughly, yes.

22  **Q.**   In that nurses' station, is that staffed 24 hours day?

23  **A.**   Yes.

24  **Q.**   Does the nurses' station have a view out over that common

25  area?

1    A.    Yes.

2    Q.    Then, therefore, they can also see the doors of all the

3    individual rooms where the patients are?

4    A.    Yes.

5    Q.    That nurses' station, when it's staffed, is staffed by

6    these people who are specially trained to deal with people who

7    are mentally ill; correct?

8    A.    That's correct.

9    Q.    In Feliciana, if someone is disruptive, are they locked

10   up, at most, until they calm down?

11   A.    Well, we have an entire policy and procedure for

12   restrictive patient management.  We don't necessarily "lock"

13   folks up when they start having problems.  We interface with

14   the patient and try and find out what's going on with them.

15         We try and prevent using restrictive measures like

16   seclusion and restraint or restricting them to their room.  We

17   usually have either one-on-one with a particular guard or a PA,

18   security guard/therapeutic person one-on-one, or that person

19   can be monitoring several patients depending on the patient's

20   level of acuity or the level of their psychiatric symptoms.

21   Q.    If one of your patients in this ASSA unit threatens

22   suicide, is a guard assigned to stay within arm's reach of that

23   person?

24   A.    Yes.  They would have to have -- of course, they would be

25   evaluated, and you would make a determination whether that

1  needed to occur or not.  But if it was determined that they

2  were, you know, a threat for suicide, one of the options is to

3  place them on one-on-one where a guard can be there.

4  **Q.**   Let me be clear about something.  Are you telling

5  Judge Vance the CFS program is equivalent to this inpatient

6  treatment you provide at Feliciana?

7  **A.**   No.

8  **Q.**   Did DHH establish the CFS program because it was aware of

9  the danger of the delay in treatment of those pretrial

10 detainees who were refused admission to Feliciana pursuant to

11 statute?

12 **A.**   I don't know whether that was the trigger for it or the

13 trigger for it was primarily that we thought it was a better

14 way to do business.  Mr. Calhoun, who was the director of

15 Community Forensic Services at that time, and myself had talked

16 about ways to try and improve the overall interface of how the

17 court system deals with the hospital and how we try and make

18 all the different components work in a smoother way, and

19 Community Forensic Services was really an outgrowth of trying

20 to do that.

21        We did identify areas that we thought that we could

22 improve on or areas that we might be able to, you know, help

23 the flow of the patients go through the system more quickly.

24 That was one of the areas that we looked at.  But, also, we

25 recognized that there were a lot of problems with the interface

1    between the court system and Feliciana, and the various jails

2    in Feliciana, and trying to make that whole system move more

3    smoothly.  So Community Forensic Services and district forensic

4    coordinators made sense to put into place to make that move

5    more smoothly.

6            Rather than us just sending back and forth letters to

7    the courts, we would have actually a live person going to the

8    judge and saying, you know:  These are the options you have.

9    Patient X is here.  These are the different options that you

10   have available to you that we can provide treatment for this

11   individual on the front end as well as on the back end, when

12   they were released from the hospital.

13           So it was multifactorial as far as why we decided to

14   do it.

15   Q.   So you were one of the instigators of the program?

16   A.   I wouldn't call it an instigator, but yeah.

17   Q.   Founder?

18   A.   I think that Mr. Calhoun was probably the founder or the

19   idea person on that, and I supported his efforts to try and

20   make the system work more smoothly.

21   Q.   Is one of the reasons that you wanted to have this program

22   because you had a waiting list even then for people to get into

23   the hospital for inpatient treatment?

24   A.   I think that's always something that's, you know, on our

25   mind:  We are trying to find ways to move people into the

1  hospital more quickly, get them the appropriate services they

2  need, and make sure that the state dollars are being used as

3  efficiently as possible.

4  **Q.**   If you had room at Feliciana, would you admit the people

5  on the waiting list much more quickly?

6  **A.**   If we had room at Feliciana, would they come in more

7  quickly?  If we had more beds, sure, they would come in more

8  quickly.  I think there's no doubt about that.  But we would

9  still want to do that component where we try and find out where

10  is the best place for them to get restoration and how do we do

11  that in a way that makes sense and gets them back to the court

12  system rapidly.

13  **Q.**   Is the purpose for holding the clients in the parish jails

14  while they are awaiting for admission to this inpatient

15  treatment to keep them in a secure place until the forensic

16  hospital has room for them?

17  **A.**   I don't know that I can address the actual purpose.  The

18  court really orders where the person needs to be.  So the judge

19  usually says, you know, the person -- you know, they give an

20  order to go to the forensic facility, let's say a hypothetical

21  person, and then the judge can make a determination whether

22  they go outpatient or whether they are waiting to go into the

23  hospital or, you know, how they are handled security-wise.

24  **Q.**   Right.  Well, I --

25  **A.**   That's usually not our decision to make.

1   **Q.**   I just want to focus on those people where the court has

2   already decided that they should get inpatient treatment.   Is

3   the only purpose of keeping them in a parish jail to keep them

4   in a secure place until a room opens up at Feliciana?

5   **A.**   I don't think that I can address an answer to that

6   question.

7   **Q.**   At any time since the CFS program was established in 1993,

8   has there ever been a time when there wasn't a waiting list to

9   get into the forensic hospital?

10   **A.**   Not to my knowledge.   Since I have been there in 1993,

11   there has always been a waiting list.

12   **Q.**   You mentioned also, when you were talking about the DFC,

13   the DFCs are trained to deal with minor deficits that

14   incompetent detainees have; is that right?

15   **A.**   No.   I would say, you know, that in reference to minor

16   deficits, they are really there to try and use whatever they

17   have at their disposal both from, you know, what's available in

18   the community as well as what can be provided by CFS.

19       For instance, I may get a call where a particular

20   individual needs to be moved into an acute psychiatric

21   hospital, and let's say we don't have a bed at forensic really

22   available that day.   The DFC may tell me, "Well, I know we

23   don't have a bed available in forensic, but I think I can get a

24   bed at the local inpatient acute unit."   I can facilitate that

25   process.   If they are agreeable to do it and he doesn't look

1   like he is a security risk for us doing that, let's make that

2   happen.  So we work out trying to make that happen.

3           So we also utilize the state services at the mental

4   health clinics in certain instances to take them to get

5   medications or to move them into an acute facility or whatever

6   the individual needs.  So the DFC actually can coordinate a lot

7   of things in the particular area depending on what they have at

8   their disposal.

9   Q.   Are any of the DFCs psychiatrists, psychologists, medical

10  doctors?

11  A.   They are not psychologists or psychiatrists.  They are

12  primarily social workers and/or nurses that have extensive

13  training in both the mental health arena as well as interfacing

14  with the courts.

15  Q.   I'm sorry.  Were you through?

16  A.   Yes.

17  Q.   On direct examination you talked about the issue of

18  malingering and pointed out that some of the people on this

19  waiting list might be referred to the -- what should I call

20  it -- ELMHS, East Louisiana Mental Health Services, for

21  evaluation of malingering; right?

22  A.   Yes.

23  Q.   Leaving aside those people who might be on this list who

24  were evaluated for malingering, do the ELMHS psychiatrists or

25  psychologists see the rest of the people on this list to make a

1  determination as to the state of their mental health at any
2  time prior to the time they are actually admitted as inpatients
3  at the hospital?
4  **A.**   Yes.  I mean, if the DFC feels like they are in need of
5  services and they need to be evaluated by the psychologist or
6  the psychiatrist, they can.
7          Then we have certain reporting requirements to the
8  court.  It depends.  Sometimes the court will say, "I want a
9  30-day status or a status report every so often," and so they
10 may see the individuals on the list prior to them coming in for
11 that.  Also, we have them screen whether or not they can go
12 through the fast-track program as well.
13         So I don't know that they see every person that's on
14 the list, but they see a fair number that are on the list.
15 **Q.**   Do people stay on the list if one of your psychiatrists
16 has made an evaluation and said that they are no longer
17 incompetent?
18 **A.**   Yes.  They would stay on the list until the judge
19 determines that it is a judicial determination of competence.
20         As psychologists and psychiatrists, we make
21 recommendations to the court, and the court has to make the
22 tough decisions.  So that's what we would do.  We would trigger
23 a rehearing and then have the testimony -- the court can hear
24 the testimony and say, you know, "I don't care what your guy
25 says.  I still think they are incompetent."  They remain on the

1   list up until that time and then, whatever the Court's
2   determination, they would still remain on it.
3   Q.   If the court finds they are no longer incompetent, they
4   would be taken off the list?
5   A.   Right.  They would be removed, right.
6   Q.   What I'm trying to understand is what percentage of the
7   people on this list, as of May, of 147 people have been
8   evaluated by your psychiatrists or psychologists and whether
9   any of those have been found or what percentage of those have
10  been found by your psychiatrists or psychologists not to need
11  inpatient treatment.
12  A.   I wasn't aware you were going to ask that question or I
13  could have gone to the list and looked at that particular
14  issue, but I don't know that offhand.  I can't really look at
15  their names and make a determination of how many have been seen
16  or not.  I would have to go back and research that and try and
17  give you an idea.
18  Q.   Can you give us any kind of estimate as to how many have
19  been found by your doctors not to need inpatient treatment, if
20  any?
21  A.   I don't have that number with me, no.
22  Q.   What about on that list of 53, where their paperwork is
23  all done?  Have any of those been evaluated by your doctors and
24  found not to need inpatient treatment?
25  A.   Again, I would have to look at that issue.  I wasn't

1  prepared to come with that today.

2  **Q.**   You talked about the fast-track competency restoration

3  program.   If an average time is meaningful, what is the average

4  time that it takes for people that are put through that

5  fast-track program?

6  **A.**   You know, our numbers for competency restoration have

7  varied since the opening of the fast-track unit.  So initially,

8  when the fast-track unit was opened, we were restoring people

9  that were identified to go through that unit in probably 20

10  days to 30 days.  Whereas our average restoration to competency

11  for someone who is not found, *Lockhart v. Armistead*, are

12  unrestorably incompetent is about 90 days.  The Lockhart

13  patients often take longer because we continue to try to treat

14  them until the court, you know, makes that determination.  So

15  their lengths of stay prior to that determination are probably

16  a little bit higher, probably in the 130 to 150 range.

17  **Q.**   When you refer to the people going through either the

18  fast-track program or the average for other people who are

19  restored, you're talking about the average amounts of time when

20  they are inpatients; is that right?

21  **A.**   Yes.  That's the time from the time they are admitted

22  until the time we make a determination that they are ready to

23  return to court for a hearing.  Then they have to go back to

24  court, and then the judge has to make that determination

25  whether or not the judge feels they are competent.

1    **Q.**    During that time after you have made the recommendation

2    but while they are waiting to go to the judge, are they still

3    in the hospital?

4    **A.**    Yes.

5    **Q.**    So they are not sent back to the jail until the judge

6    gives an order?

7    **A.**    No, they are returned to the jail after we make that

8    determination, so --

9    **Q.**    Before the court orders it?

10   **A.**    Yes.  We return them to the jail shortly after we restore

11   them to competency, and then there's a rehearing and then

12   there's a determination of whether they are competent or not.

13   So within a reasonable period of time, we try and get them back

14   to the jail so they can go to their hearing.

15              You have to remember they are from all over the

16   state, and they are going to have to get reevaluated by the

17   sanity commission in the local area.  So we can either, you

18   know, ping-pong them back and forth for every evaluation, which

19   delays the process, or we can return them to the jail and they

20   have the evaluations done and they move forward for

21   determination of whether they have the capacity or not.

22   **Q.**    And sometimes when you -- "you" meaning your people --

23   **A.**    Right.

24   **Q.**    -- say that someone is now competent and then they are

25   returned to the jail, do the courts ever say, "No, we don't

1   agree with the sanity commission," and they end up having to

2   come back?

3   A.   If we feel that they are too fragile to go back and that

4   they need to be inpatient rather than move back to the jail, we

5   will send the court a letter to that effect.  When we send the

6   competency report back, we will say, "We would recommend that

7   he remain at the facility pending the court's decision on

8   whether he is competent or not."

9   Q.   I'm actually asking a different question.

10  A.   Okay.

11  Q.   You have somebody at Feliciana.  You say they are now

12  competent --

13  A.   Right.

14  Q.   -- and you send them back to the jail --

15  A.   Yes.

16  Q.   -- and then they have to go to the sanity commission and

17  another court hearing.

18  A.   Yes.

19  Q.   Are there any instances where someone who you have said is

20  competent, the sanity commission then looks at or the judge

21  looks at and says, "No, we don't agree"?

22  A.   Yes, yes, that happens.  Roughly, about 20 percent of the

23  time courts don't agree with our recommendations.

24  Q.   While patient detainees -- namely, people who have been

25  ordered to go to inpatient treatment at Feliciana -- are on

1   this waiting list, are they under the care of whatever the

2   medical staff is that is provided in the individual parish

3   jails?

4   **A.**   Yes.  They are also being visited or followed by the DFC.

5   **Q.**   Of the 64 parish jails, how many have a full-time

6   psychiatrist on staff?

7   **A.**   That varies from jail to jail.  The ones in the larger

8   metropolitan cities have higher percentages of time for

9   psychiatrists, but I have not done a study to determine, you

10  know, who has a psychiatrist at which particular jail.  I mean,

11  we usually learn that over time, you know, that this facility

12  does have a full-time psychiatrist, can treat them, is willing

13  to force medication, you know, those kinds of things, but again

14  it varies from time to time.  A lot of these things are

15  short-term contracts, so I wouldn't be able to tell you.

16  That's something that the sheriffs may be able to answer.

17  **Q.**   Are you aware of any parish jail other than Orleans that

18  has a full-time psychiatrist on staff?

19  **A.**   Jefferson Parish has a regular psychiatrist, but I don't

20  know if he's full-time.  St. Tammany has a consulting

21  psychiatrist.  I'm familiar with those just from more regularly

22  dealing with them.  East Baton Rouge has a consulting

23  psychiatrist that comes in.  I don't know that many, other than

24  Orleans, have a full-time psychiatrist.  I would be surprised

25  if any do.

1  Q.   I would like to understand a little bit about what kind of

2  doctor-patient ratios you have at the forensic unit in your

3  hospital.  About how many patients are there total in the

4  forensic units?

5  A.   235.

6  Q.   How many psychiatrists serve those people?

7  A.   Presently, we have 12 to 14 psychiatrists providing that

8  care, but they're not all full-time.  They are not all

9  providing care to the forensic population.  They are also

10  providing care to the patients in the East population and the

11  patients in Greenwell Springs.  So the doctor-patient ratio

12  that you were discussing before for our system is roughly about

13  30 or 35-to-1.

14  Q.   How about the number of psychologists that are either

15  doctor or medical psychologists who are providing service to

16  that population?  How many do you have?

17  A.   I don't know the exact number.  It would roughly be in the

18  teens.

19  Q.   All I'm looking for is approximations here.  How about how

20  many psychologists that have master's degrees who provide

21  services to those forensic patients?

22  A.   Again, I didn't come equipped with all the numbers of the

23  exact --

24  Q.   But that would be another few at least?

25  A.   Sure.

1   **Q.**   In preparing for your testimony today, did you by any

2   chance look back at the list that was provided to the Advocacy

3   Center from October of 2009 that showed how many people had

4   their paperwork complete at that point?

5   **A.**   I did not look back at that list.

6   **Q.**   Are you aware that as of the May list, which I have shown

7   to you, that 21 people who had their paperwork complete in

8   October were still on the waiting list?

9   **A.**   Again, I didn't go through that, those specific numbers.

10  **Q.**   You have talked about the 53 people whose paperwork is

11  complete and are awaiting admission to Feliciana.

12  **A.**   Yes.

13  **Q.**   How long would you expect that it will take before those

14  53 people actually get into inpatient beds at Feliciana?

15  **A.**   I have no way of determining that other than by looking at

16  our general number of admissions.  I don't know that I could

17  calculate that out.  I mean, it would take some time; probably,

18  I would imagine, six months to nine months for those folks to

19  move into the hospital.

20  **Q.**   In those six months, you would expect there to be another

21  100 people added to the list, and in nine months you would

22  expect another 150 to be added to the list?

23  **A.**   And there will be, roughly, a percentage of those that are

24  being removed from the list at the same time that those are

25  being admitted, yes.

1          **MS. LINDBLOM:**  Thank you, Dr. Thompson.

2          **THE COURT:**  Redirect.

3                      **REDIRECT EXAMINATION**

4     BY MS. BORDELON:

5     **Q.**   Dr. Thompson, the district forensic coordinators set up an

6     individual competency restoration plan?

7     **A.**   For the individuals that they have in their particular

8     list, yes.

9     **Q.**   Would you expect that of them?

10    **A.**   Yes.

11    **Q.**   What is the fast-track competency plan?

12    **A.**   The fast-track competency restoration unit was a unit that

13    was put together to try and run more like an acute psychiatric

14    unit so that we would have, you know, kind of shorter lengths

15    of stay for individuals that we thought could be restored

16    fairly quickly.

17          So if, you know, the DFC and the consulting

18    psychologist or psychiatrist looked at the patient and said,

19    "Well, this person has had in the past two or three

20    hospitalizations and they were fairly brief and the person

21    responded to medications," then they would be identified as

22    people that might benefit from the fast-track unit.  So we are

23    trying to look at ways that we can develop different programs

24    and more effectively utilize the resources.

25    **Q.**   On this fast track, prior to -- these pretrial detainees,

1    would the district forensic coordinator have worked with them

2    in the jail-based?

3    A.    Yes, they would.  But the person that identifies them for

4    fast track would be our consulting psychiatrist or

5    psychologist.

6    Q.    Once the department or forensic makes a decision that

7    someone is competent, why do we return them to the jail?

8    A.    Well, they come from the jail and we return them to the

9    jail awaiting -- they're awaiting evaluations by the sanity

10   commission members before the court hearing.  So at the time of

11   discharge, they may not have a court hearing scheduled the next

12   day.  We try and trigger a court hearing as close to the time

13   as we discharge as we can, and CFS helps to coordinate that.

14            But, you know, they have to go from our place to

15   another place for custody.  When we get them, we are in charge

16   of care and custody, and they have to go to another place for

17   custody awaiting.  That's primarily because the court wants it

18   that way.

19   Q.    But it also gives the sanity commission access?

20   A.    Yes.  Most sanity commission evaluations are conducted in

21   jails.  I would say 90 percent or more are conducted in jails.

22   Q.    There are 235 forensic licensed beds; correct?

23   A.    Yes.

24   Q.    But there are also forensic patients in the East licensed

25   beds?

1  A.   Yes.

2  Q.   I think we established earlier that number was

3  approximately 400?

4  A.   Yes.

5          **MS. BORDELON:**  Thank you.  No further questions.

6          **THE COURT:**  Thank you, sir.  You may step down.

7          **MS. LINDBLOM:**  May I retrieve the exhibit?

8          **THE COURT:**  Sure.

9          **MS. BORDELON:**  At this time, Your Honor, the defense

10  rests, I guess.

11          **THE COURT:**  The defense has rested.

12              Is there anything further for today?

13          **MS. LINDBLOM:**  We have nothing further unless

14  Your Honor wants to hear argument.

15          **THE COURT:**  I don't think so.  I don't think I need

16  argument.

17          **MS. BORDELON:**  Defense would just ask if we could

18  have a short window of post-trial memorandum to summarize the

19  testimony.

20          **THE COURT:**  Sure.  What's today?

21          **MS. BORDELON:**  Today is the 22nd.  Tuesday?

22          **THE COURT:**  Yes, that will be good.  A week from

23  Tuesday.  Can you do that?  Does that work?  June 29.  Can you

24  do that?  I don't want to jam you too much.  If you can do it,

25  that's fine.

1    **MS. LINDBLOM:**  I'm torn, Your Honor.  I'm losing one

2   of my people to vacation, which makes it difficult, but he is

3   going to be gone forever.  I do think this is a real matter of

4   urgency and so I'm willing to do it.

5           **THE COURT:**  Well, you-all are going to lose me, too,

6   if we don't get these briefs in.  I think we need to get the

7   briefs in, so do your best to get it in next Tuesday.  If you

8   need Wednesday, that's okay.

9           **MS. LINDBLOM:**  Let's make it Wednesday, if that's

10  okay, Your Honor.

11          **MS. BORDELON:**  5:00, Your Honor.

12          **THE COURT:**  5:00 on Wednesday.

13          **MS. BORDELON:**  That would be Wednesday, the 30th?

14          **MS. LINDBLOM:**  I'm sure we can agree on what date

15  Wednesday is.

16          **MS. BORDELON:**  A week from tomorrow.

17          **THE COURT:**  A week from tomorrow.  No more than 15

18  pages each.  I don't want to see a big ol' long stack of paper.

19  The pages are limited.

20          **MS. BORDELON:**  Do we have attachments?  The list that

21  you requested, can we attach that?

22          **THE COURT:**  You can attach that.  Your brief does not

23  include attachments, but I don't want attachments that are

24  affidavits or anything like that.  Thank you very much.  Nice

25  job everybody.

1    **THE DEPUTY CLERK:**  All rise.

2         (WHEREUPON the Court was in recess.)

3                        * * *

4                      <u>**CERTIFICATE**</u>

5         I, Toni Doyle Tusa, CCR, FCRR, Official Court

6   Reporter for the United States District Court, Eastern District

7   of Louisiana, do hereby certify that the foregoing is a true

8   and correct transcript, to the best of my ability and

9   understanding, from the record of the proceedings in the

10  above-entitled and numbered matter.

11

12

13                              <u>s/ Toni Doyle Tusa</u>
                                Toni Doyle Tusa, CCR, FCRR
14                              Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25